UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal No. 3:06CR160 (JBA) |
| *v.* | |
| AZIBO AQUART. | December 6, 2012 |

**RULING ON DEFENDANT'S MOTION FOR A NEW TRIAL**

Defendant Azibo Aquart moves [Doc. # 1102] for a new trial and penalty proceeding claiming "newly discovered evidence" that Lashika Johnson, one of the Government's witnesses, "knowingly presented false testimony" during the guilt phase of Defendant's trial. (Def.'s Mot. at 1.) The Government opposes. The Court, having compared the testimony of Lashika Johnson given in this and a subsequent trial, is unpersuaded that Defendant's motion has merit for the reasons that follow, and thus his motion for a new trial is denied.

**I.      Relevant Factual Background**

On May 23, 2011, a jury convicted Mr. Aquart of all counts charged.[1] On June 15, 2011, the jury reached a sentencing verdict of death on the capital counts of conviction (Counts Two through Seven). This motion focuses on testimony given during the guilt phase of Azibo Aquart's trial by Government witness Lashika Johnson, who was Defendant's former girlfriend and the sister of co–Defendant Efrain Johnson, at whose

---

[1] Mr. Aquart was found guilty of eight counts: three counts of murder in  aid of racketeering under 18 U.S.C. § 1959(a)(1) for the killings of Tina Johnson (Count Two), James Reid (Count Three), and Basil Williams (Count Four), and three counts of drug–related murder under 21 U.S.C. § 841 for the killings of Tina Johnson (Count Five), Basil James Reid (Count Six), and Basil Williams (Count Seven); one count of conspiracy in aid of racketeering under § 1959(a)(5) (Count One); and one count of conspiracy to distribute and to possess with intent to distribute fifty grams or more of cocaine base under 21 U.S.C. § 846 (Count Eight).

non–capital trial she also testified. At Defendant Aquart's trial, Ms. Johnson testified that after the murders, she helped Defendant get rid of the bloody clothes and a drill, and offered other incriminating details, including those provided to her by her brother Efrain Johnson. This motion compares how Ms. Johnson characterized at each trial the Government's treatment of her during one of her early proffer sessions.[2] At Mr. Aquart's trial, Ms. Johnson was asked on direct examination about her proffer agreement with the Government:

> Q.    Did you tell the law enforcement officers after you entered into that proffer agreement everything you testified to here today?
> A.    No.
> Q.    And why not?
> A.    Because I was afraid that, once again, it would hurt us, and my brother mostly.
> Q.    Has this been an easy or difficult process for you?
> A.    Difficult.
> Q.    And what happens if you lie today?
> A.    I will be charged with the crime that I'm—that I committed.
> Q.    And are you aware that you could be charged with perjury?
> A.    Yes.
> Q.    And as of today you've not been charged with any of those crimes, correct?
> A    Correct.

(Azibo Aquart Trial Tr. [Doc. # 1147] 2916:11–21.) Defendant Aquart's counsel cross–examined Ms. Johnson as follows:

> Q.    [The Government] said "we don't think you are telling us the truth."
> A.    Yeah.

---

[2] The 302 report of the October 14, 2008 proffer meeting  provided to the defense in discovery states that "the AUSAs and Investigators" told Ms. Johnson they did not believe she was being truthful, she "began to cry," and had a short, private discussion with her attorney who was present throughout. "After a short break, the interview resumed. Lashika asked if she could start over." (Def.'s Mot. at 3; Gov't Opp'n [Doc. # 1105] at 3.)

> Q.      Now, you understood that at that point that if the law enforcement people didn't believe you, you were in big trouble.
>
> A.      Yeah.
>
> Q.      And they were telling you they didn't believe you, right? . . . And you understood, however, that if they didn't believe you, your proffer was gone, right?
>
> A.      Right.
>
> Q.      And so you told them some more stuff about your brother, didn't you?
>
> A.      Possibly.
>
> [ . . . ]
>
> Q.      Because you were being threatened, right?
>
> A.      Not because I was being threatened. . . . *I didn't think it was a threat*. It was just more so like they were telling me what was right and what I had to do.

(Aquart Trial Tr. 2945–2946:12 (emphasis added).)

