UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 3:06-cr-00160-JBA |
| v. | |
| AZIBO AQUART | JUNE 1, 2021 |

## Motion to Dismiss VICAR Counts
## and Accompanying Memorandum of Law

Defendant Azibo Aquart, through his counsel, and pursuant to the authorities cited in the accompanying Memorandum of Law, hereby moves this Court to dismiss the Violent Crimes in Aid of Racketeering (VICAR) counts (Counts One through Four of the Fourth Superseding Indictment) on the following grounds:

- The Connecticut murder statutes relied on by the government sweep so broadly that they cannot serve as predicates for generic murder under the VICAR statute.

- The instructions and verdict form did not ensure jury unanimity as to whether the underlying predicate murder under Connecticut law was intentional murder or felony murder.

- The jury was not instructed as to essential elements of the underlying state-law predicate offenses.

- The evidence to support the VICAR convictions is insufficient.

- Entering judgment against Mr. Aquart for six murders when three people were killed would violate the Double Jeopardy Clause of the Fifth Amendment.

In support of this Motion, Mr. Aquart submits the following Memorandum of Law:

I.    **In the pending resentencing proceeding, this Court's authority is not limited by the scope of the Second Circuit's mandate in Mr. Aquart's appeal.**

   A.  **The original scope of the mandate has been nullified by the government's decision to stop seeking a death sentence in this case.**

As this Court is aware, the U.S. Court of Appeals for the Second Circuit vacated Mr. Aquart's death sentences and remanded this case "for a new penalty proceeding consistent with this opinion." *United States v. Aquart*, 912 F.3d 1, 70 (2d Cir. 2018). The federal government has exercised its discretion to no longer seek the death penalty in this case. (Doc. 1303.)  The scope of the Second Circuit's remand order has thus been rendered moot, and that order is now a nullity.  The parties are proceeding towards a noncapital resentencing hearing scheduled for August 9, 2021.

Following that noncapital resentencing hearing, this Court will issue a new amended judgment.  When it does so, it must assess whether Mr. Aquart "is otherwise entitled to be discharged." Fed. R. Crim. P. 32(k)(1) ("Judgment.  In General.").  *Cf. United States v. Wilson*, 420 U.S. 332, 352-53 (1975) (contemplating that a judge may rule in favor of a defendant after a verdict of guilty has been entered by the trier of fact, and holding that when that occurs, the Government may appeal from that ruling without violating the Double Jeopardy Clause).  This Court has a duty not to enter judgment on convictions and sentences that are legally invalid and should entertain and adjudicate Mr. Aquart's legal claims before it enters final judgment in this matter.

**B. In the alternative, the mandate rule does not prevent the Court from addressing the claims raised in this Motion due to: (i) its operation as a guide to the Court's discretion rather than a limit on its power; (ii) the Court's overarching obligation to do justice; and (iii) well-recognized exceptions that apply here.**

Even if this Court were to disagree that the mandate rule has been rendered inapposite by the government's decision not to seek the death penalty on remand, there are several exceptions to that rule that authorize this Court to address Mr. Aquart's legal claims.

The mandate "rule" derives from the law-of-the-case doctrine. *United States v. Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001). As such, it is not a jurisdictional limit on this Court's power but instead serves to guide this Court's exercise of its discretion. *United States v. Gama-Bastidas*, 222 F.3d 779, 784-85 (10th Cir. 2000), cited with approval by *Ben Zvi*, 242 F.3d at 95; *see also Messenger v. Anderson*, 225 U.S. 436, 444 (1912) ("[T]he phrase, 'law of the case,' as applied to the effect of previous orders on the later action of the court rendering them in the same case, merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power."); *United States v. Moore*, 83 F.3d 1231, 1234-35 (10th Cir. 1996) ("[T]he mandate rule . . . is a discretion-guiding rule subject to exception in the interests of justice. . . . Most importantly, . . . [it] is a rule of policy and practice, not a jurisdictional limitation, which thus allows some flexibility in exceptional circumstances."); *United States v. Carson*, 793 F.2d 1141, 1147 (10th Cir. 1986) ("We recognize that law of the case is not a jurisdictional rule; rather, it is a rule to be applied at the sound discretion of the court to effectuate the proper administration of justice."); *Cochran v. M & M Transp. Co.*, 110

2

F.2d 519, 521 (1st Cir. 1940) (emphasizing that the law-of-the-case doctrine, "like its twin brother stare decisis, is not an inexorable command, and must not be utilized to accomplish an obvious injustice.").

The Second Circuit has long recognized that "upon remand the trial court may consider matters not expressly or implicitly part of the decision of the court of appeals." *United States v. Cirami*, 563 F.2d 26, 33 (2d Cir. 1977) (expressing concern not only for the judicial system's interest of finality of judgments but also "the interest of deciding cases on their merits."); *see also United States v. Lasaga*, 136 Fed. App'x 428, 431 (2d Cir. 2005) ("[T]he mandate rule affords the district court discretion to reconsider, on remand, issues that were not 'expressly or implicitly' decided by this court[.]") (not selected for publication).

*Lasaga* provides a concrete example of an issue that was deemed not to have been implicitly decided in a previous appeal. In that case, which involved convictions relating to child pornography, the Second Circuit in the defendant's first appeal affirmed the district court's *two*-level upward departure on the basis that the sentencing guidelines did not adequately account for the large quantity of images at issue. 136 Fed. App'x at 432. On remand for resentencing due to a different type of departure that the Second Circuit held erroneous, the district court then considered and granted the government's request for a *three*-level upward departure due to the quantity of images. *Id.* The Second Circuit affirmed, reasoning that its previous holding affirming the two-level quantity departure "neither explicitly nor implicitly decided the question of whether a three-level enhancement would also have been appropriate." *Id.* Thus, the determination of whether

an issue has been implicitly decided by the appellate court must not cast a wide net; instead, the question of what was—and was not—previously decided must be determined with precision.

Moreover, neither the law-of-the-case doctrine nor the mandate rule preclude federal courts from addressing issues that are non-waivable. *Gama-Bastidas*, 222 F.3d at 785. In *Gama-Bastidas*, the Tenth Circuit addressed a second appeal from resentencing that followed a remand that had resulted from the defendant's first appeal. For the first time in the district court on remand, the defendant challenged whether the indictment was facially sufficient to charge a violation of 21 U.S.C. § 841(a) and whether his conviction for possession with intent to distribute under § 841(a) was unconstitutional because it impermissibly exceeded the grand jury's charge in violation of his Fifth Amendment right to be tried for a felony only on a grand jury indictment. *Id.* at 782-84. Even though these challenges to the indictment had not been raised in the initial appeal, the Tenth Circuit adjudicated them, reasoning that Fed. R. Crim. P. 12(b)(2) "clearly allows him to raise his current challenge." The version of Fed. R. Crim. P. 12(b)(2) addressed by *Gama-Bastidas* provided that "a defendant's objection that the indictment fails to charge an offense 'shall be noticed by the court at any time during the pendency of the proceedings.'" 222 F.3d at 785. That is the version that was in place at the time of Mr. Aquart's trial. Three years later, in 2014, during the pendency of Mr. Aquart's direct appeal, Fed. R. Crim. P. 12(b)(3) was amended to provide that a challenge to an indictment for failure to state an offense must be brought before trial. Given the timing

of that amendment, the new provision cannot serve as the basis of any waiver by Mr.

