**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:06CR160 (JBA) |
| | : | |
| v. | : | |
| | : | |
| AZIBO AQUART | : | October 1, 2021 |

**SENTENCING MEMORANDUM**

In the early morning hours of August 24, 2005, the defendant, Azibo Aquart, along with three accomplices, viciously murdered three people. He forced his way into their apartment, bound them head to foot with duct tape, and then beat them to death with a baseball bat. For these heinous crimes, he was convicted by a jury in 2011 of three counts of murder in aid of racketeering and one count of conspiracy to commit the same, three counts of drug-related murders, and a count of conspiring to distribute drugs. That same jury, following a penalty phase trial, handed down a verdict of the death penalty. Following the Second Circuit's 2018 affirmance of the defendant's convictions and limited vacatur of the death sentence only, the Government was authorized by the Attorney General to no longer seek the death penalty against Aquart.

Accordingly, Aquart now comes before the Court, finally, to be sentenced for the crimes he committed 16 years ago. This Memorandum is submitted in aid of the sentencing of the defendant, Azibo Aquart, which is presently scheduled for October 21, 2021, and in response to the defendant's Sentencing Memorandum filed on September 24, 2021 (Doc. 1345). The matter of sentencing is straightforward: Aquart's offenses of conviction *mandate* a sentence of life in prison. All of the relevant factors here—the U.S. Sentencing Guidelines, the statutory sentencing

1

factors, and, again, the mandatory minimum statutory term of imprisonment—speak in concert: Aquart must be given a mandatory imprisonment term of life.

## I.     PROCEDURAL HISTORY

A federal grand jury indicted Aquart, his brother Azikiwe Aquart, and Efrain Johnson for the triple murders in June 2007. *See United States v. Aquart*, No. 06cr160 (JBA) (Doc. No. 105). In January 2009, the Government filed a notice of intent to seek the death penalty against Azibo Aquart. *Id.* (Doc. No. 228).   On March 3, 2010, a subsequent grand jury returned the operative fourth superseding indictment.   After the trials of Azikiwe Aquart and Efrain Johnson were severed, Azibo Aquart proceeded to trial alone in April 2011.

On May 23, 2011, after a four-week trial on the narcotics and murder charges outlined in the fourth superseding indictment, a jury found Aquart guilty on all counts against him:

1.  Count One, charging conspiracy to commit murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5);

2.  Counts Two, Three and Four, charging the murders in aid of racketeering of Tina Johnson, James Reid, and Basil Williams, in violation of 18 U.S.C. § 1959(a)(1) and § 2;

3.  Counts Five, Six and Seven, charging the drug-related murders of Tina Johnson, James Reid, and Basil Williams, in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2; and

4.  Count Eight, charging conspiracy to distribute and to possess with intent to distribute 50 grams or more of cocaine base, in violation of 21 U.S.C. § 846.

(Doc. No. 833). On June 15, 2011, following presentation of evidence in the penalty phase, the same jury unanimously found that Aquart should be sentenced to death under 18 U.S.C. § 1959(a)(1) and 21 U.S.C. § 848(e)(1)(A) for the murders of Tina Johnson and Basil Williams. *Id.* (Doc. No. 936).

After denying various defense motions for a new trial or penalty proceeding, on December 17, 2012, this Court sentenced Aquart to death on four counts (Counts Two, Four, Five and Seven), to life imprisonment on three counts (Counts Three, Six and Eight), and to 10 years' imprisonment on the remaining count (Count One). *Id.* (Doc. Nos. 1184, 1185, 1195).

Aquart appealed, challenging many aspects of both the guilt and penalty phases of his trial. In 2018, after multiple rounds of briefing, the Second Circuit issued a lengthy decision "unanimously affirm[ing]" Aquart's convictions but vacating his capital sentence and remanding for a new penalty proceeding. *See United States v. Aquart*, 912 F.3d 1, 16-17, 44, 69 (2d Cir. 2018).

Subsequently, in a December 2020 telephonic status conference, the Government alerted the Court and defense counsel of the Attorney General's authorization not to seek the death penalty in a new penalty proceeding. *United States v. Aquart*, No. 06cr160 (JBA), Doc. No. 1299, at 4.   In discussion with the parties, the Court noted, without defense objection, that the defendant would therefore face a "mandatory life" sentence, and that the sentencing itself would presumably be "a somewhat pro forma proceeding."   *Id.*

In June 2021, the defense opted instead to file two motions seeking to dismiss seven of the eight counts of conviction and a third motion adopting Aquart's *pro se* arguments to dismiss the operative indictment wholesale.   *United States v. Aquart*, No. 3:06CR160 (JBA), Doc. Nos. 1310 ("Def. Mot. to Dismiss VICAR Counts"), 1312 ("Def. Mot. for Resentencing and to Dismiss"), and 1313 ("Def. Mot. to Dismiss for Speedy Trial and Due Process").   The Government filed an opposition brief arguing that the operation of the mandate rule precluded the defense's requested relief, and, if necessary, reserving the right to respond with arguments on the underlying substance, on which the defense's motions were also without merit.   *See* Gov't Opp'n to Def. Mot to Dismiss,

3

Doc. No. 1316.   Those motions are now fully briefed.

Subsequently, the U.S. Probation Office prepared a Pre-Sentence Report ("PSR").   Doc. No. 1341.   After reviewing a draft version of the PSR, the defense submitted objections to the Probation Office, comprising 19 pages of both factual assertions and legal argumentation.   On September 24, 2021, the defense submitted its sentencing memorandum. Doc. No. 1345 ("Def. Memorandum").

## II.    OFFENSE CONDUCT

The facts of Aquart's offense are set forth at greater length at paragraphs 7-24 of the Presentence Report ("PSR").   Given the gravity of his crimes as well as the extensive objections raised by the defense, however, it is necessary to summarize them briefly here as well.   Of course, the most detailed information regarding Aquart's offense conduct is to be found in the trial testimony and evidence that was submitted over the course of his five-week trial in April and May 2011, at which this Court presided.   *See* Trial Transcripts, Doc. Nos. 1136-1160.

