**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

UNITED STATES OF AMERICA

v.

AZIBO AQUART

CRIMINAL NO. 3:06-cr-00160-JBA

SEPTEMBER 28, 2022

# Motion for Sentence Reduction under 18 U.S.C. § 3582(c)(1)(A)

# Table of Contents

A. Procedural Posture ................................................................................................ 5

B. Introduction .......................................................................................................... 9

C. Relevant Facts .................................................................................................... 13

    1. Mr. Aquart's early life is uniquely significant for its lack of love and support, the trauma imposed by his criminogenic family in the midst of a violent, forsaken city, and the ultimate abandonment of losing his father to incarceration and deportation and his mother to a tragic and fatal accident. ................................................................. 13

    2. Mr. Aquart's early years on death row were defined by isolation and mental breakdown. ........................................................................................................ 17

    3. Mr. Aquart's later years on death row were uniquely traumatizing because of the 13 executions carried out by the federal government over a six-month period. ...... 18

    4. Post-resentencing transitions: the trauma continues. ........................................... 21

D. Reasons for Sentence Reduction ........................................................................ 24

    1. Mr. Aquart has been subjected to severe medical neglect during his years on federal death row continuing to the present, the conditions within the BOP render him more likely to contract COVID-19, and should he contract COVID-19, he is likely to suffer more grievously due to his untreated and inadequately treated medical conditions. ................................................................................................ 24

        (a) Tuberculosis ................................................................................................ 26

        (i) *Mr. Aquart was diagnosed with tuberculosis 12 years ago. No treatment was offered until this year, and then the treatment was disrupted when USP Florence misplaced his medication.* ................................................................................................ 26

        (ii) *Tuberculosis and status as a former smoker render people more likely to get severely ill if they contract COVID-19.* ................................................................................................ 28

        (b) Undiagnosed and Untreated Painful Circulatory Problem ......................... 33

    2. Mr. Aquart has been denied the mental-health treatment that he desperately needs and that can only be provided in the community. ........................................... 35

    3. The conditions of Mr. Aquart's confinement have been and will continue to be uniquely punitive and harsh. ................................................................................ 38

    4. Especially given his traumatic childhood and background, Mr. Aquart has engaged in a remarkable process of rehabilitation. ................................................. 42

    5. Mr. Aquart was only 23 years old on the date of the crimes. ............................... 46

(a)     Scientific advancements since Mr. Aquart's trial demonstrate that people who commit crimes at the age of 23 are less morally culpable than adults because their brains are not fully matured. .......................................................................... 46

(b)     The law responds to the science ........................................................... 48

6.   Several of Mr. Aquart's current convictions reflect the ongoing and significant racially discriminatory disparity in federal sentencing between powder and crack cocaine that Congress may soon repeal. ...................................................... 53

7.   Mr. Aquart's reentry plan is strong and would support the mature, law-abiding man he has become in his transition back into society. ................................ 55

(a)     Mr. Aquart's release plan. .................................................................... 55

(b)     Mr. Aquart's hopes for the future. ....................................................... 58

E.  Jurisdiction ................................................................................................ 61

F.  Conclusion ................................................................................................. 62

# LIST OF EXHIBITS

| Exhibit # | Description |
|---|---|
| 1 | Dr. Jolie Brams Report (Aug. 11, 2022) |
| 2 | Lockdown Bulletins |
| 3 | Letter from Gabriel B. Eber (ACLU) to Warden Harvey Lappin |
| 4 | Brandon Sample, *Conditions on Federal Death Row "Horrendous", ACLU Finds*; Prison Legal News (April 15, 2009) |
| 5 | Declaration of Former Warden Maureen Baird |
| 6 | Medical Records Related to Tuberculosis |
| 7 | Medical Records Related to Circulatory Issues |
| 8 | Pavlo, Walter; BOP Director Leaves Behind a Tainted Legacy Void of Accountability (Washington Post, July 31, 2022) |
| 9 | Certificates of Achievement from USP Florence |
| 10 | Statement of the Department of Justice before the Senate Committee on the Judiciary (June 22, 2021) |
| 11 | Letter from Professor Lahny Silva |
| 12 | Payments to Clerk |
| 13 | Barrett, Devlin; *U.S. Prison Officials Resist Making Inmates Pay Court-Ordered Victim Fees* (Washington Post, Aug. 4, 2022) |

## Motion for Sentence Reduction under 18 U.S.C. § 3582(c)(1)(A)

Defendant Azibo Aquart, through his counsel, hereby moves this Court for a sentence reduction under 18 U.S.C. § 3582(c)(1)(A) on the basis of extraordinary and compelling reasons warranting such a reduction, as detailed in this Motion.

### A.  Procedural Posture

Following appellate reversal of his death sentences and the government's decision to no longer seek the death penalty, Mr. Aquart was resentenced on October 21, 2021. After acknowledging that history and characteristics of the defendant "do not in any way diminish the honor of the victims or their terror or their pain or their loss", the Court said this about Mr. Aquart:

> Mr. Aquart is now 40.[1] He was 23. He has been on – he was on death row for nine years. He suffered terribly. This resentencing shines a light on the terrifying and arbitrary nature of life on death row and the toll that it takes nearly driving Mr. Aquart to madness. As described, this is terrible punishment. However, the defendant's documented quest for education, purpose, and self-rehabilitation under these circumstances and in this isolation is a remarkable manifestation of what everyone wishes existed on August 24, 2005. We would not be here if it did. It did not.
> Possibly more remarkable is the record of zero disciplinary charges during these nine years and over all the years since 2005 that Mr. Aquart has been incarcerated. What is also underscored in the examination of Mr. Aquart's history and characteristics is the extraordinarily traumatic childhood of neglect, abandonment, violence, sexual abuse, absence of love.

---

[1] Mr. Aquart recently had a birthday and is now 41 years old.

Dr. Brams, the psychologist who examined him and submitted to the Court a detailed report of her findings, says he lacked even the most basic normalizing childhood experiences. And in effect after age 12, he became feral. And 11 years later, an unthinkable price was paid.

Nonetheless, this case, the history, and characteristics demonstrates an astonishing resilience that shows through in his actions and his prosocial activities and his search for goodness in himself.

In summary, the Court will take into consideration his traumatic childhood, his experience on death row, and his remarkable rehabilitation as bearing on the 3553(a) factors of deterrence and public protection.

Resentencing Transcript (October 21, 2021), pp. 82-84.

The Court then imposed sentence. The chart below shows the original sentences and those imposed on resentencing:

| Count | Offense | First sentence | Current sentence |
|---|---|---|---|
| 1 | VICAR conspiracy | 10 years consecutive | 10 years concurrent |
| 2 | VICAR murder | Death consecutive | Life concurrent |
| 3 | VICAR murder | Life consecutive | Life concurrent |
| 4 | VICAR murder | Death consecutive | Life concurrent |
| 5 | Drug-related murder | Death consecutive | 40 years concurrent |
| 6 | Drug-related murder | Life consecutive | 40 years concurrent |
| 7 | Drug-related murder | Death consecutive | 40 years concurrent |
| 8 | Drug conspiracy | Life consecutive | 40 years concurrent |

On August 5, 2022, Mr. Aquart sent his request for compassionate release to the Warden of the USP Florence, where he is incarcerated. The Warden has not responded. Thus, because more than 30 days have elapsed without a decision, administrative remedies have been exhausted, and the matter is ripe for adjudication. 18 U.S.C. § 3582(c)(1)(a).

Mr. Aquart moves the Court to reduce his sentence on Counts 2-8. With regard to Counts 2, 3, and 4, this is the Court's first opportunity to give effect to the mitigation evidence presented at resentencing, because at that time, the Court was required to impose life imprisonment. The mitigation evidence caused the Court to reduce the sentences below life imprisonment where it could, and Mr. Aquart asserts here that the same evidence justifies a similar reduction to the Counts 2, 3, and 4 sentences. *See generally*, *United States v. Perez*, No. 3:02cr7 (JBA), 2021 WL 837425, at *4 (D. Conn. March 4, 2021) (where life sentence was mandatory, the Court's first opportunity to "functionally weigh the §3553(a) factors" was during compassionate-release litigation). Mr. Aquart also presents significant additional evidence in this Motion that was unavailable at resentencing, which he asserts warrants a further sentence reduction on Counts 2-8.

The sentence-reduction provisions of 18 U.S.C. § 3582(c)(1)(A) give federal sentencing judges the authority and discretion to reduce a sentence below the applicable statutory mandatory-minimum term of imprisonment—an authority that this Court and other federal courts have exercised even in murder cases and even

where the mandatory sentence was life, as here. *See, e.g.*, *United States v. Cruz*, No. 3:94-cr-112 (JCH), 2021 U.S. Dist. LEXIS 68857 (D. Conn. April 9, 2021) (for defendant serving four concurrent life sentences for 2 murders and other offenses, granting sentence reduction to time served – approximately 31 years with good time credit); *United States v. Suggs*, No. 3:99cr244 (JBA), 2021 U.S. Dist. LEXIS 120221, at *1 (D. Conn. June 28, 2021) (for defendant serving two consecutive mandatory-minimum sentences of life imprisonment, granting sentence reduction to 30 years); *United States v. Ramsay*, No. 96-cr-1098 (JSR), 2021 WL 1877963, at *1 (S.D.N.Y. May 11, 2021) (for defendant serving mandatory-minimum sentence of life imprisonment, granting sentence reduction to 360 months); *Perez*, 2021 WL 837425, at **1, 6 (for defendant serving three mandatory-minimum sentences to life imprisonment, granting sentence reduction to time served where defendant had served 23 years); *United States v. Quinones*, No. 00Cr.761-1 (JSR), 2021 WL 797835, at **1, 5 (S.D.N.Y. Feb. 27, 2021) (for defendant serving mandatory-minimum sentence of life imprisonment for murder, granting sentence reduction to 35 years plus lifetime supervised release); *United States v. Rodriguez*, 492 F. Supp. 3d 306, 308, 317 (S.D.N.Y. 2020) (for defendant serving mandatory-minimum sentence of life imprisonment for murder, granting sentence reduction to 30 years plus lifetime supervised release); *United States v. Tidwell*, 476 F. Supp. 3d 66, 68, 80 (E.D. Pa. 2020) (for defendant serving mandatory-

minimum sentence of life imprisonment[2] for murder, granting sentence reduction to time served where defendant had served close to 26 years); *United States v. Rios*, No. 3:94cr112 (JBA), 2020 U.S. Dist. LEXIS 230074, at **4-6 (D. Conn. Dec. 8, 2020) (for defendant serving mandatory-minimum sentence of life imprisonment for murder, granting sentence reduction to 30 years).

Based on the extraordinary and compelling reasons discussed in this Motion, Mr. Aquart respectfully seeks a sentence reduction to time served.