Defendant claims that this testimony, denying that she thought the Government had threatened her, was perjured and suborned by the Government, as demonstrated by different testimony that she offered at Efrain Johnson's trial the following year, in February 2012, where Ms. Johnson again testified as a Government witness. Ms. Johnson was again cross–examined about how the Government treated her during this October 14, 2008 proffer session with the Government:

> Q.      Do you remember a meeting around this time when you first started meeting with the government where you kind of broke down crying?
>
> A.      Yes.
>
> [ . . . . ]
>
> Q.      Am I correct at that meeting [an AUSA] yelled at you?
>
> A.      Yes.
>
> Q.      And she stood up and threatened to put you in shackles?
>
> A.      Yes.
>
> Q.      She said if you didn't start saying what they wanted to hear they were going to take you off to jail?
>
> A.      She didn't put it in exactly those words.
>
> Q.      She threatened you'd be going to jail?

A.      Yes.

Q.      That you were going to lose your children?

A.      Yes.

Q.      How did that make you feel?

A.      It didn't feel too good.

Q.      And they had to basically take a break at that point, right?

A.      Yes.

Q.      And give you some time to gather yourself, right?

A.      Yes.

[ . . . . ]

Q:      But I think fair to say that [the AUSA] made clear to you that either you get down with the program with what the government was looking to do or you were going to jail; is that the message?

A.      I don't know really how to word—that you are wording it completely correct.

Q.      I mean, did you feel that if you didn't start saying different things that you could be going to jail?

A.      Yeah.

Q.      You could lose your kids?

A.      Yeah.

(Efrain Johnson Trial Tr. [Doc. # 1084] 2081:6–2083:14.)

Significantly, prior to the Aquart trial, Defense counsel's motions [Doc. ## 661, 664] to exclude any evidence that the federal prosecutors had attended these proffer sessions were granted, and the witnesses were instructed to avoid any reference to prosecutors being present at the proffer sessions. At Efrain Johnson's trial, there was no such order precluding evidence about the presence of prosecutors at the witnesses' proffer interviews.

## II.   Discussion

Mr. Aquart's counsel argue that Ms. Johnson's testimony at her brother's trial shows her perjury at the Aquart trial and that the Government suborned this perjury, violating Defendant's Fifth, Sixth, and Eighth Amendment rights, 18 U.S.C. § 3595 and Fed. R. Crim. P. 33, because the Aquart jury should have been apprised that this

4

Government witness was falsely denying being threatened by the Government, and that the prosecutors knew of the falsity, having participated in the proffer session in question.

### A.       Legal Standard

Under Fed. R. Crim. P. 33, a new trial may be granted "if the interest of justice so requires," particularly where there is "a real concern that an innocent person may have been convicted." *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005). The Second Circuit requires:

> (1) the evidence be newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal.

*United States v. Persico*, 645 F. 3d 85, 109 (2d Cir. 2011).[3]

Defendant relies on the principle articulated in *United States v. Agurs*, 427 U.S. 97, 103 (1976), that "[a] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury," *id.* at 103,  even if the false testimony only goes to witness credibility. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). The threshold inquiry here, therefore, is whether "the newly discovered evidence" shows that Lashika Johnson's testimony was perjurious. *United States v. Stewart*, 433 F.3d 273, 297 (2d Cir. 2006). Perjury is "false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory." *United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001) (citing *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)).

---

[3] Defendant satisfies the first two requirements.

5

If perjurious testimony is found to have been given, then its materiality must be assessed. *United States v. White*, 972 F.2d 16, 20 (2d Cir. 1992) ("[W]hether the introduction of perjured testimony requires a new trial depends on the materiality of the perjury to the jury's verdict." (citing *Shotwell Mfg. Co. v. United States*, 371 U.S. 341, 355–57 (1963))). "Where the prosecution knew or should have known of the perjury, a new trial is warranted if 'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *United States v. Wong*, 78 F.3d 73, 81 (2d Cir. 1996) (quoting *Agurs*, 427 U.S. at 103). "However, where the government was unaware of the perjury at the time of trial, a new trial is warranted only if the testimony was material and the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *Id.* (internal citations omitted). The Second Circuit cautions generally that "even where newly discovered evidence indicates perjury, motions for new trials 'should be granted only with great caution and in the most extraordinary circumstances.'" *United States v. Stewart*, 433 F.3d 273, 296 (2d Cir. 2006) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir.1992)).

While the Government disputes whether the two versions given by Ms. Johnson were inconsistent, much less perjury, for the purposes of this motion, the Court will assume that Ms. Johnson's testimony could be considered inconsistent in the sense that she first testified that she did not regard the Government's warning about the consequences of lying as a threat, but during the Johnson trial she agreed with defense counsel's characterization that the AUSA threatened to put her in shackles, send her to jail, and take away her children.