Aquart of such challenges to the indictment.

"A district court may depart from an appellate court's mandate under exceptional

circumstances, including (1) a dramatic change in controlling legal authority; (2)

significant new evidence that was not earlier obtainable through due diligence but has

since come to light; or (3) if blatant error from the prior sentencing decision would result

in serious injustice if uncorrected." *United States v. Webb*, 98 F.3d 585, 587 (10th Cir.

1996 (internal quotation marks and alterations omitted)), cited in *Ben Zvi*, 242 F.3d at 95;

*see also Moore*, 83 F.3d at 1234.

These justifications are present here, as discussed further *infra*.  The intervening

decision of *United States v. Davis*, 139 S. Ct. 2319 (2019), constitutes a dramatic change

of controlling authority.  And blatant error in the previous entry of conviction on counts

that are legally and constitutionally invalid would result in serious injustice if

uncorrected.

Taken together, these principles support the conclusion that this Court should

address the legal claims raised herein before it enters a new judgment following the

upcoming resentencing hearing in this case.[1]

---

[1] Nothing in this filing is meant to be construed as any claim brought under 28 U.S.C. § 2255.
Mr. Aquart's opportunity to bring claims under that statute is not yet ripe, given that no final
valid judgment has been entered or appealed.  Current counsel for Mr. Aquart do not represent
him in section 2255 proceedings.  And any such motion under that statute would be brought only
following thorough investigation of all potential postconviction claims by section 2255 counsel.

**II.  Because the convictions on the VICAR counts are legally invalid, this Court should not enter judgment on those counts during this resentencing proceeding.**

**A.  Under *Davis*, application of the categorical approach demonstrates that the elements of the Connecticut statutes relied on by the government sweep so broadly that they cannot serve as predicates for generic murder under the VICAR statute.**

**1.  The federalism backdrop to the VICAR statute.**

The federal government may exercise only such power as the Constitution delegates to it.  The Tenth Amendment, ratified in 1791, provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."  U.S. Const. amend. X.  As James Madison wrote in Federalist Paper No. 45: "The powers delegated by the proposed Constitution to the federal government[] are few and defined.  Those which are to remain in the State governments are numerous and indefinite."

Not every murder is a federal crime.  Indeed, most are not.  The general police power is not one of the enumerated powers the Constitution delegates to the federal government; this is a quintessential power reserved to the States.  *United States v. Morrison*, 529 U.S. 598, 606, 618 (2000) (noting that the Founders denied the federal government the police power and instead reposed that power in the States); *United States v. Lopez*, 514 U.S. 549, 566 (1995) ("The Constitution . . . . withhold[s] from Congress a plenary police power that would authorize enactment of every type of legislation."). The "suppression of violent crime and vindication of its victims" is an exercise of police power reserved to the States.  *Morrison*, 529 U.S. at 618; *see also Brecht v. Abrahamson*,

6

507 U.S. 619, 135 (1993) ("States possess primary authority for defining and enforcing the criminal law." (citation omitted)); *Medina v. California*, 505 U.S. 437, 445 (1992) ("[P]reventing and dealing with crime is much more the business of the States than it is of the Federal Government."); *see also* Federalist Paper No. 17 (Alexander Hamilton) (noting that the "administration of criminal and civil justice" os within the province of the States). "For nearly two centuries it has been 'clear' that, lacking a police power, 'Congress cannot punish felonies generally.'" *Bond v. United States*, 572 U.S. 844, 854 (2014) (citation omitted). Thus, most murders in this country are prosecuted by state authorities under state law in accordance with the general police power reserved to the states under the Tenth Amendment.

Congress adopted the federal VICAR statute in 1984 as an exercise of its powers under the Commerce Clause. U.S. Const. art. I, § 8, cl. 3.

### 2. The VICAR statute and convictions in this case.

The VICAR statute proscribes the commission of certain violent crimes with a required nexus to a racketeering enterprise:

> Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished—

7

> (1) for murder, by death or life imprisonment, or a fine
> under this title, or both; and for kidnapping, by imprisonment
> for any term of years or for life, or a fine under this title, or
> both[.]

18 U.S.C. § 1959(a).

Mr. Aquart was not initially charged with any VICAR offenses.  The original

Indictment filed in December 2005 charged him with only one count—drug conspiracy.

U.S. District Court for the District of Connecticut Criminal Action No. 3:05-cr-00309-

JBA, Doc. 12.  The First Superseding Indictment, filed nearly a year later in November

2006 (under the instant case number), charged him with drug conspiracy and being a

felon in possession of a firearm.  (Doc. 47.)  The Second Superseding Indictment, filed in

June 2007, alleged for the first time the commission of conspiracy to commit VICAR

murders and three VICAR murders.  (Doc. 105 at pp. 1-7.)  Each of the three VICAR

murder counts referenced two underlying Connecticut state statutes: Connecticut General

Statutes section 53a-54a (proscribing murder) and Connecticut General Statutes section

53a-8a, which sets forth that state's law concerning criminal liability for the acts of

another.  None of these three counts cited Connecticut General Statutes section 53a-54c,

which proscribes felony murder.

The Third Superseding Indictment, filed in April 2009, again charged Mr. Aquart

with the VICAR conspiracy and the three VICAR murders (Doc. 255 at pp. 5-9.)  This

time, each of the VICAR murder counts cited only one Connecticut statute: section

53a-54a, the statute concerning intentional murder.  (Doc. 255 at pp. 5-9.)

The Fourth Superseding Indictment, filed in March 2010, charged Mr. Aquart with

the VICAR murders of Tina Johnson (Count Two), James Reid (Count Three), and Basil

Williams (Count Four).  (Doc. 361 (Fourth Superseding Indictment) at pp. 6-9.)  Each of

these counts charged the offense using identical language excepting the decedents'

names, describing "the Aquart Enterprise" and then alleging the following:

> On or about August 24, 2005, in the District of
> Connecticut, **AZIBO AQUART**, also known as "Azibo
> Smith," "D," "Dreddy," and "Jumbo"; **AZIKIWE
> AQUART**, also known as "Z" and "Ziggy," and **EFRAIN
> JOHNSON**, also known as "Pootney;" who are the
> defendants herein, together with John Taylor, who is not
> named as a defendant herein, as consideration for the receipt
> of, and as consideration for a promise and an agreement to
> pay, anything of pecuniary value from the enterprise and for
> the purpose of gaining entrance to and maintaining and
> increasing their position in the enterprise, an enterprise
> engaged in racketeering activity, did murder [decedent's
> name] unlawfully, willfully, knowingly, and in the
> perpetration of, and attempt to perpetrate, a robbery, in
> violation of Connecticut General Statutes, Sections 53a-54a,
> 53a-54c, and 53a-8a.
>
> All in violation of Title 18, United States Code,
> Section 1959(a)(1), and Title 18, United States Code, Section
> 2.