From the fall of 2004 through the summer of 2005, Azibo Aquart led a large-scale drug distribution enterprise in Bridgeport.   PSR ¶¶ 10-15. Working out of Apartment 211 at 215 Charles Street, Aquart and his lieutenants sold substantial quantities—amounting over time to multiple kilograms—of crack cocaine to dealers and received drug sale proceeds in return. *Id.* Aquart kept tight control over the enterprise, disciplining violently those dealers who sold drugs from other sources or who could not properly account for all proceeds.   Those individuals were beaten, sometimes to unconsciousness, and suffered broken noses or dislocated knees, often personally inflicted by Aquart himself.   *Id.*

In the summer of 2005, Tina Johnson and her boyfriend, James Reid, moved in with their friend, Basil Williams, who lived in Apartment 101 of the 215 Charles Street building. PSR ¶¶ 9,

14. Although Tina Johnson initially bought crack cocaine from Aquart's dealers in the building, when the quality of Aquart's crack declined, she bought drugs from other sources, and sold that crack to some of Aquart's customers. *Id.* Aquart confronted Tina Johnson, telling her to stop competing with his drug sales, but Tina Johnson ignored the warning. *Id.*

In late August 2005, Aquart recruited John Taylor, one of his marijuana dealers, and Efrain Johnson, his girlfriend's brother, as well as his brother Azikiwe Aquart to assist him in dealing with people who had cut into his drug business.  PSR ¶ 16.  To that end, Aquart and his accomplices purchased duct tape, equipped themselves with face masks and latex gloves and armed themselves with baseball bats.  *Id.*  They then entered 215 Charles Street and approached Tina Johnson's apartment, but abandoned their plan when they encountered another person there. *Id.*

In the early morning hours of August 24, 2005, Aquart and the same three accomplices returned to Tina Johnson's apartment to commit the heinous murders of Tina Johnson, James Reid, and Basil Williams.  PSR ¶¶ 8, 16-21.  Armed with a gun and baseball bats, the four men kicked in the door to Tina Johnson's apartment, and used duct tape to bind and restrain the three victims. *Id.*  After wrapping the victims' heads, arms and legs in duct tape, the perpetrators then used the baseball bats to bludgeon the victims to death.  *Id.*  Forensic evidence, including fingerprints and DNA evidence, linked Aquart, Azikiwe Aquart and Efrain Johnson to the crime scene, which was covered—walls, floor and ceiling—in the victims' blood.  *Id.*  The evidence established that Azibo Aquart was the person who physically beat Tina Johnson and Basil Williams to death and that Azikiwe Aquart was the person who physically beat and murdered James Reid.  Aquart himself "bashed" Tina Johnson's body "like he was . . . at a meat market" and offered a share of

the murderous violence to a co-conspirator: "Yo, come and get you some."   Trial Tr. at 2322-23; 2502-03.   Before leaving the apartment, Aquart drilled the door shut from the inside, effectively entombing his victims within.   PSR ¶ 17.

Tina Johnson's son, Leroy Whittingham, found the victims later that day when he arrived at the apartment. He went to the apartment that morning expecting, as planned, to help his mother move out of the apartment. Trial Tr. at 81-92.   When nobody answered the door, he entered the apartment through a window, finding his mother and the other two victims dead.   *Id.*   He testified that the bedrooms in which their bodies lay were covered in blood and the living area looked like a war zone.   *Id.*; PSR ¶ 8.   All three victims died from blunt force trauma to the head. PSR ¶ 8.

After committing the murders, Aquart asked Lashika Johnson—his girlfriend and the sister of co-conspirator Efrain Johnson— to dispose of garbage bags containing clothes and a drill.   PSR ¶ 22.   He also instructed his "baby momma" to get rid of the weapons, as he later admitted to co-conspirator Taylor, while both men were locked up on unrelated charges. *Id.*; Trial Tr. at 2342.

Later, while he was in detention on the charges underlying this case, Aquart began a campaign to obstruct justice.   PSR ¶¶ 23-24, 35.   He wrote letters to two possible "witnesses"— Venro Flemming and Shamarr Myers—suggesting ways they could falsely testify to help his case. *Id.*   Aquart instructed Flemming to falsely inform federal authorities that there was no drug trafficking conspiracy.   *Id.*   And he instructed Myers to create a courtroom outburst during his trial and falsely claim that another (potentially fictious) individual was responsible for the murders. *Id.*

While in prison awaiting trial, Aquart continued his pattern of violence.   In October 2009, Aquart assaulted fellow detainee Anthony Armstead, striking him repeatedly in the head—an

6

attack that necessitated stitches to Armstead's head, both eyes, lip and ear.   PSR ¶ 5.   And in 2010, the year before his trial, Aquart confessed to fellow inmate Myers that, after having problems with people selling crack in the same building, he ultimately decided, "they had to die."   Trial Tr. at 3642-44.

### III.    STATUTORY AND GUIDELINES EXPOSURE

#### A.  Statutory Exposure

Based on his convictions for Counts 2, 3 and 4, charging the murders in aid of racketeering of Tina Johnson, James Reid, and Basil Williams, in violation of 18 U.S.C. § 1959(a)(1), the defendant must receive a mandatory term of imprisonment of life.[1]   *See* PSR ¶ 171.   Based on his convictions for Counts 5, 6 and 7, charging the drug-related murders of Tina Johnson, James Reid, and Basil Williams, in violation of 21 U.S.C. § 848(e)(1)(A), the defendant faces a minimum term of imprisonment of 20 years and a maximum term of life.[2]   *Id.*   Based on his conviction for Court 1, charging conspiracy to commit murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5), the defendant faces a maximum term of imprisonment of 10 years.   *Id.*   Based on his conviction for Count 8, charging conspiracy to distribute and to possess with intent to distribute 50 grams or more of cocaine base, in violation of 21 U.S.C. § 846, the defendant faces a minimum term of imprisonment of five years and a maximum of 40 years.[3]   *Id.*

---

[1]    The statute sets a maximum penalty of death, but because the Government has withdrawn its notice of intent to seek the death penalty, the applicable maximum is life imprisonment.

[2]    Likewise, the statute sets a maximum penalty of death, but in the absence of any Government notice of intent to seek the death penalty, the applicable maximum is life imprisonment.

[3]    Although there is reason to believe that the defendant may have waived any challenge to a lengthier sentence on Count 8, based on the prior version of the statute, *see* Gov't Opp'n to Def. Mot. to Dissmiss, Doc. No. 1316, at 21-22, the Government nonetheless consents to an amended sentence on Count 8 of at least five and up to 40 years' imprisonment.