## B. Introduction

Although "[a] federal court generally 'may not modify a term of imprisonment once it has been imposed,'" *Dillon v. United States*, 560 U.S. 817, 819 (2010), in 18 U.S.C. § 3582(c)(1)(A), Congress enumerated several exceptions to this general rule. One exception, sometimes referred to as "compassionate release," authorizes district courts to reduce a federal sentence for "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A).

As the Second Circuit and this Court have noted, "compassionate release" is a misnomer, since the statute "in fact speaks to sentence reductions." *United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020); *Perez*, 2021 WL 837425, at *2 n.4 (same). "A district court could, for instance, reduce but not eliminate a defendant's prison

---

[2] Although this district-court decision does not expressly reference the fact that the sentence to life imprisonment was mandatory, it was. *United States v. Tidwell*, 521 F.3d 236, 238 (3d Cir. 2008).

sentence, or end the term of imprisonment but impose a significant term of probation or supervised release in its place." *Brooker*, 976 F.3d at 237. "Beyond this, a district court's discretion in this area—as in all sentencing matters—is broad." *Id.*

For more than three decades, under the original statute, only the Director of the Bureau of Prisons (BOP) could file a motion for a sentence reduction on a defendant's behalf under section 3582(c)(1)(A). "BOP used this power sparingly, to say the least." *Brooker*, 976 F.3d at 231. "A 2013 report from the Office of the Inspector General revealed that, on average, only 24 incarcerated people per year were released on BOP motion." *Id.* (citing U.S. Dep't of Just. Office of the Inspector General, The Federal Bureau of Prisons' Compassionate Release Program 1 (2013), https://www.oversight.gov/sites/default/files/oig-reports/e1306.pdf). The Inspector General concluded that BOP had not properly managed the compassionate-release program and that its implementation of the program was inconsistent and resulted in ad-hoc decision making. *Id.* at p. 11. Although BOP responded by increasing releases to some extent, the overall number of releases remained paltry.

Then in 2018, as part of the First Step Act, Congress amended section 3582(c)(1)(A) to also allow a defendant to seek a reduction directly from the court when the BOP declines to make such a motion. Pub. L. No. 115-391, Title VI, sec. 603(b)(1), § 3582, 132 Stat. 5194, 5239 (2018). The amended statute authorizes a district court to reduce a term of imprisonment previously imposed, after considering the factors set forth in 18 U.S.C. § 3553(a) to the extent that they are applicable, if it

10

finds that extraordinary and compelling reasons warrant such a reduction. 18 U.S.C. § 3582(c)(1)(A).

Congress's goal was clearly to expand the use of sentence reductions. *See* Shon Hopwood, *Second Looks & Second Chances*, 41 Cardozo L. Rev. 83, 106 (Oct. 2019) (noting that "Congress labeled these changes, 'Increasing the Use and Transparency of Compassionate Release.'" (citing 164 CONG. REC. H10358 (daily ed. Dec. 20, 2018))). The difference this statutory change has made is dramatic. The First Step Act took effect in December 2018. In all of 2018, "only 34 people received compassionate release sentence reductions." *Brooker*, 976 F.3d at 233. But in the nearly four years since the First Step Act took effect and the BOP's role as gatekeeper was abolished, at least than 4,287 sentence-reduction motions have been approved, according to the BOP.[3]

Congress failed to define what types of "extraordinary and compelling reasons" would warrant a sentence reduction. Instead, it asked the U.S. Sentencing Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t) (specifying only that a defendant's rehabilitation "alone" is not an extraordinary and compelling reason); *see also* 28 U.S.C. § 994(a)(2)(C).

---

[3] *See* https://www.bop.gov/inmates/fsa/index.jsp (last accessed September 26, 2022).

In *Brooker*, 976 F.3d at 234, the Second Circuit held that the First Step Act allows federal courts to independently determine what reasons are "extraordinary and compelling" and that Application Note 1(D) to U.S.S.G. § 1B1.13, which would otherwise constrain that discretion, does not apply to motions for sentence reduction brought by defendants.[4] Thus, this Court has broad authority under 18 U.S.C. § 3582(c)(1)(A) to "consider any extraordinary and compelling reason for release that a defendant might raise." *McCoy*, 981 F.3d at 284 (quoting *Brooker*, 976 F.3d at 230). Congress "intended to give district courts an equitable power to employ on an individualized basis to correct sentences when "extraordinary and compelling reasons" indicate that the sentence initially imposed on any individual defendant no longer served legislative objectives." *United States v. Panton*, No. 89 CR. 346 (LAP), 2020 WL 4505915, at *4 (S.D.N.Y. Aug. 4, 2020). "[A]lthough the power to reduce sentences provided for by 18 U.S.C. § 3582(c)(1)(A) has most often been used to reduce the prison terms of elderly and/or terminally ill defendants, nothing in the statutory language or legislative history of 18 U.S.C. § 3582(c) indicates that Congress

---

[4] This holding is in accord with the "overwhelming majority of the courts of appeals that have decided the issue." *United States v. Ruvalcaba*, 26 F.4th 14, 21 (1st Cir. 2022), citing *United States v. Andrews*, 12 F.4th 255, 259 (3d Cir. 2021); *United States v. Aruda*, 993 F. 3d 797, 802 (9th Cir. 2021) (per curiam); *United States v. Shkambi*, 993 F.3d 388, 392-95 (5th Cir. 2021); *United States v. McGee*, 992 F.3d 1035, 1050-51 (10th Cir. 2021); *United States v. McCoy*, 981 F.3d 271, 281-84 (4th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1109 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020); *Brooker*, *supra*; *see also United States v. Long*, 997 F.3d 342, 357-59 (D.C. Cir. 2021).

intended to limit its application to elderly defendants or defendants with compelling medical circumstances." *Id.* (granting sentence reduction from life imprisonment to time served (nearly 30 years) plus one week).

A reduction in Mr. Aquart's sentence to time served is warranted by many extraordinary and compelling reasons, both considered individually and in combination.

## C. Relevant Facts

1. **Mr. Aquart's early life is uniquely significant for its lack of love and support, the trauma imposed by his criminogenic family in the midst of a violent, forsaken city, and the ultimate abandonment of losing his father to incarceration and deportation and his mother to a tragic and fatal accident.**

If one set out to create a perfect storm for violent crime, one could not have constructed the narrative more flawlessly then the facts reveal in this case. Mr. Aquart, the youngest child of Sonia and Richard Aquart, was born into the chaos and violence of the drug trade. Both parents were undocumented and dealt drugs. Richard regularly used firearms and taught his young sons that disputes are settled with violence. Richard used brawn to deal with disagreements and stress not only in his business but also in his marriage. As a youth, Mr. Aquart was sexually victimized by an aunt and a caretaker.

The family lived in Bridgeport which was gang-infested, brutal, and violent.[5] In their front yard, a young Azibo found a family friend in the front seat of his car shot to death. A babysitter died while Azibo and his siblings were in her care. The children knew they were not supposed to contact law enforcement because of their family's immigration status and drug dealing, so they just lived with the dead woman until their parents returned.

The Court will recall that Dr. Jolie Brams evaluated Mr. Aquart prior to resentencing and described an upbringing bereft of parental guidance and love and instead full of violence, lawlessness, and sexual molestation at the hands of various relatives and caregivers. Brams Report (Sept. 23, 2021); Doc. #1345-6. Mr. Aquart's father was incarcerated and then deported. His mother died in a freak drowning accident. Mr. Aquart was essentially rendered homeless at the age of 12.

When he could beg a meal or a bed from friends of his parents or classmates, he had a roof over his head. But frequently, he found himself living on the streets of

---

[5] The year Azibo turned 13, Clarence H. Greg, Jr., Director of the Bridgeport Housing Authority in 1994, described some of the issues the city was facing: "Services that were necessary weren't being provided. There wasn't proper police patrol, garbage pickup, and other normal services that any other neighborhood gets. Things just went downhill from there." Not surprisingly, gangs filled the gaps left by the lack of services; and Connecticut became the epicenter of drug trafficking in the Northeast. "The system has collapsed," said Allan MacDonald, the resident agent in charge of the Federal Bureau of Alcohol, Tobacco and Firearms in New Haven, in 1992. "Nowadays it just makes good economic sense to deal drugs." *See generally*, https://www.nytimes.com/1992/07/05/nyregion/on-the-street-drug-gangs-thrive-as-arsenals-expand.html.

Bridgeport, which by then had become so violent and ungovernable, the police and city planners referred to it as "little Beirut."[6] There, sex workers helped the young Azibo Aquart learn how to survive. They instructed where he could get a free meal, where he could sleep safely. And they taught him how to deal drugs to earn a living. As his drug business thrived, he attracted the attention of older women who offered shelter in return for sex; this was an arrangement that worked because he was unable to secure housing in any other way -- he was too young to sign a lease. He describes himself during this time as "feral," and one would be hard pressed to disagree.

The young Mr. Aquart was "unloved", "unwanted", and "unprotected." Doc. 1345-6 at 9. Dr. Brams was overwhelmed by the amount of trauma he suffered:

> Even in the hours spent in interviews with him, it was not possible to detail each of these horrendous experiences, which included seeing dead bodies of people he knew, observing domestic violence toward his mother, being told by his father, with no explanation, to protect himself from outside threats of death and harm, and being subject to physical abuse. The continual hypervigilance that he experienced during his developmental years obviously continued into adulthood and was the result of not only vicarious exposure to traumatic events, but also personally experiencing them, and the never-ending unpredictability and instability in his young life.

*Id.* at 10. Unsurprisingly, Dr. Brams concluded, "he clearly met the criteria for childhood post-traumatic stress disorder, or complex developmental trauma." *Id.* at 10.

---

[6] https://www.csmonitor.com/1994/0420/20121.html;
https://chicagoreader.com/news-politics/tales-from-the-frontier/

Living on the streets. Dealing drugs. It is no surprise that eventually Mr. Aquart would be arrested. On New Year's Eve 1995, when he was just 14 years old, he was arrested for robbery in the third degree. The official version reflects that the 14-year-old Aquart - while riding a bicycle - approached a 43-year old man, said "excuse me," put his hand in his pocket as though he had a weapon, and told the man to give him his money. PSR, ¶ 100. The robbery netted Mr. Aquart $1. Mr. Aquart says there was no robbery and that instead, he was a go-between in a drug-dealing operation and that the man gave him a crumpled-up dollar bill in exchange for drugs of significantly greater value. *Id.* Mr. Aquart says when he realized the bill was a single, he chased the man down and retrieved the drugs. *Id.* Although he was a homeless, orphaned, first-time offender, because Mr. Aquart was three and a half months past his 14th birthday, he landed in the adult criminal justice system. There, he was sentenced to 5 years in prison following an *Alford* plea he was counseled to enter by his exploitive older brother. *See* Conn. Gen. Stat. § 46b-127 ("Mandatory transfer of child charged with certain felonies to regular criminal docket.") (1995).