However, even if Ms. Johnson's characterizations are inconsistent, to constitute perjury, she must have willfully intended to testify falsely at Mr. Aquart's trial. "Simple

inaccuracies or inconsistencies in testimony do not rise to the level of perjury." *United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001) (internal citations omitted) (finding that the testimony at issue was "so ambiguous as to preclude a finding of perjury," because it seemed possible that Sessa the witness "could simply have misspoken" and concluding that "in the totality of the circumstances, there is an insufficient evidentiary basis for a finding of perjury. Thus, there is no reason for us to proceed further to determine whether any perjury reasonably affected the jury's judgment."); *see also Sanchez*, 969 F.2d at 1414 (finding that the district court judge erred in concluding that the detectives' testimony was perjured: "[w]hile it is true that the testimony of each officer was somewhat different as regards the point in time at which the door to the Sanchez apartment was first opened, whether the battering ram was used on the apartment door and the manner in which the ram was used (if it was applied at all), the testimony was consistent in a number of other respects.").

Ms. Johnson's testimony in the two trials was consistent as to its inculpatory substance. She testified that the Government confronted her with the potential for prosecution for lying at the October 14, 2008 proffer session, causing her to cry, and resulting in her providing what she claimed at trial was truthful detail to preserve the benefit of her proffer agreement. Her answers were given to different questions posed at each trial, and she qualified her agreement with defense counsel's characterization at the Johnson trial: "[the AUSA] didn't put it in exactly those words," and "I don't really know how to word—that you are wording it completely correct." (Johnson Tr. 2082:4, 2083:7–8.)

Moreover, her failure to mention specific prosecutorial conduct was in accord with the Court's order that the presence of prosecutors not be mentioned, and no

question put to her sought to elicit her testimony about specific prosecutorial conduct in the interview. The Court is unpersuaded that willful intent to give false testimony at Mr. Aquart's trial can be inferred from these testimonial discrepancies.

Defendant argues that if the jury knew that Ms. Johnson had been threatened or had lied about being threatened during her proffer, they could have disbelieved her substantive testimony about Mr. Aquart's actions and directions to her and about what her brother told her had happened at the scene of the murders. However, Ms. Johnson's credibility and motivation to give false testimony favoring the Government was clearly a focus of cross examination. The jury heard Ms. Johnson admit that she had lied during her first meetings with the government in order to protect herself and her brother (*see, e.g.*, Aquart Tr. at 2933:24–2934:1), and that she only changed her story after being confronted about her untruthful statements and warned of prosecution if she adhered to her statements. The jury also learned about her lifestyle, including that at the time of the murders she was selling marijuana and "engaged in other illegal activities" (*id.* at 2918:6–12), that she had children (*id.* at 2879:24), and that she had two prior larceny convictions (*id.* at 2927:11–13), one while she was a juvenile (*id.* at 2928:24).

"Trial courts must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses." *Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992) (internal citations omitted). The test is whether "it would be a manifest injustice to let the verdict stand," *id.*, and the Second Circuit has advised that "[m]anifest injustice cannot be found simply on the basis of the trial judge's determination that certain testimony is untruthful," unless the judge is prepared to answer the following question in the negative:

> "Am I satisfied that competent, satisfactory and sufficient evidence in this record supports the jury's finding that this defendant is guilty beyond a reasonable doubt?" In making this assessment, the judge must examine the

8

totality of the case. All the facts and circumstances must be taken into account. An objective evaluation is required. There must be a real concern that an innocent person may have been convicted.

*Id.*

Here, the jury had ample opportunity to assess Ms. Johnson's credibility as a witness, knowing of law–enforcement pressure on her to change her initial versions and denials, which the jury could consider along with the testimony of sixty–two other witnesses in Defendant's trial, including the testimony of Defendant's drug trafficking co–conspirators, phone records, DNA evidence, prison tapes, and the testimony of John Taylor, one of Defendant's co–conspirators who actually participated in the murders of the three victims. While her testimony was without doubt very important, corroborating aspects of Taylor's, the jury's decision to convict Mr. Aquart could hardly have been materially affected by how accurately she characterized the Government's confrontation with her during her October 14, 2008 interview, particularly where she was precluded from discussing the presence of prosecutors, and thus a new trial is not warranted.

### III.    Conclusion

The Court concludes that Ms. Johnson's denial that she gave the Government more information because she was being threatened does not constitute perjury, and considering all the facts and circumstances of this trial, the Court is fully satisfied that there was no reasonable likelihood that the verdict of the jury would have been different if she had instead given testimony similar to that which she gave at her brother's trial.

Accordingly, the Court answers the *Sanchez* query in the affirmative and has no concern "that an innocent person may have been convicted," and Defendant's motion for a new trial [Doc. # 1102] is DENIED.


IT IS SO ORDERED.

        /s/
Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 6th day of December, 2012.