(Doc. 361 at pp. 6-7, ¶ 11 (Count Two re Tina Johnson), at pp. 7-8, ¶ 14 (Count Three re

James Reid), and at pp. 8-9, ¶ 17 (Count Four re Basil Williams).  Thus, the Fourth

Superseding Indictment resurrected the previously dropped reference to accomplice

liability under state law (section 53a-8a) *and, for the first time,* added references to and

allegations about felony murder under Connecticut law, section 53a-54c.

The Fourth Superseding Indictment also charged Mr. Aquart with Conspiracy to Murder in Aid of Racketeering under 18 U.S.C. § 1959(a)(5).  (Doc. 361 at pp. 5-6 (Count One) (re "Tina Johnson and her associates").)  Count One relies on Connecticut General Statutes sections 53a-54a (intentional murder), 53a-54c (felony murder), and 53a-48(a) (conspiracy; renunciation).  (Doc. 361 at p. 6, ¶ 8.)

Mr. Aquart was convicted of all four of these VICAR counts (Doc. 846 at p. 1) and others; he was sentenced to death on Counts Two and Four and other counts relating to the deaths of Tina Johnson and Basil Williams (Doc. 936 at pp. 12-13).

### 3.   VICAR murder is generic murder.

The VICAR statute defines "racketeering activity" and "enterprise," but it does not define "murders."  Instead, as reported in the Congressional Record:

> While section [1959] proscribes murder, kidnaping, maiming, assault with a dangerous weapon, and assault resulting in serious bodily injury in violation of federal or State law, *it is intended to apply to these crimes in a generic sense*, whether or not a particular State has chosen those precise terms for such crimes.

129 CONG. REC. S1, 22,906 (daily ed. Aug. 4, 1983) (emphasis added).

Thus, the government has long recognized that the predicate crimes listed in statutes like the VICAR statute are meant in their generic sense.  *Scheidler v. National Organization for Women, Inc.*, 537 U.S. 393, 409 (2003) (noting government concession that for an offense to be an "act or threat involving ... extortion, ... which is chargeable under State law" as required by the Racketeer Influenced and Corrupt Organization Act (RICO), 18 U.S.C. § 1961(1), "the conduct must be capable of being generically

classified as extortionate"); *United States v. Nardello*, 393 U.S. 286, 290, 296 (1969) (noting and agreeing with the Government's position that the Travel Act's prohibition against "extortion ... in violation of the laws of the State in which committed or of the United States," 18 U.S.C. § 1952(b)(2), is a prohibition on acts that "would be generically classified as extortionate"); *see also* excerpt from <u>Violent Crimes in Aid of Racketeering; 18 U.S.C. § 1959: A Manual for Federal Prosecutors</u>, Organized Crime and Racketeering Section of the U.S. Department of Justice (December 2006), p. 22 ("[T]he determination of whether a statutory offense falls within the generic definition of a particular crime involves a pure issue of statutory construction that can be resolved prior to indictment and turns on whether the statutory elements of the offense, and not the factual circumstances of the specific case, substantially corresponds to the generic definition of the crime.").

This Court ascertains the generic meanings of predicate offenses "'[i]n many instances' by reference to 'the sense in which the term is now used in the criminal codes of most States,' but also by 'consult[ing] other sources, including federal criminal statutes, the Model Penal Code, scholarly treatises, and legal dictionaries.'" *United States v. Scott*, 990 F.3d 94, 123 (2d Cir. 2021) (en banc) (quoting *United States v. Castillo*, 896 F.3d 141, 150 (2d Cir. 2018)).

**4. The categorical approach of *Davis* applies to determining whether a charged state crime sweeps more broadly than generic murder and therefore cannot serve as a valid VICAR predicate offense.**

For more than three decades, the Supreme Court has issued opinions regarding how courts should determine whether a federal criminal defendant's *prior* conviction

qualifies as a crime of violence for purposes of sentencing enhancements such as the

Armed Career Criminal Act (ACCA).  *See, e.g., Descamps v. United States*, 570 U.S. 254

(2013) (courts should use categorial approach to determine whether a prior conviction is

a "violent felony" within the meaning of the ACCA); *Mathis v. United States*, 136 S. Ct.

2243, 2245 (2016) ("To determine whether a prior conviction is for one of those listed

crimes, courts apply the "categorical approach"—they ask whether the elements of the

offense forming the basis for the conviction sufficiently match the elements of the

generic (or commonly understood) version of the enumerated crime."); *Taylor v. United

States*, 495 U.S. 575, 600 (1990) ("This question requires us to address a more general

issue—whether the sentencing court in applying § 924(e) must look only to the statutory

definitions of the prior offenses, or whether the court may consider other evidence

concerning the defendant's prior crimes. The Courts of Appeals uniformly have held that

§ 924(e) mandates a formal categorical approach, looking only to the statutory definitions

of the prior offenses, and not to the particular facts underlying those convictions.  We

find the reasoning of these cases persuasive.") (citations omitted).  Thus, for example, the

*Mathis* Court held that "[b]ecause the elements of Iowa's burglary law are broader than

those of generic burglary, Mathis's convictions under that law cannot give rise to an

ACCA sentence."  136 S. Ct. at 2257.

That was the legal landscape at the time Mr. Aquart was sentenced, as well as

when the Second Circuit decided his first appeal in December 2018.  But the next year,

the Supreme Court issued its decision in *Davis*, 139 S. Ct. 2319, which addressed 18

U.S.C. § 924(c), a statute that "threatens long prison sentences for anyone who uses a

firearm in connection with certain other federal crimes." *Id.* at 2323.  The *Davis* Court concluded that whether an accused has violated § 924(c) is determined by applying the categorical approach, and under that approach, the Court held that the residual clause of § 924(c) was unconstitutionally vague in violation of due process and the separation of powers. *Id.* at 2323-36.

Davis recognized that the Court's previous doctrine in this area involved sentencing enhancement statutes that "required a judge to determine whether a defendant's prior conviction was for a 'crime of violence' or 'violent felony.'" *Id.* at 2327.  "By contrast," the Court noted, "a § 924(c) prosecution focuses on the conduct with which the defendant is *currently charged*." *Id.* (emphasis in original).  The Court reasoned that "the statute's use of the present and not the past tense lends further support to the categorical reading." *Id.* at 2335.