Because the defendant faces mandatory life imprisonment, any term of supervised release may be moot.   Nonetheless, according to the operative statutes, the Court must impose a term of supervised release of at least four years and up to life as to Count 8, and may impose terms of supervised release of not more than three years as to Count 1 and not more than five years as to each of Counts 2 through 7.   PSR ¶ 174.   The defendant also faces fines of up to $250,000 on each of Counts 1 through 7, and up to $2 million on Count 8, and a mandatory $800 in special assessments.   PSR ¶¶ 179, 180.   Additionally, under 18 U.S.C. § 3663A, the Court shall order restitution, in the total amount of $17,106, to cover the documented funeral expenses of each of the defendant's three murder victims: $2,335 for Tina Johnson, $6,633 for James Reid, and $8,138 for Basil Williams.   PSR ¶ 183.

### B.  Guidelines Provisions

The PSR accurately sets forth the operation of the U.S. Sentencing Guidelines as to the defendant's convicted crimes.   *See* PSR ¶¶ 38-95, 97-112, 172, 176, 178, 181, 184, 186. Because, however, the defendant has chosen to create a different "calculation" of the Guidelines range, *see* Def. Memorandum at 2-3, it is necessary to set forth here the appropriate Guidelines application.

As to Count 1, under which Aquart stands convicted of conspiracy to murder in aid of racketeering, the base level under U.S.S.G. § 2E1.3, which directs the application of the Guideline for First Degree Murder, U.S.S.G. § 2A1.1, is 43.   Two points are then added to reflect Aquart's role as an organizer or leader under U.S.S.G. §3 B1.1(c), and another two points are added to reflect his obstruction of justice under U.S.S.G. § 3C1.1.   Accordingly, his adjusted offense level for Count 1 is 47.

As to Counts 2, 3 and 4, under which Aquart stands convicted of VICAR murder of his three victims, the same analysis applies: the base offense level under U.S.S.G. § 2E1.3, directing the application of the Guideline for First Degree Murder, U.S.S.G. § 2A1.1, is 43, and then a total of four points are added to reflect his leadership role (U.S.S.G. § 3B1.1) and obstruction of justice (U.S.S.G. § 3C1.1), for an adjusted offense level of 47 for each count.

Similarly, for Counts 5, 6 and 7, under which Aquart stands convicted of intentional murder of each of his three victims while engaged in a drug trafficking conspiracy, the base offense level under U.S.S.G. § 2A1.1 is 43.   Then a total of four points are added to reflect his leadership role (U.S.S.G. § 3B1.1) and obstruction of justice (U.S.S.G. § 3C1.1), for an adjusted offense level of 47 for each count.

Finally, as to Count 8, the applicable U.S.S.G. § 2D1.1(d)(1) Guideline contains a "cross-reference[]" requiring the application of the Guideline for First Degree Murder, U.S.S.G. § 2A1.1, if "a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States." Accordingly, the defendant's base offense level under is 43.   Again, a total of four points are added to reflect his leadership role (U.S.S.G. § 3B1.1) and obstruction of justice (U.S.S.G. § 3C1.1), for an adjusted offense level of 47.

After the requisite grouping analysis is performed, the combined adjusted offense level rises to 50.   PSR ¶¶ 86-92.   Under Chapter 5, Part A (comment n.2), in those rare instances where, as here, the total offense level is calculated in excess of 43, the offense level will be treated as a level 43.   PSR ¶ 95.

The PSR also accurately sets forth the defendant's criminal record, which yields a total criminal history score of 16.   PSR ¶¶ 97-112.   This score results from convictions for robbery in the third degree (for which Aquart received five years' imprisonment, with two years to serve in 1997), sale of narcotics (for which Aquart received two years' imprisonment in 1997), illegal possession of body armor (for which Aquart received one year's imprisonment in 2000), sale of narcotics (for which Aquart received four years' imprisonment in 2000), and multiple convictions for sale of narcotics and failures to appear (for which Aquart received 12 years' imprisonment, with 66 months to serve in 2000).   *Id.*   His score also reflects the fact that Aquart committed the instant offenses while on parole.   PSR ¶ 111.   This score of 16 points in turn establishes a Criminal History Category of VI.   PSR ¶ 112.

Accordingly, with a total offense level of 43 and a CHC of VI, the Guidelines call for a term of imprisonment of life.   PSR ¶ 172.   Also, insofar relevant, the applicable Guidelines term of supervised release is one to three years as to Count 1, two to five years as to each of Counts 2 through 7, and at least four to five years as to Count 8.   PSR ¶ 176.   The defendant also faces a Guidelines fine range of $25,000 to $2 million, in addition to the statutory restitution discussed above.   PSR ¶¶ 181, 184.

## IV.    LEGAL STANDARD

After the Supreme Court's ruling in *United States v. Booker*, 543 U.S. 220, 243-245 (2005) rendered the Sentencing Guidelines advisory rather than mandatory, a sentencing judge is required to "(1) calculate[] the relevant Guidelines range, including any applicable departure under the Guidelines system; (2) consider[] the Guidelines range, along with the other § 3553(a) factors; and (3) impose[] a reasonable sentence." *See United States v. Fernandez*, 443 F.3d 19, 26 (2d Cir.

2006), *abrogated on other grounds by Rita v. United States*, 551 U.S. 338 (2007).   Under 18

U.S.C. § 3553(a), the sentencing "court shall impose a sentence sufficient, but not greater than

necessary, to comply with the purposes set forth in paragraph (2) of this subsection."   The statute

provides that the Court shall consider the following factors in determining the particular sentence

to be imposed:

> (1) "[T]he nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct;
> >
> > (C) to protect the public from further crimes of the defendant; and
> >
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established [in the Sentencing Guidelines];
>
> (5) any pertinent policy statement [issued by the Sentencing Commission];
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense."

18 U.S.C. § 3553(a).   The Second Circuit reviews a sentence for reasonableness. *See Booker*,

543 U.S. at 260-62. The reasonableness standard is deferential and focuses "primarily on the

sentencing court's compliance with its statutory obligation to consider the factors detailed in 18

U.S.C. § 3553(a)." *United States v. Canova*, 412 F.3d 331, 350 (2d Cir. 2005).

Of course, the Court must apply these overreaching principles against the backdrop of any applicable statutory mandatory minimum.   In this case, in the absence of a death penalty proceeding, the applicable mandatory minimum term of imprisonment for the defendant is life. *See supra*, Section III.A.