From there, he was arrested for drugs, possession of body armor, and failure to appear. His age prevented him from securing housing on his own, and now his felony arrest record prevented him from finding legitimate employment. This sad state of affairs led to his involvement in the illegal drug business and culminated in the tragic events that are the basis for the convictions in this case.

16

## 2. **Mr. Aquart's early years on death row were defined by isolation and mental breakdown.**

On December 17, 2012, this Court sentenced Mr. Aquart to the death penalty, as it was required to do given the jury's verdict. Mr. Aquart fell into a virtual pit of despair – such a sentence represented a confirmation of the government's claim in its closing sentencing argument that he was undeserving of mercy. He suffered "profound depression, dissociation, desperation, frustration, fear, and many other psychological impairments." Doc. 1345-6 at 11.

When he was initially sent to death row, Mr. Aquart was assigned a place even more desolate than traditional death row. He was isolated in a cell generally reserved for condemned prisoners in the days immediately preceding their executions. There, he was sometimes forgotten for count and meal distribution. *Id.* at 12. He believed he would die there alone. *Id.* Dr. Brams described how Mr. Aquart lost all sense of time and place and how he disengaged from his own mind. *Id.* When he was moved to the "normal" death row unit, he was held in solitary confinement. Death row prisoners are single celled; they eat and shower in their cells. The small amounts of time they are permitted for recreation is a solitary endeavor. Dr. Brams noted the life damaging impact of solitary confinement observed in at least one hundred research studies.[7] *Id.* at 11.

---

[7] The research literature is clear that the prolonged use of solitary confinement is psychologically very damaging. Craig Haney, *The Psychological Effects of Solitary Confinement: A Systematic Critique*, 47 Crime & Just. 365, 368 (2018) (noting that the

"While in laypersons' terms one might describe Mr. Aquart's decompensation during his first years of death row incarceration as a 'nervous breakdown', his functioning was much more compromised than just someone experiencing depression or anxiety." *Id.* And, of course, we know that is not the only trauma death row inflicted on those confined there to await their executions.

3. **Mr. Aquart's later years on death row were uniquely traumatizing because of the 13 executions carried out by the federal government over a six-month period.**

More viscerally, Mr. Aquart's experience on death row was impacted by the 13 executions that occurred from July 2020 until January 2021. Most of the people who were executed during this six-month period had lived near Mr. Aquart on death row at USP Terre Haute for extensive periods of time. Some of them were his friends. Sometimes three men were executed in a single week. The horror of watching and hearing one's friends, neighbors, and fellow citizens dragged to their execution by officers of the state cannot be overstated. Nor can the despair that creeps in over a period of months as the surrounding range of cells are emptied out one by one, amidst the silence of the irrevocable deaths of their former occupants.

---

American Psychological Association, "the world's largest professional association of psychologists, asserted that 'solitary confinement is associated with severe harm to physical and mental health among both youth and adults, including: increased risk of self-mutilation, and suicidal ideation; greater anxiety, depression, sleep disturbance, paranoia, and aggression; exacerbation of the onset of pre-existing mental illness and trauma symptoms; [and] increased risk of cardiovascular problems.'").

18

Several other circumstances exacerbated this already severe source of trauma. First, there was the sense of illegitimacy. A disproportionate number of the prisoners executed—6 of them—were Black, like Mr. Aquart. People were executed who had ongoing, active litigation on potentially meritorious legal claims. The stays of execution imposed by the lower courts were sometimes dissolved in the dead of night so that the federal government could execute them more quickly. Justice Sotomayor described the unseemly judicial rush to kill:

> Rather than permit an orderly resolution of these suits [challenging death sentences], the Government consistently refused to postpone executions and sought emergency relief to proceed before courts had meaningful opportunities to determine if the executions were legal.
>
> Throughout this expedited spree of executions, this Court has consistently rejected inmates' credible claims for relief. The Court has even intervened to lift stays of execution that lower courts put in place, thereby ensuring those prisoners' challenges would never receive a meaningful airing. The Court made these weighty decisions in response to emergency applications, with little opportunity for proper briefing and consideration, often in just a few short days or even hours. Very few of these decisions offered any public explanation for their rationale.
>
> This is not justice.

*United States v. Higgs*, 141 S. Ct. 645, 647 (2021) (Sotomayor, J., dissenting from the grant of certiorari and the order vacating the lower court's stay of execution).

To make matters even worse, the selection of those whose name would be placed on the execution list appeared utterly random. There was rampant fear and

speculation on the federal death row during this time about when the list would issue and whose names would be on it.

Moreover, the problems with the government's lethal-injection protocols meant that those being executed were not just being killed but were being tortured in the minutes before their deaths. *Id.* at 649-50 ("A federal district court found that Daniel Lee, Wesley Purkey, and Keith Nelson were likely to succeed in showing that the 2019 Protocol violates the Eighth Amendment because pentobarbital causes fluid to rapidly accumulate in the lungs, resulting in 'extreme pain, terror and panic.'"). Mr. Aquart and the other men on death row were aware that one man was "strapped to a gurney for four hours in the middle of the night while the government successfully sought to recall a reprieve that had been granted." Doc. 1345-6 at 15.

Amidst these executions, there was a COVID outbreak, which resulted in more extreme isolation and denied the denizens of death row access to the limited coping mechanisms otherwise available to them, such as opportunities for collective grieving or commiseration.

As Dr. Brams explained, "[Mr. Aquart] is visibly traumatized recollecting this period of profound loss and fear." *Id.* at 14. His discussion of this time "reflect[s] more than pain and loss, although he has personal empathy and sorrow." *Id.* As a result of this extraordinary execution spree, Mr. Aquart suffers frequent nightmares, disabling anxiety, and extreme survivor's guilt:

> Mr. Aquart is overwhelmed with survivor's guilt,
> which enhances his trauma issues. He was very upset that
> by chance he saw the only female who was executed in
> 2021 walk by his cell, and acknowledge him. He could not
> get it together quickly enough to acknowledge her and give
> her a sign of encouragement. He is racked with guilt for her
> and the others who were executed in 2020 and 2021.
> Survivor's guilt may seem irrational, on first glance ….
> However, trauma does not work in logical ways. Mr.
> Aquart cared and identified with his death row
> companions. He learned to appreciate even their smallest
> gestures and realized the humanity in all who were
> executed. He did not feel that he was any better a person
> than those around him, and that he was not more deserving
> to live. Mr. Aquart internalizes his feelings and thinks
> deeply about life. The rapidity of the executions, his
> inability to give advice as the orders to execute came at
> times daily, his inability to comfort those facing death or to
> even say goodbye, became cumulative trauma and losses.

*Id.* at 14-15. The harm these events inflicted on him will likely have a lasting impact

on Mr. Aquart for many years. This is truly an extraordinary and compelling

circumstance that (thankfully) few other BOP inmates share.

Such was the state of Mr. Aquart's mental-health struggles when the Court saw

him last. Unfortunately, things have deteriorated since then. Undersigned counsel,

concerned about Mr. Aquart's apparent decompensation following the resentencing,

asked Dr. Brams to reevaluate him. She did so and generated a follow-up report dated

August 11, 2022, which is attached as Exhibit 5.

### 4. Post-resentencing transitions: the trauma continues.

After resentencing in October 2021, the BOP returned Mr. Aquart to the USP

in Terre Haute, Indiana. Inexplicably, although he was no longer under a sentence of

death, the BOP placed Mr. Aquart back in the death-row unit. For reasons that seem unfathomably cruel, the BOP placed him not just in the regular death row unit but specifically in the isolation cells where the condemned are housed in the days just before they are executed. This is the exact location where the BOP had housed Mr. Aquart decades ago when he was first sent to death row. It is an understatement to say this was retraumatizing:

> [H]e reexperienced the profound loneliness and fear that he did then as a young man. As he states, "it was recreating my worst time". He states with desperation, "They could have put me in maximum, in maximum segregation for that matter", but this was descending into what I can't describe". He does not understand why he was singled out for this treatment. His fear of being in danger was profound, and his paranoia heightened. The total lack of control over his life caused and causes him to doubt everything that was happening to him, even the motivation of those who he had known for years.

Exhibit 1 at 1-2.

It was in this place, under the mattress of his cot, that he discovered unopened mail addressed to one of the executed prisoners:

> To make matters worse, in this death-row holding cell, under the mattress, he found correspondence addressed to an inmate friend, and a letter written by that person, who was executed after having been confined for his final days in this holding cell. He could not share what was contained in those papers; he states he could barely read one of them, and blocked out what he did read. He could barely talk about this experience, and shut down. In addition, he shares that the shower door was left open, where his friend likely took his last shower. All alone, he could not stop thinking of his friend's last days. The trauma he conveyed was painful.

*Id.* at 2.

From the isolation cells on federal death row in USP Terre Haute, Mr. Aquart was sent to isolation at the Federal Transport Center in Oklahoma City. There, he was denied all hygiene products, underwear, paper, and writing utensils. His incoming mail, including from his lawyers, was not provided to him. His outgoing legal mail to his lawyers was returned to him. Essentially, he was held *incommunicado*. He was constantly cold, as he was provided insufficient bedding; this was likely exacerbated by preexisting and untreated circulation problems.

The guards at the Transport Center in Oklahoma City taunted Mr. Aquart by telling him he was going to the "supermax," which he understood to be the ADX. In fact, the BOP was transferring him to USP Florence, which is on the same property as the ADX but is an entirely different building with entirely different conditions. ADX is notorious and has been described by a former Warden there as "life after death" and "far worse than death."[8]

Finally, just before Christmas 2021, Mr. Aquart arrived at USP Florence. While he did not expect Florence to be a panacea, he did expect to be able to live in community with other prisoners, work, participate in programming, and receive mental-health treatment. But due to the impact of severe staff shortages within the

---

[8] "5 things to know about the 'escape proof' supermax prion"; Corrections 1 (July 19, 2019); https://www.corrections1.com/escapes/articles/5-things-to-know-about-the-escape-proof-supermax-prison-Nw3H6vQbd0EN0mSd/ (last accessed August 30, 2022).

BOP, none of this was to be. Though he is "desperate to do something meaningful and constructive"[9], these opportunities are not available to him. Dr. Brams describes his conditions at USP Florence:

> Mr. Aquart's existence at FCI Florence has been extremely difficult. He has had no access to the programming that he so much wants to better his mental health and social abilities (after years of isolation). He wants access to education, and learning and knowledge, which is a fundamental part of who he is and who he wants to be. He has had no access to mental health treatment and his access to medical care has been spotty at best. The prison has been on a constant series of lockdowns; on the day of the evaluation, he had his first shower in three days. He had a mentally disturbed cell mate, whose issues he did not want to discuss, but it caused him mental anguish and an increase in trauma symptoms.

Exhibit 1 at 2. Whether due to the pandemic or short-staffing, the lockdowns have been so pervasive that on several occasions, undersigned counsel has had to ask for extensions of time for filing Mr. Aquart's appellate briefs in the Second Circuit because counsel was unable to schedule client meetings and legal calls. A sampling of bulletins provided to inmates notifying them of lockdowns are attached as Exhibit 2.