The principles of *Davis* apply in the context of determining whether a charged murder under state law meets the requirements of the VICAR statute at issue in Mr. Aquart's case.  Here too, the predicate offense conduct is phrased in the present tense ("Whoever . . . murders . . . any individual in violation of the laws of any State or the United States . . ."), which supports the use of the categorical approach. *Davis*, 139 S. Ct. at 2335.  And for VICAR murder, the statute provides for a penalty of death or life imprisonment (or a fine or both).  18 U.S.C. § 1959(a)(1).  The Second Circuit recently summarized the concerns with how to define predicate offenses where such lengthy minimum penalties apply:

Tying significant, mandatory penalties to particular types of crimes is problematic in our federal system, because the definitions of most crimes vary, to a greater or lesser degree, from state to state, and between the states and the United States itself.  If Congress chooses to attach such consequences only to particular federal offenses, it can do so simply by listing the covered offenses by their designation in the United States Code.  But to incorporate crimes without the use of such a list, including state crimes, Congress must resort either to listing "generic" labels of crimes (such as "murder" or "burglary") that might be defined differently in different jurisdictions, or provide a general description of the types of elements that would entail the consequences Congress wishes to include (as in the "force" and "risk of force" clauses in § 924(c)).

*United States v. Martinez*, 991 F.3d 347, 353 (2d Cir. 2021); *but see United States v. Keene*, 955 F.3d 391 (4th Cir. 2020) (holding that categorical approach does not apply to the determination of whether a state offense counts as a VICAR predicate).

### 5. Because the charged predicate state crimes sweep more broadly than generic murder, such offenses cannot serve as valid VICAR predicate offenses.

In Mr. Aquart's case, there are two distinct ways in which the predicate state crimes charged sweep more broadly than generic murder.  Either one is independently sufficient to prevent the Court from entering judgment on the VICAR convictions (Count One (VICAR conspiracy) and Counts Two through Four (VICAR murders).

14

**a) Unlike generic murder, Connecticut's intentional murder statute, Conn. Gen. Stat. § 53a-54a(a), subjects people to criminal liability for murder for causing the suicide of another, including by means of deceit.**

The Connecticut statute charged in the VICAR counts in the Fourth Superseding Indictment that governs intentional murder includes a provision that proscribes as murder the act of using deception to cause another person to commit suicide:

> A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person *or causes a suicide by force, duress or deception* . . .

Conn. Gen. Stat. § 53a-54a(a) (2010) (emphasis added).  When it is not a capital felony, murder under § 53a-54a is a Class A felony under Connecticut law and as such is punishable by imprisonment from 25 years to life.  Conn. Gen. Stat. § 53a-54a(c) (2010); Conn. Gen. Stat. § 53a-35a (2010).

Connecticut's inclusion of causing suicide by deception as a form of *murder* is an expansive view of murder that sweeps more broadly than the scope of generic murder. The main way to discern the scope of generic murder is with reference to "the sense in which the term is now used in the criminal codes of most States."  *Scott*, 990 F.3d at 123, quoting *Castillo*, 896 F.3d at 150.  Here, such a review shows that the vast majority of states (and related U.S. jurisdictions) do not consider causing suicide by deception to be a form of murder.

At least 9 states expressly proscribe causing, aiding, or assisting a suicide *as manslaughter*, not murder: Arizona, Arkansas, Colorado, Delaware, Florida, Hawaii, Missouri, Oregon, and Utah.  *See* Ariz. Stat. § 13-1103(A)(3) (intentionally providing a

15

suicidal person the physical means to commit suicide that they use to do so is manslaughter); Ark. Code § 5-10-104(a)(2) (manslaughter includes purposely causing or aiding another person to commit suicide); Colo. Rev. Stat. § 18-3-104(1)(b) (manslaughter includes intentionally causing or aiding another person to commit suicide); Del. Code, tit. 11, § 632(5) (manslaughter includes intentionally causing another person to commit suicide)[2]; Fla. Stat. § 782.08 ("[a]ssisting self-murder" is manslaughter); Haw. Stat. § 707-702(1)(b) (manslaughter includes intentionally causing another person to commit suicide); Mo. Rev. Stat. § 565.023(1.)(1) (knowingly assisting another "in the commission of self-murder" is voluntary manslaughter); Or. Rev. Stat. § 163.125(1)(b) (same); Utah Code § 76-5-205(2)(b) (intentionally aiding suicidal person to commit suicide is manslaughter).

At least another 28 jurisdictions expressly proscribe causing, aiding, assisting, or encouraging a suicide as a standalone crime that is neither murder nor manslaughter; these typically have penalty provisions that are more lenient than the penalties for murder or manslaughter, or at most, comparable to the penalties for manslaughter: Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Jersey, New Mexico, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Washington, Wisconsin, Puerto Rico, U.S.V.I.  *See* Ga. Code. § 16-5-5(b) ("Assisted suicide) (penalty of not more than 10 years); Idaho Code § 18-4017(1) & (2)

---

[2] When force or duress is used, however, Delaware categorizes intentionally causing another to commit suicide as murder.  Del. Code, tit. 11, § 636(a)(3).

("Causing a suicide--Assisting in a suicide . . .") (penalty of not more than 5 years); Ill.

Comp. Stat. ch. 720, § 5/12-34.5 ("Inducement to commit suicide"), Ill. Comp. Stat. ch.

730, § 5/5-4.5-35 (at most a Class 2 felony with penalty of not more than 7 years); Ind.

Code § 35-42-1-2 "Causing suicide") (a Level 3 felony), Ind. Code § 35-50-1-2(d)(4)

(not more than 20 years); Iowa Code § 707A.2 ("Assisting suicide") (a Class C felony),

Iowa Code § 902.9 (not more than 10 years); Kan. Stat. § 21-5407(a)(1) & (b)(1)

("Assisting suicide") (at most, when committed by force or duress, a "severity level 3,

person felony"), Kan. Stat. § 21-4704(a) (top of guideline range is 8 1/3 years); La. Rev.

Stat., tit. 14, § 32.12 ("Criminal assistance to suicide") (not more than 10 years); Me.

Rev. Stat., tit. 17-A, § 204 (Aiding or soliciting suicide") (a Class D crime), tit. 17-A,

§ 1604(1)(D) (less than 1 year); Md. Code, Criminal Law, § 3-102 ("Assisting another to

commit or attempt suicide"), § 3-104 (not more than 1 year); Mich. Comp. Laws

§ 750.329a ("Intent to assist an individual in killing oneself . . .") (not more than 5 years);

Minn. Stat. § 609.215(1) ("Suicide") (not more than 15 years); Miss. Code § 97-3-49

("Assisting suicide") (not more than 10 years); Mont. Code § 45-5-105 ("Aiding or

soliciting suicide") (not more than 10 years); Neb. Rev. Stat. § 28-307 ("Assisting suicide

. . .") (a Class IV felony), Neb. Rev. Stat. § 28-105(1) (not more than 2 years); N.H. Rev.