## V.   DISCUSSION

This is the unusual case in which every possible factor—the U.S. Sentencing Guidelines, the § 3553(a) sentencing factors, the *mandatory* statutory minimums, and the interests of justice itself—speaks with one voice: Aquart must receive the mandatory minimum term of life in prison. *See* 18 U.S.C. § 1959(a)(1); PSR ¶ 171.   The various and sundry arguments raised by the defendant to the contrary are without basis in fact or law.   In this case, the course is plain.   By operation of law, Aquart must be sentenced to life imprisonment for the multiple heinous crimes he committed.

Though the Court need look no further than the statutory mandatory minimums at issue here, this memorandum will briefly address the baseless arguments raised in the defendant's sentencing memorandum, as well as the objections the defendant lodged to the PSR.   Because the parties have separately briefed the defendant's motions to dismiss, this memorandum will not reiterate the Government's arguments as to why those motions should be denied.   But this memorandum will set forth the Government's position as to why—even if the mandatory statutory minimums were not in place—the objectives of federal sentencing weigh in favor of a term of life imprisonment.

### A.  The mandatory minimum term of imprisonment is life

The VICAR murder statute for which Aquart was convicted in Counts 2, 3 and 4 provides that a defendant convicted for a murder in violation of its provisions, "shall be punished . . . by

death or life imprisonment." 18 U.S.C. § 1959(a)(1). As set forth in the statute, in the absence of the death penalty, VICAR murder "carries a mandatory life sentence." *United States v. Delgado*, 971 F.3d 144, 159 n.6 (2d Cir. 2020).

This factor is both the first consideration for the Court, and, in some ways, the last. Aquart's VICAR convictions in Counts 2, 3 and 4 have now been affirmed by the appellate court, and the mandate has issued. *See* Gov't Opp'n to Def. Mot. to Dismiss, Doc. No. 1316 for further discussion. This Court is not permitted to depart below the Congressionally-imposed mandatory minimum penalty. *See United States v. Richardson*, 521 F.3d 149, 159 (2d Cir. 2008) (instructing that a district court may only depart below a statutory minimum pursuant to a Government motion under 18 U.S.C. § 3553(e), which assuredly has not occurred here). Recognizing as much, this Court properly noted in a December 2020 telephonic status conference that the sentencing itself would presumably be "a somewhat pro forma proceeding," since the defendant was facing a "mandatory life" sentence. *United States v. Aquart*, No. 06cr160 (JBA), Doc. No. 1299, at 4. Those circumstances continue to hold true today.

By operation of the applicable statute, the defendant must receive a mandatory life sentence, as to Counts 2, 3 and 4.

### B. The Guidelines term of imprisonment is life on each of the Counts

Likewise, the Sentencing Guidelines call for a life term of imprisonment for the defendant on each of the eight counts of conviction. As discussed below, this is true even of the drug conspiracy offense charged in Count 8. The defendant's contentions to the contrary are simply wrong.

#### 1. *The offense level is 43 for every Count, even if viewed in isolation, as determined in the PSR*

13

In his sentencing memorandum, the defendant begins by providing a proposed "advisory guidelines calculation" for Count 8 alone, which bears little relationship to the PSR calculation or, indeed, to the requirements of the Sentencing Guidelines.   *See* Def. Memorandum at 2-3.   As an initial matter, as the defendant openly acknowledges, the proffered calculation is limited to the drug trafficking conspiracy in Count 8, based on his incorrect theory that the other counts can or should be discarded by this Court.   *Id.*   Of course, this Court must tabulate the range for *all* counts of conviction, as the Probation Office meticulously did in the PSR. PSR ¶¶ 38-95, 97-112, 172, 176, 178, 181, 184, 186.

More to the defendant's own point, however, is the fact that his offense level calculation—even for Count 8 standing alone—is wrong.   The defendant calculates the base offense level for Count 8 as 24, under U.S.S.G. § 2D1.1(a)(5) and (c)(8), and then assesses 10 additional points for possession of a dangerous weapon, use of violence, maintenance of drug premises, aggravating role plus another factor, and leadership role, for an adjusted offense level of 34.   *See* Def. Memorandum at 3.

This calculation wholly ignores the requirement imposed by U.S.S.G. § 2D1.1(d)(1), which requires by cross-reference that "[i]f a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States, apply § 2A1.1 (First Degree Murder) or § 2A1.2 (Second Degree Murder), as appropriate, if the resulting offense level is greater than that determined under this guideline."   Since Aquart's crimes indubitably constitute murder—and more specifically, a "premeditated killing," *see* U.S.S.G. § 2A1.1, Application Note 1—this Court is required to apply the cross-referenced Guideline for First Degree Murder under U.S.S.G. § 2A1.1.   Application of

that Guideline yields a base offense level of 43—the highest possible offense level—even before any enhancements are applied.   U.S.S.G. § 2A1.1; *see also* Chapter 5, Part A, Application Note 2 (directing that, if the total offense level exceeds 43, it will be treated as a level 43).

The defendant asks the Court to embrace an offense level calculation that deliberately ignores his commission of three murders.   Presumably, he does so based on his contention, described further in his pending motions to dismiss, that "Counts 1-4 and Counts 5-7 are legally invalid and that therefore, the Court cannot enter judgment on them following the upcoming resentencing."   Def. Memorandum at 2.

But this position misapprehends the nature of fact-finding and Guidelines calculation during the sentencing process.   At sentencing, "no limitation shall be placed on the information concerning the . . . conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."   18 U.S.C. § 3661.   Indeed, courts may even consider uncharged or acquitted conduct in determining—by the lower standard of preponderance of the evidence—the applicable Guidelines range and the appropriate sentence.   *See United States v. Watts*, 519 U.S. 148, 153, 117 S. Ct. 633, 635, 136 L. Ed. 2d 554 (1997); *United States v. Vaughn*, 430 F.3d 518, 526 (2d Cir. 2005).

That Aquart did indeed commit these murders is beyond question.   At trial, the jury found him guilty of all murder charges beyond a reasonable doubt—a significantly higher standard than that applicable at sentencing.   On appeal, the Second Circuit rejected his challenge to the sufficiency of the evidence for the VICAR murders and held that "defendant's sufficiency challenge to his VICAR convictions fails on the merits."   *United States v. Aquart*, 912 F.3d 1, 20 (2d Cir. 2018).   (In fact, in appellate briefing, Aquart limited his challenge to the legal matters of

the interstate commerce nexus and motive requirements—both rejected by the Second Circuit—and he actually did not even challenge the sufficiency of the evidence to prove, as a factual matter, that "he conspired to, and did in fact, murder Tina Johnson, James Reid, and Basil Williams."   *See Aquart*, 912 F.3d at 17.)[4]

Therefore, even assuming *arguendo* that the Court were to dismiss Counts 1 through 7 on legal technicalities (which, however, it has no valid basis or authority to do following the issuance of the mandate), this Court would *still* be required to consider Aquart's murders as a factual matter in its Guidelines calculations and in fashioning a sentence.   And in factoring the murders into its Guidelines calculation, this Court would *still* be required to apply the cross-referenced Guideline for First Degree Murder and obtain a base offense level of 43, before any enhancements.   *See* U.S.S.G. §§ 2A1.1; 2D1.1(d)(1).