### D. Reasons for Sentence Reduction

1. **Mr. Aquart has been subjected to severe medical neglect during his years on federal death row continuing to the present, the conditions within the BOP render him more likely to contract COVID-19, and should he contract COVID-19, he is likely to suffer more grievously due to his untreated and inadequately treated medical conditions.**

---

[9] Exhibit 1 at 2.

For federal prisoners generally, obtaining adequate medical care behind prison walls can be difficult in the best of circumstances. For those on death row, the BOP's failings, deliberate indifference, and negligence with respect to the provision of medical care is perhaps at its zenith. *See* letter from Gabriel B. Eber of the ACLU to then-BOP Director Harley Lappin detailing how the BOP's "systematic denial of adequate medical, mental health, and dental care causes inordinate fear, pain, and suffering among men" on federal death row, attached as Exhibit 3; *see also* Brandon Sample, *Conditions on Federal Death Row "Horrendous," ACLU Finds*, Prison Legal News (April 15, 2009), attached hereto as Exhibit 4.

BOP's critical staffing shortages negatively impact healthcare for inmates. According to a Department of Justice Office of Inspector General (OIG) report dated October 15, 2021, "staffing shortages, including difficulty recruiting and retaining medical staff, have been a persistent challenge for the BOP. The OIG's remote inspections found that the existing staffing shortages significantly undermined the BOP's ability to respond to the pandemic and provide appropriate healthcare to inmates."[10] The same report from the previous year noted that the challenges posed by the COVID pandemic exacerbated the strain on BOP. Exhibit 3 at 16 (Baird Declaration) [citation omitted].

---

[10] Exhibit 5 at 15 (Baird Declaration), quoting, U.S. Department of Justice Office of the Inspector General, *Top Management and Performance Challenges Facing the Department of Justice – 2021"* (October 15, 2021).

Whatever the cause, and much of the blame must be laid at the feet of the BOP and its management[11], Mr. Aquart's medical treatment while incarcerated has been grossly inadequate. He has repeatedly tested positive for tuberculosis (TB), initially over a decade ago. For over ten years, no treatment was offered. This year, for the first time, he started treatment, but that was disrupted when USP Florence misplaced his medication. He has also been plagued with what appears to be a serious circulatory problem. For years, BOP has had difficulties drawing adequate blood from him, even though he has no history of intravenous drug use. He has complained about being cold even in relatively warm environments, and he has searing pain, alternating with numbness, in his extremities so badly that it often interrupts his sleep. This significant medical problem has never been diagnosed or treated.

**(a)     Tuberculosis**
**(i)**     *Mr. Aquart was diagnosed with tuberculosis 12 years ago. No treatment was offered until this year, and then the treatment was disrupted when USP Florence misplaced his medication.*

In 2010, while in state custody, Mr. Aquart tested positive for TB. He first tested positive for TB in the BOP on December 21, 2012. Exhibit 6 at 1, attached.

---

[11] In 2021, the Government Accounting Office (GAO) added the BOP to its high-risk areas of government organizations. The GAO noted that of the 19 recommendations made in the preceding five years, fully 16 of them had not yet been addressed. The GAO blamed this institutional failure on "(1) inadequate management of staff and resources, (2) inadequate planning for new programs or initiatives that help inmates prepare for a successful return to the community …; and (3) insufficient monitoring and evaluation of these inmate programs, which has led to imprudent spending." Exhibit 5 at 16 (Baird Declaration), [citation omitted].

The 2012 positive TB test appears year after year in Mr. Aquart's medical record. For

reasons that are unclear, his BOP records repeatedly and falsely asserted that Mr.

Aquart had been treated for TB while in custody.

Mr. Aquart complained that he had never been treated for TB:

> I have had symptoms for 10 years and no one will treat me.
> I am at the tail end of it now and I will be okay for a couple
> months then I will have night sweats and puke blood again,
> but it's no use telling you, nothing will be done about it.

Exhibit 6 at 2.

> [E]veryone refuses to treat me and are either telling me not
> to trust the PPD[12] or tell me about some x-ray. We can
> argue all day about what I feel and the phases of bad health
> I go through but two things we cannot argue about because
> they are facts. I recently discussed my medical records in
> court and someone at this facility at some point claimed I
> received treatment for TB and that is easily proven false by
> a simple check of any and all medication ever ordered and
> or administered to me. TB meds would've for sure left an
> enormous paper trail, months worth.

Exhibit 6 at 3.

Finally, on March 25, 2022, the BOP acknowledged: "[T]here are no

documents supporting [that Mr. Aquart ever had treatment for TB] in BEMR[13] and

patient adamantly denies every receiving treatment." Exhibit 6 at 4. At that point –

---

[12] "PPD" stands for purified protein derivative and is a skin test used to diagnose
latent tuberculosis.

[13] BEMR is an acronym used by the BOP which stands for Bureau Electronic Medical
Records. It is the official BOP prisoner record system that includes a prisoner's
medical, social, and psychological history and ongoing data and related informational
records.

nearly 12 years after his initial diagnosis -- it was determined that treatment was

appropriate. *Id.*

However, Mr. Aquart's treatment regimen was disrupted for unknown reasons

when his pills went missing:

> [W]ithin 90 days there was a missed dosage. Medical staff was asked about it the following day (Thurs. June 31st) as he again passed my cell with no meds for me. He informed me that my pills were "lost". He went on to state that a week would simply be "added" to make up for the missed dose. The following week (Wed. July 7th) in pill-line, staff asked me (a prisoner) if I knew where my meds were kept – confirming that the dosage from the week was in fact misplaced and no one had bothered to contact co-workers involved to inquire as to its whereabouts nor re-order.

> I was asked to "wait a day" for the issue to be corrected. To date nothing has happened and no one has said anything. TB treatment is a rather lengthy and strict regimen of a lot of pills known to cause liver damage. Adding additional weeks on to a treatment period to make up for missed doses is not a fix. According to the WHO and CDC, it doesn't work that way & treatment may very well have been rendered useless and make me untreatable even more so, given my age. Whether "active" or not, TB is known to complicate a COVID-19 diagnosis and cause it to be fatal.

Exhibit 6 at 5-6.

**(ii)** *Tuberculosis and status as a former smoker render people more likely to get severely ill if they contract COVID-19.*

The Centers for Disease Control and Prevention (CDC) lists tuberculosis and

being a former smoker among the underlying medical conditions that render people

more likely to get severely ill from COVID-19.[14] According to the World Health

Organization (WHO), "it is anticipated that people ill with both TB and COVID-19

may have poorer treatment outcomes, especially if TB treatment is interrupted."[15] The

WHO thus recommends that "TB patients should take precautions as advised by

health authorities to be protected from COVID-19 and continue their TB treatment

as prescribed."[16] The CDC advises:

> Patients with TB can become infected with COVID-19, which could result in an unexpected deterioration of a patient's condition (e.g., was responding well to treatment and develops new acute cough, fever, or shortness of breath). TB patients who are at least 65 years old; have respiratory compromise from their TB; or other medical conditions, including HIV and other immunocompromising conditions, are at greater risk for severe COVID-19 infection.

CDC, Tuberculosis and Public Heath Emergencies: COVID-19 information for TB

programs.[17]  Tuberculosis causes more deaths than any other infectious disease in the

world.  CDC, Treating TB During the Time of COVID-19.[18]

---

[14] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed August 28, 2022).

[15] *See* https://www.who.int/teams/global-tuberculosis-programme/covid-19 (last accessed Sept. 26, 2022).

[16] *Id.*

[17] *See* https://www.cdc.gov/tb/education/public-health-emergencies.htm?s_cid=fb_cdctb_covid19202007120001 (last accessed Sept. 26, 2022).

[18] *See* https://www.cdc.gov/globalhealth/stories/2020/tb-covid.html (last accessed Sept. 26, 2022.)

Mr. Aquart has availed himself of the opportunity to be vaccinated against COVID-19, and he received a booster more than six months ago. The efficacy of the booster decreases dramatically after six months. (*See* Doucleff, Michaeleen, *Booster Longevity: Data reveals how long a third shot protects* (NPR, January 19, 2022). The ongoing pandemic continues to pose significant threats to prisoners with underlying medical conditions such as Mr. Aquart.[19] Visits by undersigned, and other defense personnel, to USP Florence (where he is housed) throughout the past year reveal virtually no guards are wearing masks; similarly, visitors are neither required nor encouraged to wear masks. Indeed, in the fall of 2022, guards at the FCC at Florence, which contains the USP, organized protests opposing protections like vaccine mandates[20]:

---

[19] To paraphrase Mark Twain, reports of the death of COVID are greatly exaggerated. As of Sept. 26, 2022, the CDC is reporting nearly 4,000 hospitalizations and 350 deaths per week in the United States from COVID-19. https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html (last accessed Sept. 26, 2022).

[20] Officers also protested forced overtime and the widespread practice of making up for short-staffing by forcing medical staff and counselors to work shifts as correctional officers. See, https://krdo.com/news/local-news/2021/09/29/staff-to-picket-federal-correctional-complex-florence-over-dangerous-working-conditions/ (last accessed Sept. 27, 2022).



Each compassionate release case must be considered on its own merits. Mr. Aquart posits that his latent TB and status as a former smoker constitute extraordinary and compelling grounds for compassionate release. Similar medical problems and conditions, considered collectively, have been deemed extraordinary and compelling reasons for granting sentence reductions. *See, e.g.*, *Suggs*, 2021 WL 2661874, at *1 (granting sentence reduction based on defendant's "medical conditions, including obesity, hypertension, and arteriosclerotic cardiovascular disease"); *United States v. Reyes*, No. 3:11CR1 (JBA), 2021 WL 2154714, at *1 (D. Conn. May 26, 2021) (granting sentence reduction to defendant who "suffers from high blood pressure, hypertension stage one and hypercholesterolemia"); *Perez*, 2021 WL 837425, at *1 (granting sentence reduction in part due to defendant's "obesity, hypertension, sleep apnea, and arthritis"); *United States v. Nieves-Feliciano*, No.