Stat. § 630:4 ("Causing or Aiding Suicide") (a Class B felony), N.H. Rev. Stat.

§ 625:9(III)(a)(2) (not more than 7 years); N.J. Stat. § 2C:11-6 ("Aiding suicide") (a

crime of the second degree), N.J. Stat. § 2C:43-6(a)(2) (not more than 10 years); N.M.

Stat. § 30-2-4 ("Assisting suicide") (a fourth degree felony), N.M. Stat.

§ 31-18-15(A)(13) (1 ½ years); 21 Okla. Stat. §§ 813, 817 ("Aiding suicide") (at least 7

years); Pa. Consol. Stat. tit. 18, § 2505 ("Causing or aiding suicide") (a felony in the second degree), Pa. Consol. Stat. tit. 18, § 1103(2) (not more than 10 years); R.I. Gen. Laws § 11-60-3 ("Prevention of assisted suicide") (not more than 10 years); S.C. Code § 16-3-1090(B) & (E) ("Assisted suicide . . .") (not more than 15 years); S.D. Codified Laws § 22-16-37 ("Aiding and abetting suicide—Felony") (a Class 6 felony), S.D. Codified Laws § 22-6-1(9) (not more than 2 years); Tenn. Code § 39-13-216 ("Assisted suicide . . .") (a Class D felony), Tenn. Code § 40-35-112(c)(4) (not more than 12 years); Tex. Penal Code § 22.08 ("Aiding Suicide") (a "state jail felony"), Tex. Penal Code § 12.35 (not more than 2 years); Wash. Rev. Code § 9A.36.060 ("Promoting a suicide attempt") (a Class C felony), Wash. Rev. Code § 9A.20.021(1)(c) (not more than 5 years); Wisc. Stat. § 940.12 ("Assisting suicide") (a Class H felony), Wisc. Stat. § 939.50(3)(h) (not more than 6 years); Laws of Puerto Rico, tit. 33, § 4738 ("To abet to commit suicide") (a third degree felony), Laws of Puerto Rico, tit. 33, § 4644(c) (not more than 8 years); V.I. Code, tit. 14, § 2141 ("Aiding or advising suicide") (not more than 5 years).

Finally, 14 jurisdictions within the U.S. do not expressly criminalize the conduct of causing, aiding, or assisting suicide: Alabama, California, the District of Columbia, Kentucky, Massachusetts, Nevada, North Carolina, Ohio, Vermont, Virginia, West Virginia, Wyoming, the United States, and Guam.

In sum, an overwhelming majority of U.S. jurisdictions—51 of them—do not include causing another person to commit suicide as a form of murder (let alone, causing another person to commit suicide by mere verbal conduct such as deception).

Moreover, the Model Penal Code likewise does not include the conduct of causing another person to commit a suicide as a form of murder.  Instead, the Model Penal Code expressly provides for this as an independent offense—one that is a lesser form of criminal homicide than murder.  *Compare* MPC § 210.5(2) ("Causing or Aiding Suicide") ("A person who purposely aids or solicits another to commit suicide is guilty of a felony of the second degree if his conduct causes such suicide . . .") *with* MPC § 210.2(2) ("Murder") ("Murder is a felony of the first degree[.]").

For all these reasons, generic murder does not encompass causing another person to commit suicide.  Because the Connecticut statute governing intentional murder, § 53a-54a(a), includes this provision, it does not fit the definition of generic murder under federal law for purposes of 18 U.S.C. § 1959(a), the VICAR statute.  *Cf. Mathis*, 136 S. Ct. at 2257 ("Because the elements of Iowa's burglary law are broader than those of generic burglary, Mathis's convictions under that law cannot give rise to an ACCA sentence."); *United States v. Ibarra*, No. 17cr0411-AJB, 2018 WL 620185, at \*\*1-2 (S.D. Cal. Jan. 29, 2018) (granting motion to strike assault allegation because "[f]ederal law requires more than California before someone can be convicted of assault with a dangerous weapon as a predicate act" under 18 U.S.C. § 1959(a)(3), and therefore, "The state statute is not a categorical match to the federal offense charged.").  Applying the categorical approach of *Davis*, 139 S. Ct. at 2323-35, to 18 U.S.C. § 1959(a), this Court should rule that the convictions on the VICAR counts (Counts One through Four of the Fourth Superseding Indictment) are invalid.

19

**b) Unlike generic murder, Connecticut's felony-murder statute, Conn. Gen. Stat. § 53a-54c, purports to subject people to criminal liability for causing the death of another while in flight from having committed a felony with no immediacy requirement or temporal limitation whatsoever.**

Again, neither the original Indictment nor any of the first three Superseding Indictments referenced felony murder under Connecticut law.  Citations to that statute, Conn. Gen. Stat. § 53a-54c, appeared for the first time in this case in the Fourth Superseding Indictment.  (Doc. 361 at p. 6, ¶ 8 (Count One); at p. 7, ¶ 11 (Count Two); at p. 8, ¶ 14 (Count Three); at p. 9, ¶ 17 (Count Four).)

Connecticut's felony-murder statute provides, in relevant part:

> A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, aggravated sexual assault in the first degree, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, *in the course of and in furtherance of such crime or of flight therefrom*, he, or another participant, if any, causes the death of a person other than one of the participants . . .

Conn. Gen. Stat. § 53a-54c (2010) (emphasis added).  The animating principal of felony-murder liability is that a defendant may be held criminally liable for a killing he did not intend because he participated in committing a dangerous felony and therefore has assumed the risk that doing so could result in someone's death.

Some felony-murder statutes require that the death had to have been caused during the commission of the felony itself.  Others, like Connecticut's, have a more expansive provision allowing for felony-murder liability when a death is caused during the

defendant's flight from the felony.  Unlike Connecticut's felony-murder statutes, most felony-murder statutes that contain a flight provision include the qualifying adjective "immediate" before the term "flight."  The general idea is that potential exposure to felony-murder liability ceases once the immediate danger has passed and the defendant has reached a place of safety.

Again, the determination of whether Connecticut's felony-murder statute is a "fit" with generic murder or sweeps too broadly begins with a survey of the codes of other U.S. jurisdictions.

As a threshold matter, 4 states have no statute providing for any criminal liability for felony murder: Hawaii, Idaho, Kentucky, and South Carolina.