Aquart's proposed base offense level of 24 and adjusted offense level of 34 are, therefore, contrary to the requirements of the Guidelines.   His proposal should be given no weight by the Court.

### 2. *Aquart properly falls into Criminal History Category VI, as determined in the PSR*

Aquart next takes issue with the Probation Office's determination that he falls within a Criminal History Category of VI, seeking instead placement in Criminal History Category V.   *See* Def. Memorandum at 3-4.   He argues that he should not have been assessed three criminal history points for his robbery in the third degree, for which he was arrested in December 1995, because "no document evidencing an arrest on December 31, 1995 has been provided."   Def.

---

[4]       Aquart also limited his sufficiency challenge to the VICAR counts alone (Counts 2, 3 and 4), and did not challenge the sufficiency of the evidence as to the other murder counts (Counts 5, 6 and 7).   In any event, the Second Circuit found that sufficient evidence did support all his convictions.

Memorandum at 3.   This is not so.   As the defendant acknowledges, the National Crime Information Center (NCIC) index reflects Aquart's December 31, 1995 arrest.   *See* Def. Memorandum at 3; PSR ¶ 100.   Further, Aquart's guilty plea transcript reflects that the crime occurred on December 31, 1995 and that police found and seized Aquart on or near the scene just after he committed the robbery.   *See* Plea Transcript, Ex. 2 to the PSR, at 7.

Aquart also objects to the inclusion of three criminal history points for the sale of narcotics offense committed on October 15, 1996.   *See* PSR ¶ 101.   He points out, appropriately, that the offense was committed on the streets, and notes that a letter from the Bridgeport Detention Center indicates that Aquart was in juvenile custody at that time.   Def. Memorandum at 3.   The Government is continuing to investigate this apparent discrepancy, first raised in the defense sentencing memorandum, which may have resulted from an inaccurate date in the juvenile facility's letter or another cause.   It is difficult to reconcile Aquart's contention, now, that he was unable to commit this crime (because he was in custody) with his guilty plea at the time.   No whisper of juvenile detention was raised as a defense during his guilty plea hearing.   *See* Plea Transcript, Ex. 2 to the PSR, at 6-11.

That said, even if the three points associated with the 1996 narcotics charge were to be removed from Aquart's criminal history calculation, no change would result in his Criminal History Category.   His score of 16 points would merely drop to 13 points.   PSR ¶ 112. According to the Guidelines sentencing table, 13 criminal history points yield a Criminal History Category of VI—the same as that currently reflected in the PSR.   *Id.*

### 3.  *A horizontal departure in Criminal History Category is unwarranted*

Aquart makes another attempt to reduce his Criminal History Category from the highest category of VI.   Relying on U.S.S.G. § 4A1.3(b)(1) and *United States v. Mishoe*, 241 F.3d 214,

219 (2d Cir. 2001), Aquart contends that CHC VI "substantially over-represents the seriousness of his criminal history."  Def. Memorandum at 6.  He argues that his youth at the time of his offenses, his social history, the relatively short length of his prior sentences, and the nature of his prior offenses weigh in favor of a reduced criminal history score.  He thus seeks a so-called "horizontal" departure to CHC III or IV.

This argument is without merit.  Aquart's Criminal History Category in no way "substantially over-represents the seriousness of his criminal history."  U.S.S.G. § 4A1.3(b)(1). In fact, it may substantially under-represent Aquart's criminal activity.  As the defense points out, the PSR includes in its CHC tabulation only a handful of convictions—mostly drug offenses, along with robbery, illegal possession of body armor and failures to appear—for which Aquart received relatively short stints in prison.  *See* PSR ¶¶ 97-112.

But as this Court well knows, extensive trial evidence established that Aquart's criminal conduct extended far beyond the convictions described in the PSR.  Aquart committed many vicious crimes for which he was never prosecuted or convicted.  Multiple witnesses testified that Aquart violently assaulted them, causing permanent scarring, loss of consciousness and multiple hospitalizations.  For example, when Jackie Bryant was short money owed to Aquart, he punched her and beat her with a ceramic ashtray until she blacked out and "busted open" her knee, an injury that left her temporarily requiring a walker and with permanent scars.  *See* PSR ¶ 13; Trial Tr. at 1134-37.  In retaliation for a drug debt, Aquart assaulted Venro Flemming, fracturing his nose and causing cuts to his eye and lip.  *See* PSR ¶ 13; Trial Tr. at 1319-26.  When Frank Hodges sold drugs from another narcotics supplier, Aquart punched and stomped on his head, face and body, fracturing Hodges' nose, blackening his eye, bloodying his face and cracking his rib.  *See*

18

PSR ¶ 13; Trial Tr. at 731-38; 1471-73.   When Juanita Hopkins and John Sullivan sold another supplier's drugs, Aquart beat them in the face and head with a gun.   PSR ¶ 13; Trial Tr. at 739-43; 1474-77; 2565-69.   While incarcerated, Aquart assaulted fellow detainee Anthony Armstead, striking him repeatedly in the head—an attack that necessitated stitches to Armstead's head, both eyes, lip and ear.   PSR ¶ 5.

Aquart was never independently prosecuted for and convicted of these violent crimes.[5] Therefore, they do not appear in the PSR's recitation of his criminal history.   The trial evidence as to his pattern of violent crimes was nonetheless overwhelming—so much so that, in its Special Verdict Form, the jury unanimously found beyond a reasonable doubt that Aquart "committed criminal acts of violence that posed a serious threat to the lives and safety of persons other than the victims in this case, and that by so doing, the Defendant engaged in a continuing pattern of violent criminal conduct." Special Verdict Form (Penalty Phase), Doc. No. 936, at 5.