31

3:19CR135 (JBA), 2021 WL 1170317, at *5 (D. Conn. Mar. 29, 2021) (ruling that defendant's "medical conditions that place him at risk of severe illness from COVID-19, unresolved and untreated medical complaints, clear disciplinary record in prison, having served over 60 percent of his sentence, and the uniquely harsh nature of his present confinement warrant releasing him to home incarceration"); *United States v. Epps*, No. 3:18cr19 (JBA), 2020 WL 7332854, at *1 (D. Conn. Dec. 14, 2020) (granting sentence reduction based on defendant's obesity and asthma); *Rios*, 2020 WL 7246440, at *1 (granting sentence reduction based on defendant's "medical conditions, including severe obesity, severe and uncontrolled hypertension, asthma and related lung ailments, and arthritis"); *United States v. Parker*, No. 3:17cr18 (JBA), 2020 WL 4432928, at *4 (D. Conn. July 31, 2020) (ruling that defendant "has demonstrated extraordinary and compelling reasons justifying his immediate release" because his "latent tuberculosis, coupled with his weight and elevated blood pressure, support a grant of compassionate release at this time."); *Panton*, 2020 WL 4505915, at *8 (noting as part of the grounds for granting a sentence reduction that defendant "has also been exposed to tuberculosis and suffers from high blood pressure (that is controlled through medication). All of this medical history makes him more susceptible to COVID-19."); *United States v. Spencer*, No. 04 CR. 1156 (PAE), 2020 WL 3893610, at *5 (S.D.N.Y. July 10, 2020) (granting sentence reduction to defendant due to medical problems including "hypertension, a congenital heart defect of a twisted aorta, latent tuberculosis, chronic kidney disease, and potentially Type 2 diabetes");

*United States v. Mapp*, 467 F. Supp. 3d 63 (E.D.N.Y. June 19, 2020) (granting sentence reduction in part due to defendant's hypothyroidism, latent tuberculosis infection, hyperlipidemia, enlarged prostate with elevated prostate specific antigen, and alopecia areata, an autoimmune disorder); *United States v. Copeland*, No. 02-CR-01120 (FB), 2020 WL 2537250, at *1 (E.D.N.Y. May 19, 2020) (granting sentence reduction to defendant with "hypertension, pre-diabetes, hyperlipidemia, latent tuberculosis infection, vitamin D deficiency, chronic hepatitis C, and aortic atherosclerotic disease"); *United States v. Hansen*, No. 07-CR-00520 (KAM), 2020 WL 1703672, at *8 (E.D.N.Y. Apr. 8, 2020) (granting sentence reduction to defendant with a host of medical problems including tuberculosis that the BOP was treating with medication).

This Court should also give consideration to the state and federal governments' decade-long failure to treat his TB and its failure to competently administer that treatment as a ground supporting a sentence modification.

**(b) Undiagnosed and Untreated Painful Circulatory Problem**

For years, Mr. Aquart has experienced numbness, alternating with pain, in his extremities. It has become worse in the past couple years. In August of 2021, he requested sick call complaining that he had "severe cramping because my feet + hands eventually go blue and turn numb & I have to work them back to just tingling – blood is not reaching them and flowing like it is suppose to even my veins have receded dramatically…." Exhibit 7 at 1.

In November 2021, while in the isolation cells on death row following his resentencing, he described his pain and explained how in the past he could prevent his feet from turning blue by sleeping less than three hours at a time. Exhibit 7 at 2. But things had changed. He noted: "It is not following any rules and now burns in my limbs whenever it wants and there is nothing I can do about it. I am miserable but I am not looking for pain meds or anything like that. Just please, can you figure out how to get the blood flowing in my body again and I believe the problem will eventually be solved." *Id.* The medical staff directed him to come to sick call. *Id.* He responded: "I am a former death row prisoner that for some reason is still living on death row under even more restrictions. However, NO ONE living in the SCU unit where I am housed can 'come to sick call' sir." *Id.* Medical responded that he should advise the nurse when rounds are made. Mr. Aquart responded: "No one comes to my door. No one comes to my range where I am the only one living. Why is sending my problems straight to you not better than some piece of paper that no one is aware of that also goes nowhere?" *Id.*

Eventually he was moved from the death row isolation cell in Terre Haute to USP Florence where the Catch-22-like drama ended but he still received no answer to his medical concerns. In February of 2022, he had a clinical encounter where he described his pain as "burning". Exhibit 7 at 3. He reported that his "distal extremities turn colors when he experiences the pain" and his symptoms increase when the weather is cold. *Id.* His condition was described as an "unspecified disorder of

34

circulatory system". Exhibit 7 at 4 but nothing more specific was provided and no treatment was offered.

In July 2022, Mr. Aquart filed an Informal Resolution Form that contended his problems had not been addressed. Exhibit 4 at 6. Additionally, he reported continual and ongoing inabilities to draw blood from him which were not contained in his prisoner medical records and which he reasonably believes are related to his circulatory problems. *Id.* He reported that he now has a "hardening blood clot' in his foot, is still in pain, and is unable to sleep for more than three hours at a time for fear of numbness and eventual burning pain in his feet. Exhibit 4 at 7.

This Court should also give consideration to the government's failure to diagnose and treat Mr. Aquart's circulatory condition as a ground supporting a sentence modification.

2. **Mr. Aquart has been denied the mental-health treatment that he desperately needs and that can only be provided in the community.**

One might reasonably expect the BOP to provide mental-health treatment for persons coming off federal death row after years of segregation, particularly for those who lived through 13 executions over a six-month period in late 2020 and early 2021. The inherent psychological difficulties of being forced to live within the confines of a very small, general-population cell with another person after decades of isolation seems obvious. But this is apparently not so obvious to the BOP. No mental-health treatment is available for the survivors of death row. None. This may be why *all*

35

former death-row prisoners who have entered general population have experienced significant disciplinary and other problems as they have transitioned to general population. All except for Mr. Aquart. Mr. Aquart has maintained completely clear conduct since this Court last saw him. And the Court will likely remember that one of the strongest testaments to his rehabilitation while incarcerated and his demonstrated ability to conform his behavior to societal rules is the fact that he had zero disciplinary writeups during his many years on death row.

Whether because of the persistent lockdowns attendant to the COVID-19 pandemic, BOP staffing shortages, or indifference at USP Florence, there is *no mental-health treatment* available at USP Florence unless the prisoner is suicidal. Mr. Aquart is not suicidal.

But he does have significant mental-health challenges as a consequence of the traumatic events of his early life, continuing to his time on death row, and beyond. At resentencing, this Court acknowledged his "the extraordinary traumatic childhood of neglect, abandonment, violence, sexual abuse, absence of love." Resentencing Transcript (October 21, 2021), at 83. Likewise, the Court noted, "This resentencing shines a light on the terrifying and arbitrary nature of life on death row and the toll that it takes nearly driving Mr. Aquart to madness." *Id.* at 82-83. The Court gave these factors consideration at resentencing for the convictions that did not carry mandatory life sentences and reduced the sentences accordingly. But this is the first time the Court has authority to consider these factors for Counts 2, 3, and 4.

36

Regarding the young Azibo Aquart's developmental years, Dr. Brams concluded, "he clearly met the criteria for childhood post-traumatic stress disorder, or complex developmental trauma." Doc. 1345-6 at 10. In her recent evaluation, Dr. Brams confirmed counsel's concerns about Mr. Aquart's mental status: "Mr. Aquart presented as notably different than when this evaluator evaluated him in the fall of last year." Exhibit 1 at 2. He is "currently overcome with helplessness and hopelessness, his thinking is more idiosyncratic." *Id.* He reports more frequent periods of dissociation, zoning out, and distancing himself from his environment. His nightmares of being in a coffin have continued and he has anxiety that is unpredictable. *Id.* Dr. Brams concluded, Mr. Aquart has "endured inexplicable psychological cruelty and the ongoing deprivations of extended lockdowns, a lack of medical treatment, mental health treatment, and educational programming." *Id.* at 4.

Dr. Brams concludes that it "is evident that the BOP is unwilling or unable to provide him with the environment and services necessary to allow him to heal from all he has suffered . . . . [H]is mental health needs are unlikely to be remediated with continued incarceration in the BOP." *Id.* She recommends that "his best chance for improvement and healing would be if he were allowed to access high-level, wrap-around medical and mental health services and join a social community outside the confinement of a prison." *Id.* Such treatment can only be provided outside of a prison setting.

Mr. Aquart's need for mental-health treatment that the BOP is not providing constitutes an "extraordinary and compelling" reason to warrant compassionate release. *United States v. Hatcher*, No. 18 Cr. 454-10 (KPF), 2021 U.S. Dist. LEXIS 74760, (S.D.N.Y. Apr. 19, 2021), citing *United States v. Gonzalez*, No. 19 Cr. 90 (VAB), 2020 U.S. Dist. LEXIS 222714, 2020 WL 7024905, at *7 (D. Conn. Nov. 30, 2020) (granting compassionate release and explaining that "given [petitioner's] demonstrated need for intensive mental health treatment" which was not being provided by his correctional facility, release was the "lesser of two undesirable options").

Mr. Aquart submits that given the BOP's failure to provide him with *any* mental-health treatment since resentencing and its complicity in exacerbating his mental-health problems, as well as the fact that the treatment he requires can only be provided outside a prison setting, a further reduction in his sentence is warranted.

**3.** **The conditions of Mr. Aquart's confinement have been and will continue to be uniquely punitive and harsh.**

Particularly punitive punishment has been recognized as a ground for a Guideline departure even when the Guidelines were mandatory. In *Koon v. United States*, 518 U.S. 81 (1996), the Supreme Court held the district court did not abuse its discretion when it allowed for a downward departure based upon *susceptibility* to prison abuse due to "the extraordinary notoriety and national media coverage of this case, coupled with the defendants' status as police officers…." *Id.* at 112. The *Koon* defendants were convicted in the high-profile beating of Rodney King in Los Angeles.

More recently, particularly harsh punishments have been recognized as an "extraordinary and compelling" reason to warrant a sentence reduction under 18 U.S.C. § 3582(c)(1)(A). In *United States v. Lora*, No. 16 Cr. 44-5 (KPF), 2022 U.S. Dist. LEXIS 65734 (S.D.N.Y. April 8, 2022), the court granted Lora a sentence reduction because his actual sentence was "more severe" than that anticipated by the court when it originally sentenced him, due to the conditions of his confinement resulting from the COVID pandemic. These unforeseen consequences included "lockdowns and curtailment of facility programming and visitation." *Id.* at 14.

Similarly, in *United States v. Hatcher*, No. 18 Cr. 454-10 (KPF), 2021 U.S. Dist. LEXIS 74760, (S.D.N.Y. Apr. 19, 2021), a sentence reduction was granted because at the original sentencing, the court "did not envision [defendant] to serve this term of imprisonment in near-total lockdown, without the mental health and other support programs that the Court believes to be critical to [defendant's] health and ability to reenter society." *Id.* at 14. The court reiterated that "courts reviewing motions for sentence modifications have considered the extent to which onerous lockdowns and restrictions imposed by correctional facilities attempting to control the spread of the virus have made sentences 'harsher and more punitive than would otherwise have been the case.'" *Id.* at 11 (citation omitted, collecting cases). After acknowledging that the pandemic has "required extreme restrictions on prisoners' movements and visits," one court explained:

39

> [A] day spent in prison under extreme lockdown and
> in fear of contracting a deadly virus exacts a price on a
> prisoner beyond that imposed by an ordinary day in prison.
> While not intended as punishment, incarceration in such
> conditions is, unavoidably, more punishing.