The felony-murder statutes of 30 other jurisdictions contain no provision allowing for liability for a death that occurred during *flight* from the felony: California, the District of Columbia, Florida, Georgia, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, North Carolina, Ohio, Oklahoma, Rhode Island, South Dakota, Tennessee, Vermont, Virginia, West Virginia, Wisconsin, Wyoming, the United States, Guam, and Puerto Rico.  *See* Cal. Penal Code § 189(a); D.C. Code § 22-2101; Fla. Stat. § 782.04; Ga. Code § 16-5-1(c); Ind. Stat. § 35-42-1-1(2) & (3); Iowa Code § 707.2(1.)(b), (e) & (f); La. Rev. Stat., tit. 14, § 30(A.)(1); Md. Code, Criminal Law § 2-201(a)(4); Mass. Gen. Laws, ch. 265, § 1; Mich. Comp. Laws § 750.316(1)(b); Minn. Stat. §§ 609.185, 609.19; Miss. Code § 97-3-19; Neb. Rev. Stat. § 28-303; Nev. Rev. Stat. § 200.030(1)(b) & (e); N.M. Stat. § 30-2-1(A)(2) & (3); N.C. Gen. Stat. § 14-17(a); Ohio Rev. Code § 2903.02(B); Okla.

Stat., tit. 21, § 701.7(B); R.I. Gen. Laws § 11-23-1; S.D. Codified Laws § 22-16-4; Tenn.

Code § 39-13-202(a)(2); Vt. Stat. § 2301; Va. Code § 18.2-32; W. Va. Code, § 61-2-1;

Wisc. Stat. § 940.03; Wyo. Stat. § 6-2-101(a); 18 U.S.C. § 1111; Guam Code, tit. 9,

§ 16.30(a)(2); Laws of Puerto Rico, tit. 33, § 4734(b); V.I. Stat. § 922(a)(2)).

Another 15 jurisdictions have statutes with flight provisions that require the flight

to be *immediate* in order to give rise to liability for felony murder: Alabama, Alaska,

Arizona, Arkansas, Colorado, Maine, Missouri, New Hampshire, New Jersey, New York,

North Dakota, Oregon, Texas, Utah, and Washington.  *See* Ala. Code § 13A-6-2(a)(3);

Alaska Stat. § 11.41.100(a)(3), (4) & (5), Alaska Stat. § 11.41.110(a)(3); Ariz. Rev. Stat.

§ 13-1105(A.)(2); Ark. Code §§ 5-10-101(a)(1)(B) & (2)(B), 5-10-102(a)(1)(B); Colo.

Rev. Stat. § 18-3-102(1)(b); Me. Rev. Stat., tit. 17-A, § 202(1.); Mo. Rev. Stat.

§ 565.021(1.)(2); N.H. Rev. Stat. § 630:1-b(I)(b); N.J. Stat. § 2C:11-3(a)(3); N.Y. Penal

Law § 125.27(1)(a)(vii); N.D. Century Code § 12.1-16-01(1.)(c); Or. Rev. Stat.

§ 163.115(1)(b); Tex. Penal Code § 19.02(b)(3); Utah Code § 76-5-203(2)(d)(i); Wash.

Rev. Code §§ 9A.32.030(1)(c), 9A.32.050(1)(b).

Thus, in sum, a total of 49 jurisdictions in the United States—another

*overwhelming* majority—do not allow for felony-murder liability for a death that occurs

during flight from the felony that is not immediate.

Although the felony-murder provision of the Model Penal Code does not contain

an immediacy requirement or temporal limitation, it contains an alternative requirement

that is even more restrictive, because it requires the defendant to have committed a

criminal homicide "recklessly under circumstances manifesting extreme indifference to

the value of human life." MPC § 210.2(1)(b). Connecticut's felony-murder statute

contains no such provision. Conn. Gen. Stat. § 53a-54c. In any event, the Model Penal

Code's lack of temporal limitation is not enough to counterbalance the weight of

authorities from around the country on this matter. For felony-murder liability, generic

murder requires that any flight be *immediate* flight from the commission of the felony.

This is consistent with the definition of felony murder contained in Black's Law

Dictionary:

> **felony-murder rule** (1943) *Criminal law*. The
> doctrine that if a person dies during the course of and in
> furtherance of a specified type of felony — even in *immediate*
> *flight* from the scene and even if the decedent was a
> perpetrator of the felony — the death is considered a murder
> regardless of intent. *Most states restrict this rule to
> inherently dangerous felonies such as rape, arson, robbery,
> and burglary.

Black's Law Dictionary (11th ed. 2019) (emphasis added). *See Scott*, 990 F.3d at 123

(noting that courts rely in part on legal dictionaries to determine the generic definitions of

crimes); *Castillo*, 896 F.3d at 150 (same).

Like its intentional murder statute with respect to causing suicide by deception,

Connecticut's felony-murder statute sweeps more broadly than generic murder by

allowing liability for murder during flight from a felony that may be attenuated in time

and place from the commission of the felony itself. In short, Connecticut felony murder

under Conn. Gen. Stat. § 53a-54c does not fit the definition of generic murder under

federal law for purposes of 18 U.S.C. § 1959(a), the VICAR statute. *Cf. Mathis*, 136 S.

Ct. at 2257; *Ibarra*, 2018 WL 620185, at **1-2. Applying the categorical approach of

Davis, 139 S. Ct. at 2323-35, to 18 U.S.C. § 1959(a), this Court should rule that the convictions on the VICAR counts (Counts One through Four of the Fourth Superseding Indictment) are invalid for this additional, independent reason.

> **6. Due to the legal invalidity of the VICAR counts, this Court should not enter judgment on these counts following Mr. Aquart's resentencing and should instead dismiss them.**

For either or both of the two independent reasons discussed, the VICAR counts of conviction are legally invalid.  Given that conclusion, it would be improper for the Court to enter judgment on such counts following the upcoming resentencing hearing.  The Court should decline to enter judgment on such convictions and instead dismiss Counts One through Four of the Fourth Superseding Indictment.

Dismissing these counts is well within this Court's authority at this juncture of Mr. Aquart's case.  As discussed, the Second Circuit's mandate is now a nullity due to the government's decision to no longer seek a death sentence against Mr. Aquart.

And even if it were not, the mandate rule does not preclude this Court from addressing issues that were not decided by the Second Circuit.  *Cirami*, 563 F.2d at 33.

Moreover, multiple exceptions to the mandate rule apply here.  *See Webb*, 98 F.3d at 587.  The Supreme Court's decision in *Davis* was a dramatic change of controlling authority.  And if uncorrected, blatant errors in convictions that are legally and constitutionally invalid would result in serious injustice.

When this Court enters judgment following the upcoming resentencing hearing, it should do so only with respect to those convictions that are legally valid.