In the context of this history, Aquart's attempt to recast his Criminal History Category as somehow unduly over-representative is baseless.   According to the Sentencing Guidelines, a "downward departure from the defendant's criminal history category may be warranted if, for example, the defendant had two minor misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior criminal behavior in the intervening period." U.S.S.G. § 4A1.3, Application Note 3.   This is not representative of Aquart's case, in which he committed myriad violent crimes (which would have constituted felonies if he had been prosecuted and convicted) in the months and years prior to the instant offenses.

---

[5]      This compilation may not be exhaustive.   It does not, for example, include Aquart's attempted obstruction of justice—for which he likely could have been, but was not, independently charged.

Further, the case law he cites is inapposite.   In *Mishoe*, for example, the defendant, a street-level drug seller representing the "lowest level on the distribution chain," was convicted of a non-violent drug crime and his prior offenses were all non-violent drug crimes.   241 F.3d at 217.   By contrast, Aquart was the leader of a large drug operation trafficking in kilograms of crack cocaine, a prolific violent criminal and the convicted murderer of three victims.   And though the defendant claims he should not be classed in CHC VI with defendants such as Alonzo Gregory, whose six prior convictions included a robbery at gunpoint and two assaults of female victims, *see United States v. Gregory*, No. 3:96CR114 (EBB), 2008 WL 5391938 (D. Conn. Dec. 23, 2008), Aquart's long history of vicious assaults prior to his brutal triple-murder appropriately places him in that company.[6]   No horizontal departure is warranted.

### 4.  *In any event, Aquart remains subject to a Guidelines term of imprisonment of life*

Ultimately, these arguments regarding the proper calculation of the defendant's Guidelines range are of no moment.   Even if—contrary to law and fact—the Court were to accept Aquart's various objections to the Probation Office's calculation of his offense level and Criminal History Category, it would produce no change in his overall Guidelines range.   Even if this Court were to vacate his convictions on certain counts,[7] and even if he were placed in Criminal History Category V, and even if he were granted a horizontal departure to Criminal History Category IV or even III, Aquart's Guidelines range would not move.   His offense level of 43—at every Criminal History

---

[6] *United States v. Rivers*, 50 F.3d 1126 (2d Cir. 1995) and *United States v. Preacely*, 628 F.3d 72 (2d Cir. 2010), on which the defendant also relies, presented unrelated situations in which the respective sentencing judge may not have understood their authority to grant departures; no such situation exists here.   In *Preacely*, moreover, the defendant had rendered significant assistance to the Government and received from the Government a Section 5K1.1 motion for a downward departure; no such cooperation exists here.   628 F.3d at 76, 78.

[7]       If somehow this Court dismissed each of Counts 1 through 7—which there is no basis whatsoever to do—the defendant's sentence would be capped at the 40-year statutory maximum for Count 8, notwithstanding an offense level of 43, which would otherwise yield an advisory Guidelines term of life imprisonment.

Category—triggers a Guidelines term of imprisonment of life.   *See* U.S.S.G. Ch. 5, Pt. A (sentencing table).

### 5.   *Aquart's additional factual and legal objections are meritless*

In connection with the preparation of the PSR and the submission of his sentencing memorandum, the defendant has also challenged many of the factual assertions set forth in particular in the PSR's recitation of his offense conduct.   These extensive objections appear to represent, by and large, an attempt to relitigate the facts underlying his convictions, rather than to present facts relevant to sentencing.   Insofar as the defendant now seeks to challenge at sentencing the validity of the jury's verdict or the Second Circuit's affirmance, that effort should not be countenanced.   The window to challenge his conviction is now closed.   *See also* Gov't Opp'n to Def. Mot. to Dissmiss, Doc. No. 1316.

The defendant acknowledges as much in his sentencing memorandum.   He concedes that "defense counsel understand that Mr. Aquart is before the Court on October 21st for a resentencing and not a retrial on the factual merits of his convictions."   Def. Memornadum at 1-2.   He goes on to note that, although he has lodged voluminous objections in an effort to "preserve potential future legal claims," some portion of his objections need not be resolved at sentencing.   *Id.*

Accordingly, the Government will not counter in great detail each point raised by the defendant in objection.   In the event the Court determines to resolve each of Aquart's factual disputes at sentencing, the Government reserves the right to respond further.   As an aid at sentencing, however, this memorandum will briefly address the various categories of objections raised.

In his objections to the PSR, the defendant comingles factual objections with legal argumentation that is not typically directed at the Probation Office.   For example, he adverts to

the legal challenges regarding constructive amendment, notice and due process claims made in his pending motions to dismiss.   Def. Objections to PSR, PSR Ex. 2, at 1-2.   Because those motions have been briefed elsewhere, the Government will not respond further here.[8]

As to his factual contentions, the defendant objects to the PSR information about the quantity of drugs trafficked by the Aquart organization, the assaults on Juanita Hopkins and Venro Flemming, and the general testimony of cooperator John Taylor.   Def. Objections to PSR, PSR Ex. 2, at 2-9.   There is no merit in these objections.   Extensive trial testimony—including by Jackie Bryant, Frank Hodges, Venro Flemming and Aquart's lieutenant Rodney Womble, among others—established the extremely large quantity of drugs trafficked by the Aquart organization. PSR ¶ 12.   Though, to be sure, some of those witnesses were drug users themselves, that is to be expected among lower-level sellers in a drug trafficking organization.   Their testimony was thorough, consistent and corroborative of one another.   Aquart's specific objections (*e.g.*, the organization did not weigh the packages of drugs on a scale; the police didn't seize and weigh drugs) are beside the point.   According to the highly-placed lieutenant, Rodney Womble, the Aquart organization sold 21 to 27 packs per week, amounting to 73.5 to 94.5 grams of crack sold per week. During Womble's eight-month tenure alone, the Aquart organization sold between 2.3 and 3 kilograms of crack (not counting the period before Womble joined the conspiracy).   PSR ¶ 12.   Aquart was unquestionably responsible for 280 grams of crack cocaine or more.   This fact

---

[8]      The Government merely notes that it did indeed reserve its right to address the merits of the defendant's underlying claims—including claims regarding drug quantity—if the Court decides not to apply the well-established mandate rule, *see* Gov't Opp'n to Def. Mot. to Dismiss, Doc. No. 1316, at 14 & 2 n.1; contrary to the defendant's argument in PSR objections that somehow the Government's recitation of drug quantity trial evidence "comes too late as it failed to make this claim in [motion to dismiss] briefing and briefing has closed" *see* Def. Objections to PSR, PSR Ex. 2, at 1-2.

is not merely "the government's current assertion," as the defendant would have it.   It was the unanimous finding beyond a reasonable doubt by the trial jury on the Special Verdict Form.   *See United States v. Aquart*, Verdict Form, No. 06cr160 (JBA), Doc. No. 846, at 2.   Moreover, the jury made this finding after hearing the testimony, observing defense cross-examination of each and every witness, attending to final arguments, and receiving the court's instructions on the law and their duty to assess and make determinations regarding the credibility of the witnesses.