*United States v. McRae*, No. 17 Cr. 643 (PAE), 2021 U.S. Dist. LEXIS 8777, at 5

(S.D.N.Y. Jan 15, 2021).

This Court has acknowledged the traumatizing impact of Mr. Aquart's life on

death row. A major contributor to that trauma certainly was the executions. But

another part of that trauma is the consequence of the solitary confinement under

which condemned offenders live. As Dr. Brams observed, the degree of isolation

experienced by Mr. Aquart on death row "is more than just uncomfortably punitive; it

is destructive to what makes us fundamentally human." Doc. 1345-6 at 12.

Unfortunately, these conditions continue to this day. Mr. Aquart receives no

mental-health treatment, no programming, and inadequate, if not deliberately

indifferent and wholly negligent, medical care. His isolation, imposed as a result of the

near-constant lockdowns, continues to inflict the harm endemic to solitary

confinement. None of this shows any signs of abating. This Court has no authority to

order the BOP to house him elsewhere, but even if the Court had such power, it

would appear the entire BOP is in meltdown. In our current political environment, it

is a noteworthy day when both political parties agree about anything. Yet, on a day

this past July when former-BOP Director Michael Carvajal appeared before the

Senate Committee on Homeland Security and Governmental Affairs – Permanent

Subcommittee on Investigations, that is precisely what happened. Director Carvajal's tenure was brutally criticized by Senators across the political spectrum.[21] And with good cause.

The hearing was billed as concerning "corruption, abuse and misconduct at the U.S. Penitentiary at Atlanta," and there was testimony concerning "rats in the building, roaches in the food, poor nutrition, lack of access to hygiene products, lack of access to medical care including prescription medication …a month of 24-hour solitary confinement with only a Bible for entertainment or reaching … a week with only a paper jumpsuit and paper blankets for an inmate on suicide watch without mental health treatment or medication"[22] at USP Atlanta. But as each Senator got their turn to question Director Carvajal, it became apparent that the problems in the BOP are much more widespread than just at USP Atlanta. Senator Ossoff concluded the hearing by telling Director Carvajal:

> These issues are deeper than your leadership personally. This is clearly a diseased bureaucracy, and it speaks ill to our national values and our national spirit that we let this persist year after year and decade after decade. And if this country is going to be real about the principles at the core of our founding, and our highest ideals, then it can change at the Bureau of Prisons. And it has to happen right now.

Exhibit 8 at 6.

---

[21] The full hearing is available at https://www.youtube.com/watch?v=eD67HUKerjc.
[22] Pavlo, Walter, *Bureau of Prisons Director Carvajal Leaves Behind a Tainted Legacy Void of Accountability*, Forbes Magazine (July 31, 2022); attached as Exhibit 8.

In assessing whether the term of imprisonment to be imposed is sufficient but not greater than necessary to ensure that Mr. Aquart receives "just punishment for the offense" under 18 U.S.C. § 3553(a)(2)(A), this Court should also take into consideration how Mr. Aquart has already been severely punished in ways that are truly extraordinary and outside the experience of all but a handful of federal prisoners on federal death row who lived through the recent spate of executions. And the Court should consider that in combination with the impact of continued and chronic lockdowns at USP Florence, the lack of programming there, and inadequate medical and mental-health treatment. The imposition of these conditions upon a person already traumatized by the conditions of their upbringing is uniquely retraumatizing. In the sheer punitive force of their impact, the over 18 years of imprisonment Mr. Aquart has served for his crimes of conviction are the equivalent of a sentence to a humane prison environment that is much, much longer.

**4. Especially given his traumatic childhood and background, Mr. Aquart has engaged in a remarkable process of rehabilitation.**

During his many years of incarceration on federal death row at USP Terre Haute, Mr. Aquart demonstrated his maturity and rehabilitation. First and foremost, as the Court has previously acknowledged, he did not receive *any* disciplinary writeups there. Former Warden Maureen Baird opined that Mr. Aquart's lack of a disciplinary history was "extremely rare in these types of cases or for any inmate housed in a high security prison for more than 10 years." Exhibit 5 at 5.

42

Instead of getting into trouble, Mr. Aquart spent his time on death row productively. He furthered his education and participated in programming. With only a glimmer of hope that he would ever leave death row alive, Mr. Aquart completed three classes in Shakespeare, three classes in a history of European art, and classes in sustainable communities, construction and trades, and the art of storytelling. He also completed courses entitled "Cuba: After the Revolution," "The Nile River: Shared or Monopolized," "China Inside Out," "Who Owns America," and "Mississippi River: Triumphant and Tragic." Doc. 1345-5. The PSR lists other classes that he took while on death row. PSR, ¶ 6.  Mr. Aquart's completion of these courses, taken at a time when he could only have done so for personal improvement, is particularly noteworthy given that he never even started high school.

Mr. Aquart also pursued his interest in creative writing while on death row. He became an avid reader, actively participating in a book club with citizens outside prison. He taught himself to write and has continued to work on a number of novels.

From behind prison bars, Mr. Aquart has worked to improve the world around him by becoming a certified tutor serving with Literacy Volunteers of America, helping non-English speakers learn English while he was on death row, and organizing a soup drive among the other inmates, which resulted in boxes of soup being delivered to food banks and a church in the Northeast. As former-Warden Baird opined, "Most inmates I have worked with over the years did not engage in selfless acts of generosity, and most were not thinking about a selfless, kind act that

could be done for another without expectation of something in return . . . . In fact, many inmates that I worked with during 2020 and 2021, during the height of the COVID pandemic, were trying to plot how they could get released from their prison sentence and were not worrying and cared little about what was happening to those less fortunate in their communities and considered themselves as the most 'vulnerable victims.'" Exhibit 5 at 14-15. Mr. Aquart has also spent time developing several inventions and creating a website to help abused persons document their trauma.

Mr. Aquart's interest in helping others did not emerge only from his time on death row. One of the guards at the Wyatt Detention Facility (where Mr. Aquart was detained pretrial), who has since become a police officer, discussed many of Mr. Aquart's more altruistic personality traits and the real friendship that developed between them, despite their roles as guard and prisoner. *See* video at https://vimeo.com/754038486 (password: ifcd@AQUart#3232).[23]

Mr. Aquart's undaunting quest for education continues despite the lack of programming at USP Florence due to the pandemic and short-staffing. He discovered a company, Reentry Essentials, that provides evidence-based, recidivism-reduction correspondence courses and personal-growth-and-development courses for prisoners. In the ten months he has been at Florence, he has acquired certificates for the following classes: (1) Active Parenting Pre and Post Release (25 hours); (2) Anger

---

[23] *See also* The Night Patrolman Part Two. Doc. 1345-4.

44

Management and You (25 hours); (3) Being a Successful Employee (25 hours); (4)

Community Reentry: Tools for Success (25 hours); (5) Managing Anger and Conflict

(25 hours); (6) Managing Family Conflict (25 hours); (7) Parenting and Anger

Management (25 hours); (8) Anger Management; (9) Money Management Skills; (10)

Personal Growth & Development; (11) Problem Solving & Decision Making; (12)

Victim Awareness & Restitution; (13) Better Self-Esteem (25 hours); (14) How to

Manage Stress (25 hours); (15) Employment Skills; and (16) Values Clarification, Goal

Setting & Achieving. Exhibit 9, attached.

　　　　Former-Warden Baird opined:

> With regards to Mr. Aquart's prison experience, it
> appears that once he began to realize he had the ability to
> be better and do better, he began a transformation to turn
> his life around. Through reading the various documents, it
> is apparent that once he began his journey to become a
> better person, he never slowed down. He has matured,
> grown, and demonstrated a resilience in creating a new life
> by contributing to others in addition to making himself
> better. This is a difficult task for many individuals who are
> not confined to prison. Yet, for someone to realize such a
> transformation from a prison cell, on death row, and who
> experienced life-altering, traumatic events from a young
> age, it is quite extraordinary. It is almost unfathomable to
> believe, that this now insightful, intelligent, and motivated
> individual, who has positively impacted so many lives from
> the confines of a prison cell, is the same man, who from
> the age of infancy, faced catastrophic conditions, deep
> despair, unimaginable grief, and who, by all accounts,
> lacked any type of supportive, healthy, or loving
> environment during his childhood and formative years.

Exhibit 5 at 6-7.

It seems fair to conclude that a man who has furthered himself so profoundly in prison while avoiding the almost inevitable violation of rules has grown into the person he always could have been.  The distance he has travelled makes that trip even more remarkable, given that from a young age he has been virtually alone.

**5.  Mr. Aquart was only 23 years old on the date of the crimes.**

**(a)     Scientific advancements since Mr. Aquart's trial demonstrate that people who commit crimes at the age of 23 are less morally culpable than adults because their brains are not fully matured.**

Youth has long been considered a relevant factor in mitigating even the most serious criminal offenses. *See generally*, *Eddings v. Oklahoma*, 455 U.S. 104 (1982) (Defendant's age of 16 must be considered as a mitigating factor, but "youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage."). Compelled by the growing body of scientific knowledge about brain development in youths, the Court categorically banned the death penalty for people under 18 years of age at the time of their offense. *Roper v. Simmons*, 543 U.S. 551 (2005).

*Roper* recognized that "juvenile offenders cannot [reliably] be classified among the worst offenders" because of three ways in which they differ from adults: (i) they lack maturity; (ii) they are more susceptible to negative influences and peer pressure; and (iii) their personality traits "are more transitory, less fixed." *Id.* at 569-70. These three differences "render suspect any conclusion that a juvenile falls among the worst offenders." *Id.* at 570. "Their own vulnerability and comparative lack of control over

46

their immediate surroundings mean juveniles have a greater claim than adults to be

forgiven for failing to escape negative influences in their whole environment." *Id.*

"[I]t is less supportable to conclude that even a heinous crime committed by a juvenile

is evidence of irretrievably depraved character." *Id.*

What has changed since *Roper* – and is of critical importance in Mr. Aquart's

case – is the continued progress of neuroscience and the development of scientific

evidence demonstrating that brains do not stop developing in adolescence. Rather,

they continue to develop into a period called "emerging adulthood" – age 18 to 25 – a

period of life distinct from both adolescence and adulthood. In short, "the idea that

brain maturation is finalized during adolescence is no longer tenable." Hochberg &

Konner, *Emerging Adulthood, a Pre-Adult Life-History Stage*, 10 Frontiers in

Endocrinology 918 (2020), at 3.