**B.  The VICAR convictions are legally invalid because jurors were not instructed that for them to find Mr. Aquart guilty, they had to unanimously agree as to whether the underlying predicate murder under Connecticut law was intentional murder or felony murder.**

Under the Sixth Amendment, an accused has a fundamental constitutional right to be convicted of a serious crime only on the basis of a jury verdict that is unanimous. *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020); U.S. Const. amend. VI.  Mr. Aquart's case involved allegations of two alleged predicate racketeering acts: intentional murder under Conn. Gen. Stat. § 53a-54a(a) and felony murder under Conn. Gen. Stat. § 53a-54c.  But the government did not request (and the Court did not issue) any instruction requiring jury unanimity as to the predicate murder offense for Counts One through Four.  (Doc. 781 at pp. 25, 28-31 (jury instructions proposed by the United States as to Count One); Doc. 781 at pp. 34-36 (jury instructions proposed by the United States as to Counts Two through Four); Doc. 781 at p. 50 (jury instruction proposed by the United States as to unanimity generally); Doc. 834 at pp. 26-29 (Jury Instructions given as to Counts Two through Four); Doc. 834 at pp. 37-38 (Jury Instructions given as to Count One).)  The jury instructions for each of the VICAR counts should have informed jurors that they could convict on one of two alternate types of predicate murder but that they had to be unanimous as to the particular type of predicate murder selected.

In analogous contexts, the Second Circuit has approved jury instructions requiring instructions on unanimity as to predicate offenses.  For example, in a RICO conspiracy case, the Circuit approved the following instruction:

> [I]n order to convict the defendant of the RICO conspiracy
> offense, *your verdict must be unanimous as to which type or*

> *types of predicate racketeering activity the defendant agreed would be committed*; for example, at least two acts of murder, attempted murder, or drug trafficking, or one of each, or any combination thereof.

*United States v. Applins*, 637 F.3d 59, 80 (2d Cir. 2011) (emphasis added); *see also United States v. Helmsley*, 941 F.2d 71, 91 (2d Cir. 1991) (approving instruction requiring unanimity as to at least one of five alternative objectives of the charged conspiracy).

The government also did not request (and the Court did not issue) any special interrogatory on the verdict form for the guilt phase.  (Docs. 781, 846.)  *See United States v. Pimentel,* 346 F.3d 285, 305 (2d Cir. 2003) ("[W]e . . . strongly encourage the use of special verdict forms in cases alleging multiple racketeering acts to facilitate appellate review.").  It is impossible to discern from the guilt-phase verdict form whether 12 jurors found the racketeering predicate to be intentional murder, or 12 jurors found the predicate to be felony murder, or whether the jury was split on this determination.  (Doc. 846 at p. 1.)  *See In re Gomez*, 830 F.3d 1225 (11th Cir. 2016) (concluding that "a general verdict of guilty does not reveal any unanimous finding by the jury that the defendant was guilty of conspiring to carry a firearm during one of the potential predicate offenses, all of predicate offenses, or guilty of conspiring during some and not others") (granting application to file successive section 2255 motion where one of the predicates may have been legally invalid under on *Johnson v. United States*, 576 U.S. 591 (2015)).

With no jury instruction requiring unanimity as to the predicate murder and no special finding on the verdict form, this Court can have no confidence that Mr. Aquart

was found guilty in Counts One through Four based on unanimous jury verdicts in accordance with the Sixth Amendment and *Ramos*.  Following the resentencing hearing, this Court should therefore decline to enter judgment on the VICAR counts for this independently sufficient reason.

### C. The VICAR convictions are legally invalid because the jury was not instructed as to essential elements of the predicate offense of felony murder under Connecticut law.

The Second Circuit has recognized that "VICAR and RICO 'seem to require of a predicate act based on state law that the act include the essential elements of the state crime.'"  *Pimentel,* 346 F.3d at 305, quoting *United States v. Carrillo*, 229 F.3d 177, 186 (2d Cir. 2000).  As *Carrillo* explained:

> If a district judge failed to charge a jury on the state law elements of the crime constituting a racketeering act, neither we nor the district judge could know what were the factual determinations on which the jury based its verdict. Thus, we would be unable to determine what the jury decided the defendant actually did, and whether, under the jury's findings, the defendant committed the state law offense charged as a racketeering act.

*Id.* at 183-84.  Two years before Mr. Aquart's case was tried, the Circuit emphasized the importance of specifically instructing juries on the elements of underlying state-law predicates to a federal racketeering charge:

> [W]e do not condone the District Court's decision not to include in its jury charge the definition of the racketeering acts charged in the indictment.  Indeed, as in *Carrillo* and *Feliciano*, we again caution the Government and the district courts in this Circuit that the preferred practice in VICAR and RICO cases is to include those definitions when charging the jury, and not doing so risks vacatur of the convictions on appeal.

27

*Pimentel*, 346 F.3d at 305.

> **1.  The jury was not instructed on the required mens rea for robbery under Connecticut law—a specific intent to permanently deprive the victim of the property in question.**

Counts Two, Three, and Four of the Fourth Superseding Indictment charged Mr.

Aquart with having murdered each of the victims in the perpetration of a robbery in

violation of Connecticut's felony-murder statute.  (Doc. 361 at p. 7, § 11 (Count Two); at

p. 8, ¶ 14 (Count Three); and at p. 9, ¶ 17 (Count Four).)

Connecticut law defines a robbery to include a larceny:

> A person commits robbery when, *in the course of committing a larceny*, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny.

Conn. Gen. Stat. § 53a-133 (2010) (emphasis added).  Connecticut law defines a larceny

as follows:

> A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner.

Conn. Gen. Stat. § 53a-119 (2010).  For decades, Connecticut courts have consistently

interpreted the required mens rea for larceny as a specific intent to permanently deprive

the victim of the property in question.  *See, e.g.*, *State v. Marra*, 387 A.2d 550, 553

(Conn. 1978) ("Larceny continues to require 'the existence of a felonious intent in the

taker to deprive the owner of it permanently.'") (citation omitted), *overruled on other grounds by Paulsen v. Manson*, 525 A.2d 1315 (Conn. 1987); *State v. Calonico*, 770 A.2d 454, 466 (Conn. 2001) ("[Thus, since a] specific intent [to deprive an owner permanently of his or her property] is an essential element of larceny . . . [it] must be proved beyond a reasonable doubt by the state.") (citation omitted).

Here, the jury was not instructed on the essential element of the specific intent to permanently deprive anyone of the property in question.  Instead, the jury was instructed:

> [R]obbery is defined under Connecticut law as follows: A person is guilty of robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of:
>
> (1)   preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or
>
> (2)   compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny.

(Doc. 834 at p. 27.)  The jury that convicted Mr. Aquart was not instructed as to the elements of larceny under Connecticut law.  Nor were jurors told they had to find that Mr. Aquart had acted with a specific intent to permanently deprive a person of the property in question.  Mr. Aquart was thus denied his right under the Due Process Clause not to be convicted except upon proof beyond a reasonable doubt as to each element of the crime charged.  U.S. Const. amend. V; *see also State v. Payne*, 530 A.2d 1110 (Conn. 1987) (vacating larceny conviction due to trial court's failure to instruct on all the essential elements of that offense).