Likewise, the assaults on Hopkins and Flemming that the defendant now challenges were well established in the trial record.   As to Hopkins, she testified extensively about Aquart's assault, and Womble corroborated her account.   PSR ¶ 13; Trial Tr. at 1474-77; 2565-69.   And Sullivan's testimony was more equivocal than the defendant suggests (*e.g.*, when asked if Aquart hit Hopkins, Sullivan—then understandably occupied with his own beating—testified, "I know she was screaming, but I don't think he hit her."   Trial Tr. at 4688.).   As to Flemming, his testimony regarding Aquart's pushing him to the ground and causing him a fractured nose and cuts to his face was corroborated by the hospital records documenting those injuries.   *See* PSR ¶ 13; Trial Tr. at 1319-26.

Finally, the defendant theorizes that Taylor's testimony is "suspect" because of minute details in his testimony (the living room sofa was too short for him to push out of the way with his stomach; Taylor didn't mention a floral sofa, etc.).   Def. Objections to PSR, PSR Ex. 2, at 4-9.   Aquart rehashes a frequently raised argument: "Taylor's testimony is untrustworthy and should not be relied upon in determining Mr. Aquart's sentence." *Id.* at 9.   This argument has been raised repeatedly—and rejected—at trial and before this Court.   *See Aquart*, 912 F.3d at 22 ("Judge Arterton explained that she had seen Taylor testify at both Aquart's and Efrain Johnson's trials,

23

and found him credible at each. Moreover, she understood each jury to have found him credible and, specifically, more credible than Efrain Johnson, who testified at his own trial").

In addition to these factual objections, the defendant also raises a series of legal objections that are similarly without merit.   First, the defendant objects to the enhancement for obstruction of justice under U.S.S.G. § 3C1.1, arguing that it should not apply because there was no ongoing investigation at the time the alleged obstructive conduct occurred.[9]   *See* Def. Objections to PSR, PSR Ex. 2, at 10.   This argument misrepresents the text of the enhancement itself. That Guideline instructs that the obstruction enhancement should apply if "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice *with respect to the investigation, prosecution, or sentencing of the instant offense of conviction* . . . ."   U.S.S.G. § 3C1.1.   Aquart's attempt to limit the application only to the investigative stage of the case is directly contravened by the language itself.   Clearly, his attempts to convince both Venro Flemming and Shamar Myers to falsely testify were efforts to obstruct his *prosecution*—an effort clearly embraced by the Guideline.   The obstruction enhancement applies.

Similarly groundless is his objection to the paragraph in the PSR detailing his attempt to recruit Shamar Myers to obstruct justice.   *See* Def. Objections to PSR, PSR Ex. 2, at 10.   Aquart's rights to counsel and to remain silent in no way preclude the FBI from investigating a new or ongoing crime or working with a cooperator to do so.   Nothing in the cited case law establishes a violation of Aquart's constitutional rights.

Finally, Aquart contends that over 280 grams of crack cocaine cannot be attributable to him because "there was no evidence that he distributed in excess of 280 grams *in one transaction*."

---

[9]  It should be noted that, since the enhancements do not function to increase Aquart's offense level beyond the highest possible score of 43, his objection to this enhancement may be moot.

*See* Def. Objections to PSR, PSR Ex. 2, at 3-4 (emphasis added).   This objection misapprehends the appropriate standard for the crime of narcotics conspiracy.   The operative case law makes plain that the crime of conspiracy "involves the *aggregate* quantity of all the subsidiary transactions attributable to that particular member."   *United States v. Pressley*, 469 F.3d 63, 66 (2d Cir. 2006) (emphasis added).   The defendant's cited case law dealt with substantive counts of drug distribution—a different offense entirely.   *See United States v. Rowe,* 919 F.3d 752 (3d Cir. 2019).

<p style="text-align:center">***</p>

Ultimately, the Sentencing Guidelines—like the statutory mandatory minimum—call for a term of life imprisonment.   The miscellaneous objections presented here cannot obscure or modify that conclusion.

### C. The statutory sentencing factors strongly support a sentence of life imprisonment

Finally, the sentencing factors set forth in 18 U.S.C. § 3553(a)—and the very interests of justice—strongly weigh in favor of a term of life in prison.   Aquart committed three heinous murders.   Although all murder is appalling, the particular facts of Aquart's particular murders beggar description.   Aquart and his accomplices kicked in the apartment door, duct taped Tina, James and Basil head to foot, and then proceeded to murder them in arguably the most brutal possible manner—by beating each one to death with a baseball bat.   He and his accomplices beat them so viciously that their blood and flesh was splattered over the entire apartment—walls, floor and ceiling.   The apartment looked like a war zone.   It is impossible to imagine the terror, agony and excruciating pain that Tina, James and Basil felt in their final moments.   It was an atrocity.

Aquart's crimes were made still worse by the extensive premeditation and planning that preceded the murders.   Over a period of days, Aquart recruited accomplices and procured supplies and the bats he would use as murder weapons.   He even made an aborted attempt to commit the murders a few days prior, but left when he encountered people there.   This was not the result of an impulsive and quickly regretted moment.   Aquart orchestrated these murders with careful premeditation.

His actions immediately after the murders further demonstrate the premeditation leading up to these murders.   Presumably in an effort to cover up his crime, Aquart drilled the apartment door shut from the inside, preventing anyone from easily entering, and effectively entombing his victims in their home, lying dead in pools of their own blood.   He then calmly left the apartment and enlisted the help of others in destroying the evidence.

Why did Aquart commit these heinous crimes?   Because Tina Johnson was cutting into his drug revenues.   But Tina's drug sales paled in comparison to the defendant's.   Aquart was angry that she refused to heed his warning.   For Aquart, this was a cold calculation of profit, coupled with a warped concept of power and respect.   He wanted to make someone who disobeyed him pay with her life.   He was eager to trade the lives of three people for a few extra dollars in drug money.   The mental process is beyond comprehension.