Scientific research has explained the effects of brain maturation, or the lack

thereof, on the behavioral and decision-making abilities of late adolescents in their late

teens and early twenties. The full development of executive functioning—the aspect

of a person's brain that regulates moral decision-making—does not occur until a

person is in their 20s. The development of gray matter "peaks latest in the prefrontal

cortex, crucial to executive functioning, a term that encompasses a broad array of

abilities, including organization, decision making and planning, along with the

regulation of emotion." Jay N. Giedd, *The Amazing Teen Brain*, 312 Sci. Am. 32, 35

(2015). "Because [the prefrontal cortex functions] do not fully mature until a person's

47

20s, teens may have trouble controlling impulses or judging risks and rewards." *Id.* at 36; *see also* Elizabeth P. Shulman et al., *The Dual Systems Model: Review, Reappraisal, and Reaffirmation*, 17 Developmental Cognitive Neuroscience 103, 114 (2016) (neuroimaging studies since 2008 show that "psychological and neural reflections of better cognitive control increase gradually and linearly throughout adolescence and into the early 20s."). "[Y]oung adulthood is a developmental period when cognitive capacity is still vulnerable to the emotional influences that affect adolescent behavior, in part due to continued development of prefrontal circuitry involved in self-control." Alexandra Cohen et al., *When Does a Juvenile Become an Adult? Implications for Law and Policy*, 88 Temp. L. Rev. 769, 771 (2016).

Research reveals that, even among very serious youthful offenders, the vast majority stop committing crimes by age 25. This timeline correlates with research on when brain development is complete and individuals are less prone to immature behavior. Monahan et. al., *Psychosocial (Im)maturity From Adolescence to Early adulthood: Distinguishing Between Adolescence Limited and Persisting Antisocial Behavior*, 25 Dev. & Psychopathology 1093, 1093-1105 (2013). This research also explains Mr. Aquart's remarkable turnaround in terms of his prison disciplinary record and prosocial activities and relationships since he was originally sentenced in this case.

**(b)     The law responds to the science.**

In the years since *Roper*, developing brain science has been met by a concomitant change in the way the law regards emerging adulthood vis á vis criminal

48

culpability. It is now readily accepted that, given advances in brain science, emerging adults must be treated differently for purposes of sentencing.

In May 2017, the U.S. Sentencing Commission issued a report titled <u>Youthful Offenders in the Federal System</u> ("<u>Youthful Offenders</u>").[24] The Sentencing Commission defined youthful offenders as "persons age 25 or younger at the time they are sentenced in the federal system." *Id.* at 1. Finding that "[t]he contribution that neuroscience has made to the study of youthful offending is significant and continues to evolve," *id.* at 6, the Commission's report summarized the current scientific consensus regarding brain maturation: (i) "the prefrontal cortex is not complete by the age of 18;" (ii) brain "development continues into the 20s"; and (iii) though "there will be significant variation from person to person," "the average age at which full development has taken place" is 25. *Id.* at 7.

In 2017, Connecticut opened a separate unit at the Cheshire Correctional Institution to house 18-21-year-olds where they are separated from the adult prison population at large but paired with a small group of older prisoners who serve as mentors. "Public officials have recently started to listen to neuroscientists who say the developing brains of young adults are still prone to impulse. They're not juveniles under the law but like younger teens, their minds are plastic and receptive to change."

---

[24] Available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170525_youthful-offenders.pdf (last accessed Oct. 8, 2021).

Chammah, Maurice, *The Connecticut Experiment*, The Marshall Project, May 8, 2018, https://www.themarshallproject.org/2018/05/08/the-connecticut-experiment (last accessed Sept. 23, 2022). The young prisoners "go through a series of stages, learning to confront their pasts, to be vulnerable around their peers, to resolve conflicts through communication instead of violence, and to master basic life skills they may have missed, such as managing a personal budget." *Id.*[25]

In *United States v. Johnson*, No. 05-cr-00167 (WHA), 2021 U.S. Dist. LEXIS 209833 (N.D. Cal., Oct. 30, 2021), the court granted a sentence reduction based upon today's greater recognition of differences in young brains, along with petitioner's demonstrated rehabilitation. The court noted: "While being a youthful offender has been a point of solicitous concern for the courts, since 2007 we've come to better understand the neurological differences in young brains that can drive youthful crime." *Id.* at **3-4. The court referenced not only the neuroscience evidence argued here but also that "a broader recognition of the Adverse Childhood Experiences Study (ACES), has also greatly affected our understanding of crime among young adults. Research into ACES has shown that greater traumatic experiences in

---

[25] *See also Connecticut's T.R.U.E. Prison Program Offers New Beginnings*, Vera, May 2, 2017; https://www.vera.org/news/dispatches-from-t-r-u-e/connecticuts-t-r-u-e-prison-program-offers-new-beginnings (last visited Sept. 23, 2022), for a first-person prisoner account of the program; Gohara, Miriam, *A prison program in Connecticut seeks to find out what happens when prisoners are treated as victims,* The Conversation, March 7, 2019, https://theconversation.com/a-prison-program-in-connecticut-seeks-to-find-out-what-happens-when-prisoners-are-treated-as-victims-111809 (last accessed Sept. 23, 2022).

childhood correspond with riskier behavior and a greater likelihood of involvement in the criminal legal system." *Id.* at *6. While Mr. Aquart's mental-health evaluation was not conducted within the parameters of the ACE Study, it cannot be seriously disputed that his childhood trauma was significant and a significant contributory factor to the events of this case. Moreover, as in *Johnson*, Mr. Aquart's unblemished prosocial conduct after he was originally sentenced is strong evidence that as his brain developed so too did his moral compass.

"The proportionality of a term of imprisonment imposed should be assessed in light of [a defendant]'s lessened blameworthiness due to his age at the time of his crimes." *Cruz*, 2021 WL 1326851, at *7 (there, age 18). Thus, many federal courts have considered a defendant's youth at the time of the crime as part of the basis for granting a sentence reduction under 18 U.S.C. § 3582(c)(1)(A). *See, e.g., United States v. Maumau*, 993 F.3d 821, 824, 828-29 (10th Cir. 2021) (affirming district court's reduction of sentence from 55 years to time served (approximately 12 years), based in part on the fact that defendant was only 20 years old when he committed the armed robberies); *McDonel*, 513 F. Supp. 3d at 753 (ruling that gross disparity created by certain legislative changes coupled with defendant's youth at time of crimes (age 19) and rehabilitative efforts were extraordinary and compelling reasons for granting a sentence reduction under section 3582(c)(1)(A)(i) from over 100 years down to 20 years); *Cruz*, 2021 WL 1326851, at *7 (characterizing defendant as "less than fully blameworthy for his crimes given his age [18] when he committed them," and

expressing concern that he would "end up serving significantly more time than adults who, fully blameworthy for their conduct, have committed the same crimes."); *Ramsay*, 2021 WL 1877963, at *1 (ruling that defendant's youth when he committed triple murders (at age 18) was one of several extraordinary and compelling circumstances warranting a sentence reduction from life imprisonment to 360 months); *United States v. Vargas*, 502 F. Supp. 3d 821-22 (S.D.N.Y. 2020) (granting sentence reduction from 40 years to time served (plus not more than 14 days) for defendant who was 23 years old at the time of his crimes, even though he "could be characterized as having lived a life of crime").

The Honorable Jed Rakoff recently summarized the relevance of youth to the purposes of sentencing:

> The need for "just punishment" corresponds to the moral culpability of an offense. Adolescents' immaturity, their susceptibility to peer influence, and their dependence mean "their irresponsible conduct is not as morally reprehensible as that of an adult." *Roper*, 543 U.S. at 570, 125 S. Ct. 1183 (internal quotation marks omitted). Thus, a "just punishment" for an adolescent is usually less severe than a "just punishment" for a similarly situated adult.

> Youths' immaturity -- particularly in the context of "hot cognition" decisions made in the presence of peers -- also lessens the value of deterrence because adolescents' "immaturity, recklessness, and impetuosity make them less likely to consider potential punishment." *Miller*, 567 U.S. at 472, 132 S. Ct. 2455.

> The need to incapacitate also applies with less force to younger offenders because, as noted, adolescent crime is a poor predictor of future criminal behavior, both because

adolescents' characters are still developing and because adolescent crime is attributable, in part, to temporary inadequacies of the adolescent brain.

Finally, rehabilitation is one of the congressionally enumerated goals of criminal sentencing, and adolescents' slow but steady development of means of self-control make rehabilitation and successful reintegration into society more likely than for similarly situated adult offenders. Moreover, Congress has "recogniz[ed] that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

For all these reasons, to impose a sentence that is "sufficient, but not greater than necessary," sentencing courts should generally impose lesser sentences on adolescent offenders than on similarly situated adult offenders.

*Ramsay*, 2021 WL 1877963, at *13.

6. **Several of Mr. Aquart's current convictions reflect the ongoing and significant racially discriminatory disparity in federal sentencing between powder and crack cocaine that Congress may soon repeal.**

Although the racially problematic powder-crack disparity was reduced by Congress in the Fair Sentencing Act, it has not yet been eliminated. The Fair Sentencing Act reduced the disparity from 100:1 to 18:1. If the powder-crack cocaine disparity were eliminated, then the threshold weight necessary for an underlying crack-cocaine offense to qualify as a drug-related murder under 21 U.S.C. § 848 would be 5 kilograms or more instead of 280 grams or more. *See* 21 U.S.C. § 848(e)(1)(A) (cross-referencing 21 U.S.C. § 841(b)(1)(A)); *see also* 21 U.S.C. § 841(b)(1)(A)(ii)(II).

On September 28, 2021, the U.S. House of Representatives overwhelmingly passed the EQUAL Act, which would eliminate the powder-crack disparity.[26] The bill is supported by the Department of Justice. Exhibit 10, attached hereto. It enjoys bipartisan sponsorship in the U.S. Senate.[27]

Particularly since the Department of Justice has officially taken the position that the disparity should be eliminated, the racially disparate treatment of powder and crack cocaine can, in a particular case, warrant a sentence reduction under 18 U.S.C. § 3582(c)(1)(A). *See, e.g.*, *United States v. Samas*, No. 3:18-cr-00296 (JAM), 2021 WL 5996815, at **1-3 (D. Conn. Dec. 7, 2021).

Here, too, the racially discriminatory powder-crack disparity likewise serves as an extraordinary and compelling reason for granting a sentence reduction. Even the government has not contended that 5 kilograms of cocaine should be attributed to Mr. Aquart for purposes of sentencing; the highest specific amount of crack it has asserted is 3 kilograms. Doc. 1346 at 22. Without the racially discriminatory powder-crack disparity, Mr. Aquart never would have been convicted for the three drug-

---

[26] *U.S. House passes bill to end disparities in crack cocaine sentences*, Reuters (Sept. 28, 2021), available at: https://www.reuters.com/world/us/us-house-passes-bill-end-disparities-crack-cocaine-sentences-2021-09-28/ (last accessed September 27, 2022).
[27] *Senate Sponsors Laud House Passage of EQUAL Act* (Sept. 28, 2021), available at: https://www.booker.senate.gov/news/press/senate-sponsors-laud-house-passage-of-equal-act (last accessed Oct. 7, 2021).

related murders under 21 U.S.C. § 848(e)(1)(A) (Counts 5, 6, and 7) in the first

place—and thus never would have been sentenced for those counts.