29

Because the jury was not instructed as to the essential mens rea element of the state-law predicate crime of robbery (and thus larceny), Mr. Aquart's convictions on Counts Two, Three, and Four are unconstitutional in violation of the Due Process Clause of the Fifth Amendment and the fair-trial guarantee of the Sixth Amendment.  U.S. Const. amends. V, VI.  Following the resentencing hearing, this Court should not enter judgment on these invalid convictions but instead should dismiss them.

**2. The jury was not instructed on the requirement that the homicide have been "in furtherance of" the predicate crime or of flight therefrom.**

Connecticut law defines felony murder in pertinent part as follows:

> A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery . . . and, in the course of *and in furtherance of such crime or of flight therefrom*, he, or another participant, if any, causes the death of a person other than one of the participants . . .

Conn. Gen. Stat. § 53a-54c (emphasis added).

But the jury was not instructed on the essential element that the causation of death be *in furtherance of* the robbery or flight therefrom.  Instead, the jury was instructed:

> [I]n order to convict the Defendant of felony murder, the Government must prove beyond a reasonable doubt that:
>
> (1)     the Defendant, either alone or with others, committed or attempted to commit a robbery, and
>
> (2)     in the course of the robbery, or during flight from the robbery, he, or another participant, caused the death of a person other than one of the participants.

(Doc. 834 at p. 26.)  Once again, Mr. Aquart was denied his right under the Due Process Clause not to be convicted except upon proof beyond a reasonable doubt as to each element of the crime charged.  U.S. Const. amend. V.  Once again, because the jury was not instructed as to this essential element Connecticut felony murder, the convictions on Counts Two, Three, and Four are unconstitutional in violation of Mr. Aquart's rights to due process and a fair trial.  U.S. Const. amends. V, VI.  Following the resentencing hearing, this Court should not enter judgment on these invalid convictions but instead should dismiss them.

### D.  The VICAR convictions are legally invalid due to the insufficiency of the evidence.

In his direct appeal, Mr. Aquart challenged the sufficiency of the evidence for the VICAR convictions (Counts One through Four).  The Second Circuit rejected this claim, holding that the evidence was sufficient to prove the required nexus to interstate commerce and to demonstrate that Mr. Aquart had murdered each victim for the purpose of maintaining or increasing his position in the charged racketeering enterprise.  *Aquart*, 912 F.3d at 17-20.  Mr. Aquart acknowledges that this Court is bound by the Second Circuit's decision in his first appeal but nonetheless continues to raise this issue to preserve it for potential further review.[3]  Moreover, he notes that the Second Circuit's

---

[3] Mr. Aquart's petition for certiorari raised the sufficiency issue as to motive, presenting as the proposed question for certiorari review of the Second Circuit's decision:

>          Whether a defendant acts for the "purpose of . . . maintaining or increasing [his] position in an enterprise" within the meaning of 18 U.S.C. § 1959, the Violent Crimes in Aid of Racketeering statute, whenever he acts to protect the enterprise itself.

opinion in his appeal does not address that Court's earlier decisions in *United States v. Bruno*, 383 F.3d 65, 71, 81-86 (2d Cir. 2004), which reversed convictions for VICAR murder and other related racketeering offenses due to the insufficiency of the evidence of the required motive and relatedness elements, and *United States v. Thai*, 29 F.3d 785, 816-19 (2d Cir. 1994), which likewise reversed a conviction under 18 U.S.C. § 1959(a) due to the insufficiency of the evidence with respect to motive.  *See also United States v. Jones*, 291 F. Supp. 2d 78, 92 (D. Conn. 2003) (granting motion for judgment of acquittal as to conviction for VICAR murder due to "the dearth of evidence that [the decedent's] conduct posed a threat to the Enterprise or to Jones's leadership role"; characterizing "the government's theory of VICAR motive and the inferences that it attempts to draw from the evidence in support of such a motive" as "based on no more than guesswork") (quoting *Thai*, 29 F.3d at 817).

### E.  Entering judgment against Mr. Aquart for six murders when three people were killed violates double jeopardy.

The Double Jeopardy Clause protects an accused not only from "the hazards of a second trial for the same offense" but also from "multiple punishments for the same offense." *Wood v. Milyard*, 721 F.3d 1190, 1194 (10th Cir. 2013).  "[A] court cannot impose cumulative punishments for the same offense unless the legislature has authorized it to do so."  *Id.*  In *Wood*, then-Judge Gorsuch, writing for the Tenth Circuit, explained

---

(Petition for Writ of Certiorari filed Aug. 5, 2019, in *Aquart v. United States*, No. 19-5489: Question Presented.)  The government opposed the petition for certiorari in part by arguing that it was premature and that he could raise this matter on review of the final judgment to be entered after the upcoming resentencing proceeding.  (Brief for the United States in Opposition filed Oct. 7, 2019, in *Aquart*, No. 19-5489, at pp. 11-12.) The Supreme Court denied certiorari.

the panel's conclusion that a Double Jeopardy violation had occurred with "a simple syllogism":

> Double jeopardy doctrine prohibits multiple punishments unauthorized by legislatures. The Colorado legislature has declined to permit multiple murder convictions for a single killing. Mr. Wood currently stands convicted of both first and second degree murder for a single killing. One conviction, therefore, must go.

*Id.* at 1197.

Here, for each of the three victims, Mr. Aquart stands convicted of two separate murders: one VICAR murder under 18 U.S.C. § 1959(a) (Counts Two through Four) and one drug-related murder under 21 U.S.C. § 848(e)(1)(A) (Counts Five through Seven). The government cannot show that Congress intended for there to be duplicative criminal liability under 18 U.S.C. § 1959(a) and 21 U.S.C. § 848(e)(1)(A) for a single murder of the same victim. In a case with three decedents, it violates the Double Jeopardy Clause for Mr. Aquart to receive *six* murder convictions. U.S. Const. amend. V. Therefore, following resentencing, this Court should enter judgment on—at most—only one murder conviction for each victim.

### F. Conclusion.

For all these reasons and any further arguments that may be made in a Reply or at any oral argument on this Motion, this Court should dismiss Counts One, Two, Three, and Four of the Fourth Superseding Indictment.

THE DEFENDANT,
AZIBO AQUART

Monica Foster
Indiana Federal Community Defender
111 Monument Circle, Suite 3200
Indianapolis, IN 46204
317-383-3520
IN Bar No.: 8368-49
E-mail: monica_foster@fd.org

BY: *s/ Marc Bookman*
Marc Bookman
Atlantic Center for Capital Representation
1315 Walnut Street
Suite 905
Philadelphia, PA 19107
215-732-2227
PA Bar No.: 25516
Email: marcbookman12@gmail.com

David A. Moraghan, Esq.
Smith, Keefe, Moraghan & Waterfall
257 Main Street, Fl. 2-2
Torrington, CT 06790
(860) 482-7651
Federal Bar No.: ct00054
E-mail: dam@skmwlaw.com