At the end of Aquart's murderous rampage, what remained was the gaping hole left by the lives lost.   Tina, James and Basil had breathed their agonizing last.   Their three futures were ripped away in the course of a single morning.   Their presence, their camaraderie, their unique personalities, gone.   And in the terrible aftermath, what was left was the devastation of three communities of friends and family.   The ongoing pain of the son who had come for a visit and

stepped into the waking nightmare of discovering his mother's bloody corpse.   The father who didn't "want[] to live anymore" and died shortly before the trial.   Trial Tr. at 4724-25.   The mother who felt, "[w]hen he was murdered, I was murdered too, because I wanted to die."   Trial Tr. at 4725.

The murders that Aquart committed, and the way in which he committed them, require a life sentence to fulfill the objectives of sentencing.   The "nature and circumstances of the offense" are quite literally as grave as any offense can be.   *See* 18 U.S.C. § 3553(a)(1).   The circumstances of the offense speak volumes about the "characteristics of the defendant."   *Id.*   This type of atrocious crime requires a meaningful sentence "to afford deterrence."   *See* 18 U.S.C. § 3553(a)(2).   But most of all, this Court must impose a life sentence to "reflect the seriousness of the offense, [] promote respect for the law, and [] provide just punishment for the offense."   *Id.* In this case, unlike many others that come before this Court, the need to provide just punishment for this most serious of crimes is paramount.

The other § 3553(a) factors synchronize with those above.   In evaluating "the kinds of sentences available," 18 U.S.C. § 3553(a)(3), this Court must consider that the drug-related murder statute makes life imprisonment a possibility and the VICAR murder statute makes life imprisonment a requirement.   In evaluating the "kinds of sentence and the sentence range established" in the Sentencing Guidelines, *see* 18 U.S.C. § 3553(a)(4), this Court may consider the fact that the Sentencing Guidelines provide one offense level for First Degree Murder—the highest offense level of 43.   U.S.S.G. § 2A1.1.   This Court may further consider that, for this most serious of crimes, the Sentencing Guidelines establish a Guideline term of imprisonment of life in prison, irrespective of the defendant's criminal history.   *See* U.S.S.G. Ch. 5, Pt. A (sentencing

table).   And in evaluating "any pertinent policy statement" issued by the Sentencing Commission, *see* 18 U.S.C. § 3553(a)(5), this Court may consider that the Sentencing Commission has instructed that "[i]n the case of premeditated killing, life imprisonment is the appropriate sentence if a sentence of death is not imposed."   U.S.S.G. § 2A1.1, Application Note 2(a).   The Sentencing Guidelines go on: "A downward departure would not be appropriate in such a case."   *Id.*

Finally, in fashioning the appropriate sentence, this Court must seek "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   18 U.S.C. § 3553(a)(6).   In this case, Aquart's three accomplices have already been sentenced.   Aquart's brother Azikiwe Aquart was sentenced by this Court to life imprisonment on each of three counts, as well as a $25,000 fine on each.   PSR ¶ 3.   Efrain Johnson was later prosecuted in state court, convicted of felony murder, and sentenced to a term of imprisonment of 50 years.   *Id.*   Only John Taylor received a relatively lenient sentence of 108 months (*i.e.*, nine years) in prison, which represented a very large reduction to reflect his cooperation.

If Aquart—the unquestionable leader and mastermind of the crime—were to receive a more lenient sentence than his less culpable brother for the same crime, that sentence would represent a highly unwarranted sentence disparity, and an unjust one.

The defense asks this Court to focus exclusively on the defendant's traumatic personal and family history and his professed rehabilitation while on death row.   To be sure, those factors are sympathetic and laudable, respectively.   It should be noted, however, that a traumatic personal and family history does not inevitably lead one to commit crimes—especially not crimes of this magnitude.   For an example of the different choices one might make, this Court need look no further than Aquart's brother Azizi Aquart.   Although the defendant dismisses Azizi as "a

28

nonentity at best and a malignancy at worst," Def. Memorandum at 19, the fact is that Azizi experienced much the same trauma as did the defendant.   In addition to the shared family tragedy of their mother's drowning death, their father's incarceration, and many of the terrible shared circumstances set forth in the PSR, Azizi himself was shot three times on the streets of Bridgeport at age 17.   Trial Tr. at 5065-69, 5601.   But rather than turn to a life of crime, Azizi decided to "change[] the way I live."   Trial Tr. at 5069.   He testified, "I put away guns, I put away drugs, I put away pretty much all the negative things."   *Id.*   Instead, he stayed focus on his wife and baby. *Id.*   Azizi went on to have four children, gained legitimate employment and started his own business.   Trial Tr. at 5096-97.

The defendant seems to have learned some of these lessons too in the decade since his trial ended.   The glowing reports of his interests, his studies, his tutoring and his creative ideas should rightly be a source of pride to him and his loved ones.   But one cannot help but wonder what interests Tina and Basil and James might have pursued over the past 16 years.   What community activities they might have joined.   What creative ideas they might have fostered.   What comfort and love they might have given and received.   We will never know how their lives would have unfolded, because on an August morning 16 years ago, Azibo Aquart decided that they should die.

Now, before this Court, Aquart avers that he "deserve[s] mercy."   Def. Memorandum at 24.   But in one important way, he has already received far more mercy than he showed to his victims.   At this sentencing, Aquart will face a maximum penalty of life imprisonment.   Tina and James and Basil were not so 'fortunate.'

## VI.   CONCLUSION

For the reasons set forth above, the Government respectfully submits that this Court must impose a sentence of life imprisonment, along with restitution in the total amount of $17,106, to

be divided among his victims to cover their funeral expenses.   This sentence is provided for by

the Sentencing Guidelines, supported by the § 3553(a) factors, and ultimately mandated by statute.

Finally, and most significantly, it is consistent with the interests of justice.

<div style="margin-left: 3em;">

Respectfully submitted,

LEONARD C. BOYLE
ACTING UNITED STATES ATTORNEY

    /s/

ELENA LALLI CORONADO
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv09758
Elena.Coronado@usdoj.gov
1000 Lafayette Blvd, 10th Floor
Bridgeport, Connecticut 06604
(203) 696-3000

PETER D. MARKLE
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. ct05098
Peter.markle@usdoj.gov
157 Church Street
New Haven, CT 06510
(203) 821-3700

</div>

<u>C E R T I F I C A T I O N</u>

I hereby certify that on October 1, 2021, the foregoing Memorandum was filed electronically.   Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.   Parties may access this filing through the Court's system.

/s/

ELENA LALLI CORONADO
ASSISTANT UNITED STATES ATTORNEY