**7. Mr. Aquart's reentry plan is strong and would support the mature, law-abiding man he has become in his transition back into society.**

**(a)    Mr. Aquart's release plan.**

Mr. Aquart believes that if he is released from prison, it would be best for him

to have a fresh start somewhere away from Bridgeport, Connecticut, where he spent

his childhood. As a result of his work ethic and talents, Mr. Aquart has employment

waiting for him. If released, he would accept a part-time position that has been

offered to him at the Indiana Federal Community Defenders Inc., a § 501(c)(3)

corporation that provides representation to persons charged with federal crimes who

are unable to afford counsel. This position is for 30 hours per week and pays

$30/hour. Mr. Aquart would also be encouraged to apply for the next available open

full-time paralegal position. While federal regulations require employers to post open

positions and solicit applications, Mr. Aquart is uniquely qualified for a position as

paralegal for prisoner matters. Indeed, this position was previously held by a former

death-row client whose service was exemplary and inspired defense counsel to seek

opportunities to hire former prisoners, where possible. Through this representation,

counsel has come to know that Mr. Aquart's desire to help others who are

disadvantaged and incarcerated is genuine, and his ability to solve problems creatively

is rare. His legal skills are extraordinary and deserve encouragement, particularly given

that they were developed in correspondence courses. A full-time position would start at an annual salary of approximately $66,818 and would include full federal benefits, including health insurance, dental insurance, vision insurance, life insurance, disability, and paid federal leave.

Health insurance would allow Mr. Aquart to secure much-needed trauma therapy, which is unavailable in the BOP, as well as medical care for his numerous medical problems that have gone unaddressed in the BOP, including TB and neuropathy. *See* 18 U.S.C. § 3553(a)(2)(D) (requiring the Court to consider, when imposing sentence, the need for the sentence "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.").

Indianapolis enjoys a cost of living that is below the national average, and housing costs that are significantly below the national average.[28] The average price for a one-bedroom apartment is $739/month. *Id.* When compared to the rest of the Nation, Indiana has the 11th lowest cost of living.[29] "Housing is one of the most significant impediments facing the reentering population today."[30]

---

[28] *See* https://www.bestplaces.net/cost_of_living/city/indiana/indianapolis (last accessed Aug. 25, 2022).

[29] *See* https://www.sofi.com/cost-of-living-in-indiana/ (last accessed Aug. 25, 2022).

[30] Silva, Lahny; *Reaching for Reentry: Indiana University Robert H. McKinney School of Law's Contribution to the Reentry Movement*, 54 Indiana L.R. 527, 538 (2021).

Moreover, the Southern District of Indiana has a reentry program called REACH (Re-entry and Community Help), and Mr. Aquart would seem to be a perfect candidate for it.[31] This program could help him secure housing, procure a driver's license, and manage other challenges common to citizens returning to the community from long-term incarceration. REACH participants have the benefit of law-student volunteer assistance in a clinic run by a program professor who is a licensed attorney. *See* attached Letter to Counsel from Professor Lahny Silva, Exhibit 11, attached.[32] REACH participants meet once a month with judges, prosecutors, defense lawyers, and probation officers, who monitor their progress and assist with issues as needed.

Mr. Aquart's comprehensive reentry plan addresses the most vexing issues confronting the returning citizen. Employment cuts recidivism in half[33]; he has a job. "Housing is one of the most significant impediments facing the reentering population,"[34] but he has a plan for that too. He has chosen to reside in a livable city

---

[31] For information about the Southern District of Indiana's REACH program, see then-Chief Judge Richard Young's article "Young: Federal re-entry programs continue to benefit community," Indiana Lawyer (1/12/2016), available at https://www.theindianalawyer.com/articles/39193-federal-re-entry-programs-continue-to-benefit-community (last accessed Oct. 7, 2021).

[32] *See also*, *Reaching for Reentry*, *supra*; "IU McKinney students bring energy, enthusiasm, to re-entry program", Indiana Lawyer (May 14, 2019), available at https://www.theindianalawyer.com/articles/50271-iu-mckinney-students-bring-energy-enthusiasm-to-re-entry-program (last accessed Oct. 7, 2021).

[33] *Reaching for Reentry*, 54 Indiana L.R. at 537 n.41.

[34] *Reaching for Reentry, supra* at 538.

57

and – with help from his lawyers – has identified organizations to assist him in finding housing.

**(b)      Mr. Aquart's hopes for the future.**

If released, Mr. Aquart would relish the opportunity to further develop his relationship with his teenage daughter, Angel. As the Court may recall, while the scythe of a possible and then actual death sentence hung over his head, Mr. Aquart made the brutally difficult decision to avoid a close relationship with his daughter, believing that such a relationship would be unfair to a young child (born a month after her father was incarcerated).[35] This reaction to relationships with young children is not uncommon amongst the men sentenced to death who are housed in Indiana far from loved ones.  There is frequently an overwhelming desire to shield children from the pain of watching their fathers suffer and ultimately perish at the hands of their government.

Since the prosecution's decision not to pursue the death penalty, Mr. Aquart has undertaken efforts to establish a relationship with his daughter. This is a deliberately slow and delicate process because of his decades of absence, but it is clear that their love for each other has flourished. The following text was sent to Mr. Aquart's appellate lawyer from Angel shortly after Mr. Aquart was resentenced:

---

[35] Mr. Aquart's daughter attended a predominately white, private school. He harbored concerns that if her classmates learned that her father was on death row, they would bully her. He, too, had been bullied as a youth for his Rastafarian culture and did not want his daughter to suffer the same fate.

58

> Hey Sean Bolser , this is Angel Smith
> ( Azibo's daughter). I've received the
> letter !! Thank you guys so much it's
> very appreciated 💕 tell my dad that I
> love him & that I didn't forgot about
> them I haven't wrote him back yet
> because I'm waiting for the pictures
> from my sweet 16th to come in and I
> was going to send them to him with
> my response to his first letters.

She reaches out to him for support when she is troubled. The following email thread is between Mr. Aquart's daughter and his appellate lawyer from just after Christmas last year:



Because of the distance between Connecticut and Colorado, the cost of travel, and the fact that chronic lockdowns at Florence make planning difficult, Mr. Aquart has been unable to meet with Angel in person. Such in-person meetings with his daughter are only dreams given his current circumstances, but they would clearly aid their fledgling father-daughter relationship.

59

If he is released, Mr. Aquart would also very much like to help his half-sister, who is paralyzed from a car accident and comatose, and her children. Mr. Aquart is very concerned about the danger that the standard of care for his half-sister is in danger of declining for financial reasons, and if he could be released and were able to earn wages or salary in the free world, he would have the means to provide her with some financial support to prevent that outcome. This sister tried to protect him when he was a child, and he feels a strong moral obligation to protect her in her time of need, as best he can.

Mr. Aquart also very much would like to offer mentorship and support to this sister's three sons, ages 19, 15, and 13. Not only is their mother paralyzed and in a coma, but their father—following a 10-year stint in federal prison—abandoned them. Of course, these nephews remind Mr. Aquart of his own situation when he was a young teenager, effectively orphaned. With the benefit of his maturity and perspective, he has a lot to offer these nephews to help them avoid going down the wrong path in life the way he himself did.

Of course, following release and with gainful employment, Mr. Aquart would be in a much better position to pay restitution than he would be if he were to remain incarcerated for the rest of his life. Of note is the fact that BOP officials have informed Mr. Aquart he is *not* required to pay restitution or participate in the Inmate

Financial Responsibility Program. [36] Nevertheless, since his resentencing, Mr. Aquart has made the payments that BOP would normally require – $25/quarter – despite the fact that he has no job at the USP. He has done so because, regardless of what BOP staff tell him, he knows that this Court ordered restitution at his resentencing. He has also taken a class on Victim Awareness and Restitution, which has expanded his knowledge of crime victims' families and their struggles. These payments have been made directly to the Court Clerk. Exhibit 12, attached.

Mr. Aquart now enjoys a strong, prosocial community of support[37] that will continue to be there for him if he is released from prison.

## E. Jurisdiction

Pending in the U.S. Court of Appeals for the Second Circuit is Mr. Aquart's appeal from this Court's orders denying motions he filed prior to resentencing. *United States v. Aquart*, Case Number 21-2763 (2d Cir.). Mr. Aquart invokes the provisions of

---

[36] It appears BOP has a significant interest in thwarting the will of the Court and the interests of victims of crime regarding restitution payments. The BOP is currently "pushing back against efforts to make inmates pay much more of their court-ordered restitution to crime victims, in part because the money they would use helps fund salary and benefits for hundreds of agency staff position….". Barrett, Devlin, "U.S. prison officials resist making inmates pay court-ordered victim fees"; Washington Post, Aug 4, 2022, attached as Exhibit 13. Specifically, the BOP is using interest earned from inmate funds and markups to commissary to fund 652 positions in the BOP – $49.5 million in salaries and $32.5 million in benefits. *Id.*

[37] Many of these people traveled to Connecticut for Mr. Aquart's resentencing. Some of them participated in a video provided to the Court prior to resentencing. That video can be viewed at https://vimeo.com/613844499 (Password: IfcdAqu@2021).

Fed. R. Crim. P. 37 and asks the Court to consider indicating in a written order either that it is inclined to grant the motion or that it believes the motion raises a substantial issue. Fed. R. Crim. P. 37(a)(3). *See, e.g.*, *Samas*, 2021 WL 5996815, at *1 ("This indicative ruling pursuant to Rule 37 of the Federal Rules of Criminal Procedure states my intent to grant Samas's [sentence-reduction] motion in the event that the Second Circuit determines his appeal and restores my jurisdiction to rule on Samas's motion."). In that event, counsel for Mr. Aquart would promptly notify the circuit clerk, as required by Fed. R. Crim. P. 37(b).

### F.  Conclusion

Azibo Aquart is no longer the person he was when these crimes were committed.  While his self-betterment is remarkable and his behavior since being sentenced to death impeccable, these qualities fail to adequately capture the man. With none of the advantages offered to many of us, and all of the disadvantages everyone hopes to avoid, he has become a compassionate and empathetic person while under the worst conditions our prison system has to offer.

Moreover, a term of supervised release "will adequately ensure his continued good behavior and abstention from violent or criminal conduct." *Vargas*, 502 F. Supp. 3d at 832. And as discussed, releasing him relatively soon to begin work in the community will allow him to help his family members in need and will increase the rate at which restitution is paid.

THE DEFENDANT,

AZIBO AQUART

/s/ *Monica Foster*
Monica Foster
Indiana Federal Community Defender
111 Monument Circle, Suite 3200
Indianapolis, IN 46204
317-383-3520
IN Bar No.: 8368-49
E-mail: monica_foster@fd.org

## CERTIFICATE OF SERVICE

I certify that on September 28, 2022, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the parties of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ *Monica Foster*
Monica Foster