# EXHIBIT 3

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



**VIA FEDERAL EXPRESS**

October 15, 2008

Mr. Harley Lappin
Director
Bureau of Prisons
320 First St. NW
Washington, DC 20534

Dear Director Lappin:

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

ELIZABETH ALEXANDER
DIRECTOR
ATTORNEY AT LAW

NATIONAL OFFICE
125 BROAD STREET, 18TH FL.
NEW YORK, NY 10004-2400
T/212.549.2500

OFFICERS AND DIRECTORS
NADINE STROSSEN
PRESIDENT

ANTHONY D. ROMERO
EXECUTIVE DIRECTOR

RICHARD ZACKS
TREASURER

As you are aware, the National Prison Project of the American Civil Liberties Union Foundation continues to investigate conditions in the Special Confinement Unit (SCU) at USP-Terre Haute. In August 2007, my colleague, David Fathi, sent you a detailed letter outlining serious deficiencies in medical, dental and mental health care, environmental conditions, and several other civil liberties issues. Regrettably, we received no response from your office; rather, in October 2007, we received a reply from Warden R.V. Veach, who dismissed many of our most serious concerns. For your convenience, copies of both letters are attached.

Based on a considerable body of evidence gathered in the months since Warden Veach's reply,[1] I agree with Mr. Fathi's conclusion that many of the conditions endured by men housed in the SCU may violate the Eighth Amendment's proscription against cruel and unusual punishment.[2] I further echo Mr. Fathi's desire to engage in a meaningful discussion with the Bureau in an effort to avoid litigation.

Now is a particularly difficult time for the men in the SCU. In May, the government sought judicial permission to lift the stays of execution previously granted to James Roane, Richard Tipton, Cory Johnson, Bruce Webster, Orlando Hall, and Anthony Battle.[3] The men in the SCU are fully aware of this fact and the resulting stress makes the issues discussed below even more urgent and

---

[1] I have spoken with prisoners in person in addition to written and telephone correspondence. In addition, I have reviewed hundreds of pages of documents and have been in contact with counsel for several prisoners. Many of these attorneys share the concerns discussed herein.

[2] I also echo Mr. Fathi's recognition of the courtesy displayed by the SCU staff during my visits. Kindly convey my gratitude to them.

[3] Defendants' Renewed Motion for Judgment on the Pleadings & Renewed Motion to Lift the Stay of the Plaintiffs' & Plaintiff-Intervenors' Executions, *Roane v. Mukasey*, No. 05-2337 (D.D.C. May 16, 2008).

1

salient. The Bureau's systematic denial of adequate medical, mental health, and dental care causes inordinate fear, pain, and suffering among men facing the prospect of a trip across the FCC campus to the death chamber.

Many of the men know you personally from your tenure as warden and many continue to communicate their respect for the leadership you demonstrated while at USP-Terre Haute. I ask that you consider seriously this letter's discussion of the dangerous deficiencies in the medical, mental health, and dental care provided to SCU prisoners. Each of these deficiencies is grave, and all have the capacity to kill, cause permanent harm, or cause the suffering of needless pain. This letter's conclusions may be summarized as follows:

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

I. The Bureau of Prisons fails to provide constitutionally acceptable medical care to SCU prisoners. Specifically:

- Current policies and practices result in dangerously delayed responses to medical emergencies;
- SCU prisoners lack adequate access to sick call and acute medical care;
- Medical staff fail to make timely and necessary referrals to specialists;
- Care for prisoners with diabetes is medically and constitutionally deficient;
- Prisoners needing medications face substantial obstacles;
- Preventive health care is poor; and
- Signs of potentially serious health conditions are ignored.

II. Constitutionally adequate mental health care services are not available to SCU prisoners.

III. SCU prisoners are denied access to timely, adequate dental care.

IV. Prisoners continue to endure incessant noise, resulting in sleep deprivation and psychological and physiological stress.

* * *

2

## I.    Evidence of Deliberate Indifference to Serious Medical Needs – Provision of Health Care

### A.    Response to Medical Emergencies

Several prisoners[4] report dangerous problems with staff's delayed response to medical emergencies. They report that the audio alarm that is supposed to sound when a prisoner presses his emergency call button has been either disabled or attenuated. According to the prisoners, the disabling or attenuation of the audio alarm is a relatively recent event. They further report that, although the call button may activate some form of alarm in the control "bubble," the bubble is often unmanned. Given the number of hours per day that SCU prisoners are locked down, a properly functioning emergency call button system is their only means of alerting staff to a life-threatening incident.[5]

In multiple recent incidents, the emergency call button system, to the degree it even functioned as intended, failed to timely summon help. It was only the screams of inmates and banging on cell doors that ultimately attracted staff attention. Failing to timely respond to an emergency call button may constitute actionable deliberate indifference. *Velez v. Johnson*, 395 F.3d 732, 736 (7th Cir. 2005). Officials who knowingly fail to maintain a working call button system may also be held individually liable. *Felton v. Godinez*, No. 93-C-4584, 1996 WL 137645, at *5 (N.D. Ill. March 25, 1996). Below are descriptions of several recent medical emergencies. While individual witnesses may offer slightly differing accounts, each of these incidents was urgent, had the capacity to cause serious harm or death, and failed to receive a timely response by staff.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[4] To protect their privacy, prisoners will be referred to by numbers. An identification key is attached to this letter. Kindly consider the prisoners' privacy when you share this letter with others both inside and outside of your office.

[5] Prisoner 2 submitted a BP-8 on this very issue. In response, he was told that, on March 18, 2008, "maintenance staff checked the control panel in the SCU control room and made necessary adjustments to the auditory speaker of the panel." March 19, 2008 Response to Informal Resolution submitted by Prisoner 2.

That the speaker required "necessary adjustments" supports Prisoner 2's assertion that the audio alarm was either disabled or turned down. However, according to Prisoner 2, the audio alarm was disabled or turned down once again shortly after the March 18th maintenance. Although Warden Marberry claims that a backup system is in place "[i]f the alarm is not acknowledged in a timely manner," this backup system seems to do little to reduce the institution's dangerously slow response to medical emergencies. Response to Request for Administrative Remedy No. 487815-F1, dated April 24, 2008. Regardless, even if the system is currently operating as intended, measures to ensure future operability are required.

Exhibit 3, Pg. 3

1. <u>Prisoner 1</u>

On June 7, 2008, Prisoner 1 reports pressing his emergency call button at approximately 6:34 p.m. Prisoner 1, a type-1 diabetic with a known history of diabetic emergencies, had requested his insulin two hours earlier but had yet to receive it. He felt very sick with the symptoms of hyperglycemia. Nobody responded to his distress call. He pushed the emergency button again twice. Instead of receiving a response by medical staff, the officer in charge sent an inmate orderly to tell Prisoner 1 that the nurse was too busy passing out medications elsewhere on the compound to deliver his insulin. Prisoner 1 waited and pressed the button yet again. He reports that an officer passed by his cell and said that he knew that the emergency could not be too serious because he had heard Prisoner 1 yelling for help. Sometime after 7:41 p.m., a nurse finally arrived at Prisoner 1's cell. His blood sugar was at 395 even though he had not had anything to eat prior to the reading.[6] According to the American Diabetes Association, pre-prandial (pre-meal) capillary plasma glucose should range between 70 and 130mg/dl.[7] Prisoner 1 had a similar experience on April 26, 2008. This casualness in responding to medical emergencies may one day cost the lives of Prisoner 1 and those similarly situated.

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

2. <u>Prisoner 2</u>

On February 24, 2008, Prisoner 2 suffered a cardiac emergency. He pressed his emergency call button but reports that he received no response for over forty-five minutes. Prisoner 2 sought assistance from the prisoner in the cell across from him, who began yelling for help. After 10 minutes of yelling, an officer finally responded. Prisoner 2 describes the situation in a BP-9:

> There was approximately one hour that passed between the time I pressed the emergency distress button in my cell and when the staff removed me from that cell. I suffered severe pain during this time (and afterwards). No officer responded to my request for assistance by way of the emergency signaling device because it was deactivated and they were not

[6] According the American Diabetes Association, peak post-prandial (post-meal) capillary plasma glucose should not exceed 180mg/dl, measured one to two hours after the start of a meal. American Diabetes Association, *Standards of Medical Care in Diabetes*, 31 Diabetes Care S12, S18 (Jan. 2008). Glucose levels may be measured using either whole blood or plasma. Glucose levels in blood are generally 10-15% lower than levels measured in plasma. Robyn Graham, *Self-Monitoring of Blood Glucose (SMBG): Considerations for Intensive Diabetes Management*, 30 Pharmacy & Therapeutics 1, 8-9 (2005). It is unclear whether the glucometer used to measure Prisoner 1's glucose reported his blood sugar level or whether the device converted the reading to a plasma level. Regardless, Prisoner 1's glucose level indicates severe hyperglycemia.

[7] American Diabetes Association, *Standards of Medical Care in Diabetes, supra*, at S18.

4

aware of my situation because they weren't in the SCU Control Room. The range doors are kept shut and locked so even once [another prisoner] began to holler for a staff member that a man was down it took another ten minutes for the staff to respond.[8]

According to Prisoner 2 and other prisoners, the arrival of the correctional officer did little to provide the emergency care needed. After a lieutenant arrived, Prisoner 2 was placed in a wheelchair and taken to the day room. The lieutenant contacted the on-call physician, who was more than an hour and a half away. The lieutenant told Prisoner 2 that, per policy, she could not call for an ambulance unless she received prior physician approval. According to Prisoner 2, the physician arrived approximately three hours after he first pressed his call button. Only then was he transported to the emergency room via ambulance to be treated for a critical cardiac incident involving, among other things, his left anterior descending artery.[9]

Prisoner 2 could have died as a result of the BOP's inexplicable delay in providing him with emergency care. Indeed, the left anterior descending artery is commonly known as the "widow-maker artery." The Bureau's own Clinical Guideline states that "[m]ortality from [myocardial infarction] increases from 1%, when thrombolytic therapy is given immediately, to 10% when thrombolytic therapy is given after 6 hours from the onset of symptoms. Therefore inmates with clinical syndromes consistent with acute MI should be immediately transferred to a community hospital for evaluation and treatment."[10] BOP's policy of requiring physician approval of emergency room visits when the on-call physician is located an hour and a half away speaks of a reckless disregard for the medical needs of the prisoners in its care. Indeed, the policy is so reckless that I had difficulty believing that it existed until it was confirmed by Warden Marberry, who offered this explanation:

> Due to increased security concerns of inmates housed in the Special Confinement Unit (SCU), it is necessary for a physician to make a medical determination as to whether a SCU inmate is sent to the local hospital. Upon arrival at the institution, the on call physician evaluated your condition and determined it was medically necessary for you to be sent to the local hospital for further evaluation and testing... There is no evidence

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

---

[8] Request for Administrative Remedy (BP-9) No. 487815-F1 dated March 24, 2008.

[9] Request for Administrative Remedy (BP-9) No. 487815-F1 dated March 24, 2008 and hospitalization records.

[10] BOP Clinical Practice Guidelines for the Management of Coronary Artery Disease (2001) § 3.

to suggest that there were unreasonable delays in evaluating you or having you transported to a local hospital.[11]

While there may or may not be "increased security concerns" for death row prisoners, none of these concerns justify the denial of prompt medical care for a prisoner with a life-threatening emergency. Indeed, Bureau policies already contain procedures for authorizing emergency medical trips for high-security prisoners. According to the policy, during non-duty hours, the Administrative Duty Officer or on-duty Lieutenant may authorize such trips.[12] The current policy for SCU prisoners deviates from the Bureau's own rules and the consequences may very well prove deadly.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

### 3. Prisoner 3

In February 2008, over the course of several days, Prisoner 3 experienced fever, bloody vomiting, dizziness, and sweating. At one point, he passed out in the shower. Prisoner 3 reports pressing the emergency call button on multiple occasions but failed to receive any response. According to Prisoner 3, officers were unaware of his emergency because the audio alarm connected to the call button had been deactivated. Ultimately, it was the yelling of his fellow prisoners that attracted the attention of security staff. When personnel finally arrived, Prisoner 3 was unable to stand upright. An officer told him to crawl to the door so that he could be restrained. Prisoner 3 received no meaningful treatment and never saw a physician. He is unsure of his diagnosis or whether his condition required any follow-up. Prisoner 3's symptoms called for immediate, emergency attention. He received none and, as a result, he suffered needlessly. It is my understanding that counsel for Prisoner 3 has attempted to contact the warden about her client's medical situation but has yet to receive a satisfactory response.

BOP's own policy notes that "ACA standards require a four minute response to life or limb threatening medical emergencies."[13] Clearly, staff at USP-TH has not complied with the standard and, it seems, may be unable to do so.

### B.    Access to Acute Care and Sick Call

Access to acute health care is woefully deficient. The current system of

---

[11] Response to Request for Administrative Remedy No. 487814-F1, April 25, 2008.

[12] Program Statement 5538.04 (Escorted Trips) §§ 6(c)(1), 6(d)(2), 8. *See also* USP-TH Institution Supplement THX-6400.02D (Urgent Medical and Dental Care) (Feb. 2007) § 5(b) ("the Operations Lieutenant may initiate procedures for outside emergency medical care.")

[13] Program Statement P6031.01 (Patient Care) § 9.

triage, referral to providers, and follow-up fails to meet even the basic health care needs of SCU prisoners. While lockdown units such as the SCU may present special challenges, prisoners are entitled to timely, unimpeded access to acute health care. Changes to the current system are needed immediately.

### 1. Requests for Care & Availability of Sick Call

Prisoners seeking medical attention report scribbling their complaints on pieces of notebook paper. If there is a special form for requesting sick call, it is not in regular use. As a result, there is no meaningful record of a prisoner's request for health care unless the prisoner writes a duplicate copy of his handwritten slip. Requests for care frequently seem to disappear into a "black hole." This practice is at odds with ACA standard 4-4346, which requires sick call request forms. It is also at odds with BOP's own policy, which contemplates an "Inmate Request for Triage Services form."[14] According to multiple prisoners, sick call is held only on weekdays, meaning that prisoners are unable to submit sick call requests on weekends and holidays, a practice inconsistent with the Institutional Supplement governing the SCU. Recently, Prisoner 4 submitted a Request for Administrative Remedy challenging the adequacy of this policy. He received the following quizzical response from the warden:

> An investigation into your request was completed and reveals that we are currently providing sick call 7 days a week, per policy. However, based on your concerns, medical staff has since been instructed to take sick call forms to include weekends and holidays.[15]

As an initial matter, if the policy is to provide sick call seven days per week, then, according to multiple prisoners, the policy was being ignored. Second, if sick call actually was being conducted seven days per week as claimed by the warden, then why would the warden need to instruct medical staff to take sick call forms on weekends and holidays? An adequate correctional health care system requires a suitable mechanism for prisoners to request care and receive a timely response. Current practices in the SCU fall far short of this standard.

### 2. Timely and Appropriate Referrals to Providers

Prisoners report that they lack timely access to physicians and physicians' assistants for non-emergency care. Once triaged, prisoners must wait, at a minimum, until the following Wednesday before seeing a PA. Frequently, they must wait until the Wednesday after that. Thus, prisoners needing health care

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[14] Program Statement P6031.01 (Patient Care) § 17.

[15] Response to Request for Administrative Remedy No. 484367-F1, March 31, 2008.

Exhibit 3, Pg. 7

deemed to be non-urgent must wait one or two weeks before receiving medical attention. This is an unacceptable delay, particularly for painful conditions. Further, in the event that the triage nurse mistakenly overlooks the seriousness of a prisoner's symptoms, the prisoner is put at extreme risk. The health services department is very open about its delays. In a response to a BP-8, health services responded that "[o]nce you are evaluated on sick call, you should be scheduled within two weeks to be evaluated by the PA."[16]

### 3. Prisoner 5

The case of Prisoner 5 illustrates some of the significant barriers faced by prisoners needing acute medical care. On May 5, 2006, Prisoner 5, who has a history of neck and back trauma, slipped and fell while stepping out of the shower, hitting his head and injuring his back. That evening, a health care provider inserted staples in Prisoner 5's head to treat his wounds but provided no additional care for his injuries, let alone screening for neurological damage. The next morning, Prisoner 5 awoke in severe pain and unable to move his head. He experienced shooting, electric-like sensations up and down his spinal column. Despite his pleas to nursing and correctional staff, he reports receiving no additional meaningful medical attention until May 10th – five days after his fall – when health staff realized his condition warranted immediate evaluation at the emergency department of the local hospital, where it was determined that Prisoner 5 had suffered a concussion and other injuries. Upon return to the SCU, staff failed to provide him with the pain medications prescribed by the hospital physician at discharge. Instead, after he had suffered excruciating pain for several days, staff told him that he could purchase the medication from the commissary if he had sufficient funds to do so. Ultimately, Prisoner 5 reports that he went without pain medication for approximately two weeks.

Prisoner 5's care did not improve. Staff ignored multiple sick call requests and failed to remove the staples from his head within the time frame originally intended, placing him at risk of complications to his wounds. Prisoner 5 reports never seeing a physician and continued through the summer to experience a combination of pain, immobility, and multiple unanswered requests for sick call. As the Seventh Circuit noted in overturning the dismissal of a deliberate indifference claim, "[a]ny injury to the head unless obviously superficial should ordinarily be considered serious and merits attention until properly diagnosed as to severity." *Murphy v. Walker*, 51 F.3d 714, 719 (7th Cir. 1995).

---

[16] Memorandum to Prisoner 4 regarding Informal Resolution, March 13, 2008.

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

Exhibit 3, Pg. 8

Prisoner 5 reports spending several painful months in a wheelchair. He received no physical therapy and only the most cursory of medical supervision. It was during this period that he filed a motion to drop his appeals and volunteer for execution. In his motion, he requested death within 60 days, adding that "I no longer wish to live like this just to be put to death anyway." [17] Quite simply, the Bureau appears to have cared little for Prisoner 5's welfare and exhibited recklessness consistent with deliberate indifference to a serious medical need.

Taken together, it is clear that providing timely access to health care services simply is not a priority. The men awaiting execution in the SCU deserve better – much better.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

4. Failure to Address Symptoms of Serious Illness

Prisoner 6 has suffered from painful swelling in his legs and feet for over a year but has received little treatment. He also reports suffering from chest pain, labored breathing, and fatigue. This cluster of symptoms could indicate a serious, life-threatening cardiovascular condition. BOP medical staff issued him T.E.D. hose, which are frequently used to prevent blood clots or other vascular problems. This suggests that medical staff is on notice of Prisoner 6's problem. Nevertheless, Prisoner 6 reports that the clinical director curtly dismissed his complaints after the most cursory of visual examinations. Proper diagnosis requires prompt evaluation. It is my understanding that counsel for Prisoner 6 have received copies of his medical records through a Freedom of Information Act request and will take appropriate action to ensure that their client receives the care he needs.

## C.    Referrals to Specialists

With regard to specialty medical care, multiple prisoners report significant delays – and seemingly unwarranted denials. Trips to off-site providers are rare, leaving prisoners without timely access to orthopedists, gastroenterologists, ophthalmologists, endocrinologists, and other providers. When combined with the lack of access to on-site health care, prisoners needing consultations with outside specialists are left to suffer.

### 1.    The *Ortiz* Litigation: An Indication of a Serious Systemic Problem

The ongoing litigation on behalf of Arboleda Ortiz provides a typical

---

[17] Prisoner 5 later withdrew this motion.

9

example of the Bureau's failure to provide proper, timely specialty care.[18]  In 2001, an ophthalmologist diagnosed Mr. Ortiz with pterygia (masses of thickened conjunctiva that cover part of the eyeball).  The doctor recommended surgical removal but this recommendation was denied.  During the next five years, Ortiz continued to suffer eye problems and his doctors continued to recommend surgical intervention.  They noted that Ortiz had "difficulty seeing" and that the pterygia impaired his vision.  Each recommendation for surgery was met with a denial with no further explanation.   On June 13, 2008, the United States Court of Appeals for the Seventh Circuit reversed the district court's ruling with respect to claims against Dr. Thomas Webster, the current Clinical Director at USP-TH.  The Court of Appeals was clearly disturbed by Webster's conduct:

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

> Dr. Webster, the only medical defendant, denied Ortiz surgery after eye specialists had recommended it, and although he belatedly provided an explanation for the denials – that the eye specialists found that the pterygia did not affect Ortiz's vision – the explanation does not square with the record.  Instead, the records show that his vision worsened from 20/80 to 20/100 between 2001 and 2003, that he had "difficulty seeing," and that the pterygia were causing "visual distortion."  And, contrary to the district court's recitation of the facts, Ortiz did not receive surgery within 75 days of when it was first recommended; instead, his surgery to remove only one of the pterygia occurred in 2006, over 5 years after the initial recommendation and only after Ortiz filed this lawsuit.[19]

The Seventh Circuit's indictment of the poor care afforded to Mr. Ortiz should serve as a wake-up call for the Bureau.  Mr. Ortiz's ordeal is hardly unique.  Several other prisoners continue to suffer similarly.

2. Prisoner 3

Prisoner 3 has a history of severe chest and abdominal pain.  This problem appears in his medical records as early as August 8, 2007, when he was prescribed ranitidine for what was assumed to be heartburn.  More than two months later, medical records indicate that "[i]t still feels like my chest is going to explode."  A BP-S622.060 (Radiologic Consultation Request/Report) indicates that x-rays had been ordered for Prisoner 3 on October 4, 2007 to help diagnose "chest pain."  However, despite the severity of his pain, the Bureau failed to perform the x-rays until December 28, 2007.  The results were not reviewed and signed off on until January 14, 2008.  Two and a half pain-filled

---

[18] *Ortiz v. Bezy, et al.*, No. 2:05-CV-246-LJM-WTL (S.D. Ind.).  SCU prisoner-paralegals prepared the legal documents for this litigation as Mr. Ortiz is unable to do so himself.

[19] *Ortiz v. Bezy, et al.*, No. 07-3807, 2008 WL 2415857, at *3 (7th Cir. June 13, 2008).

months elapsed while he awaited the most simple of radiologic procedures. By the time the x-rays were taken, Prisoner 3 was complaining of vomiting at every meal.

The Utilization Review Committee met on January 17, 2008 to consider Prisoner 3's case. Although Health Services had already had five months to determine an effective course of treatment, the URC deferred action until yet an additional medication regimen was tried. On February 13, 2008, Prisoner 3 complained of a squeezing pain in his abdomen and of spitting up blood. Finally, on February 14, the URC approved him for an esophagogastroduodenoscopy (EGD). The URC classified his need as "Level 2" and "Priority 2," meaning that the procedure "...cannot be reasonably delayed *without the risk of further complication*, serious complication, significant pain or discomfort..." (emphasis in original) and that the exam should occur within 30 days. Prisoner 3 did not have his EGD until late June 2008. This delay is unacceptable. Chest and abdominal pain are serious matters that require urgent attention and prompt diagnosis. The care provided to Prisoner 3 falls short of the standards set forth in the Bureau's own Clinical Practice Guidelines, which call for ambulatory pH monitoring, upper endoscopy, or both if the patient fails to improve after eight weeks of $H_2$ antagonist therapy (e.g., ranitidine) and four weeks of proton pump inhibiter treatment (e.g., omeprazole).[20]   Medical staff was clearly aware of Prisoner 3's pain; the decision to ignore it for so long demonstrates deliberate indifference, particularly if staff fails to provide proper follow-up based on Prisoner 3's EGD results.

3. Prisoner 7

Prisoner 7 suffers from a chronic, painful skin condition. For several years, much of his body has been covered with bright red sores. In 2000, while still in state custody, a board-certified dermatologist wrote that this condition may be the result of an allergic reaction to a metal bullet lodged in Prisoner 7's right hip. In the resulting progress note, the doctor's recommendation is underlined: "Needs to have the bullet removed." In 2001, a state court judge ordered that Prisoner 7 be taken to a doctor for evaluation and possible removal of the bullet. Later that year, the Director of Emergency Medicine at Sequoyah Memorial Hospital (Oklahoma) wrote that "I feel that there certainly can exist in a high probability a causal relationship between the persistent rash on his lower extremities and the existing bullet fragment... without removing the bullet fragment, there may exist a potential for further progression of the rash, which may in turn become more serious and/or disfiguring." It is my understanding that

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

[20] Clinical Practice Guidelines for Gastroesophageal Reflux Disease (GERD) Dyspepsia, and Peptic Ulcer Disease, Appendix 1 (November 2001).

11

Exhibit 3, Pg. 11

BOP staff have been made aware of these state medical records. On November 9, 2006, after Prisoner 7's arrival at USP-TH, an orthopedic surgeon wrote that "It is the consensus of the doctors who have seen him that [the bullet] is what is causing the sores." As of my most recent contact with Prisoner 7, the bullet remains in his hip, his sores persist, and he still awaits medically adequate treatment.

Official responses to Prisoner 7's grievances suggest a medical system that fails to meet the needs of the population it is meant to serve. In a response to his BP-11 Central Office Administrative Remedy Appeal, a BOP official wrote that:

> [r]elevant portions of your medical record have been reviewed which reveal that you were evaluated by the staff physician on October 18, 2006, for your complaint of skin rash due to a bullet being lodged in your right hip. During the evaluation, the staff physician evaluated you and determined that you did not suffer from any erosion of the bullet through the skin nor was there any skin irritation at the site of the healed bullet wound. As such, your request to have the bullet removed is not clinically indicated and will not be performed.[21]

This response – and the doctor's evaluation cited therein – do not address Prisoner 7's request that his allergic skin reaction be treated. He did not complain of the bullet protruding through the skin or of irritation limited to the wound site. After waiting over six months for a final reply, the Central Office upheld the denial of treatment for symptoms other than the ones actually suffered by Prisoner 7. In February 2007, he raised the issue again in a Request for Informal Resolution. In response, he was told that the records of his previous consultation could not be located, that no orthopedic specialist was available to see him due to contract issues, and that he should sign up for sick call if he still had problems. [22] On May 23, 2007, Warden Veach informed him that USP-TH had finally retained a new orthopedic surgeon. Four months later, Prisoner 7 submitted a "cop-out" stating that "[t]he sores are getting worse and spreading to my arms and head…" and asking when he would be seen by the new orthopedic surgeon. The Medical Secretary replied that Prisoner 7 hadn't been referred for a consult until September 12, 2007 and that he would "be evaluated once [his] name reaches the top of the list."

Prisoner 7 did not see the specialist until November 2007 and has yet to receive adequate treatment for his condition. As Prisoner 7 wrote in a BP-11, "[i]f you don't know what's wrong then send me somewhere w[h]ere they can

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[21] Response to Central Office Administrative Remedy Appeal (BP-11) No. 418953-A1, dated January 26, 2007.

[22] Undated Response to Request for Informal Resolution (BP-8) submitted on February 21, 2007.

find out… I bleed all over my clothes, bed[d]ing, and the sores are spreading. I need to know what's wrong."[23]  Regardless of what the specialist found, Prisoner 7 still suffers and BOP is responsible for diagnosing, treating, and monitoring his serious medical need. Unlike many medical conditions, his skin affliction is readily visible to even a lay observer. He needs immediate care. Further, it is unacceptable to deny care simply because the patient is not at "the top of the list."

### 4. Prisoner 8

Prisoner 8 has a long history of knee problems which, in the past, required two surgical interventions. He still experiences significant, chronic pain. Beginning in the fall of 2006, he began asking to see an orthopedist. He waited over a year before seeing the orthopedic specialist in November 2007. After the visit, BOP refused to approve the medication prescribed by the specialist. Prisoner 8 continues to suffer even as he awaits a ruling on the government's motion to vacate his stay of execution.

### 5. Prisoner 4

Prisoner 4 has a history of retinal detachments and other serious eye problems, all of which were documented in his records from MCC-Chicago.  In a consultation notes dated February 8, 2006, Prisoner 4's eye care provider wrote that Prisoner 4 should have cataract surgery within 6 to 12 months. In July 2006, after arriving at the SCU, an optometrist likewise noted that Prisoner 4 should be considered for cataract surgery. Nothing happened. In March 2007, the same optometrist noted an advanced, hypermature cataract in Prisoner 4's left eye. Yet again, he wrote that Prisoner 4 needed an evaluation for cataract surgery by an ophthalmologist. Fifteen months passed before he finally saw an ophthalmologist in June 2008. According to Prisoner 4, the ophthalmologist recommended a consultation with a retinal specialist and that Prisoner 4 be cleared for cataract surgery. Given the state of his vision, per BOP guidelines, he is a candidate for surgery.[24]  It appears that Dr. Webster signed off on the ophthalmologist's consultation report.  Prisoner 4's optometrist recently told him that his cataract was getting worse and that the surgery could trigger another retinal detachment. Given the dangerously slow response time to medical emergencies at the SCU, Prisoner 4 is terrified that he will suffer a post-surgical retinal detachment in his cell with no one to seek emergency care on his behalf.

As noted above, the *Ortiz* litigation should serve to remind the Bureau that constitutionally acceptable health care requires the provision of prompt specialty

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[23] Central Office Administrative Remedy Appeal (BP-11) No. 475571-A1, March 4, 2008.

[24] BOP Ophthalmology Guidance (February 2008) at 5.

care. Mr. Ortiz will continue to vigorously litigate his deliberate indifference claims against the Clinical Director at USP-TH. A delay of six months before referral to a specialist may constitute deliberate indifference to a serious medical need. *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999). Mr. Ortiz waited five years, and others continue to wait. Failing to follow a specialist's sound recommendation may also constitute deliberate indifference. *Gil v. Reed*, 381 F.3d 649, 663 (7th Cir. 2004); *Jones*, 193 F.3d at 490.

I am told that multiple prisoners were recently sent off-site to see specialists. This is a welcome development and, I hope, the recommendations of the specialists will be heeded and prisoners will receive proper follow-up. Proactive medical care could have averted Mr. Ortiz's need to litigate. By this letter, I hope that we can work together to avoid the need for additional litigation.

### D.    Care for Prisoners with Diabetes

The American Diabetes Association (ADA) holds that "[p]eople with diabetes in correctional facilities should receive care that meets national standards."[25] Care at Terre Haute falls woefully and dangerously short of these standards. At least two SCU prisoners suffer from diabetes serious enough to jeopardize their daily wellbeing, organ function and, ultimately, their lives. Proper care for these prisoners includes frequent, routine monitoring of glucose and hemoglobin A1C levels, appropriate diet and exercise opportunities, and care for life-threatening complications such as hypertension, dyslipidemia, kidney disease, retinopathy, and neuropathy.[26] Failure to timely diagnose and treat these complications may cost a diabetic prisoner his eyesight, limbs, and kidney function. There are major deficiencies in the care provided to diabetic SCU prisoners.

#### 1. Failure to Provide a Medically Appropriate Diet

BOP inexplicably fails to provide a diabetic diet to prisoners with diabetes. Prisoner 1, for example, does not receive a diabetic diet even though his intake assessment, signed by the USP-TH Clinical Director, clearly calls for such a diet. For Prisoner 1 and other diabetics, the only alternative to the standard fare diet is to apply to receive the common fare diet, which is designed to accommodate the dietary needs of religious prisoners.

---

[25] American Diabetes Association, *Diabetes Management in Correctional Institutions*, 31 Diabetes Care S87, S87 (Jan. 2008).

[26] *Id.* at S87, S90.

14

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

Prisoners report that, in order to receive common fare, they must apply through the chaplain and answer a series of questions related to religion. It is unclear whether this diet is actually more appropriate for diabetic prisoners than the standard meals. It is well-established that proper nutrition is critical to the care of persons with diabetes,[27] and diabetic diets are commonplace in jails and prisons throughout the country. That BOP fails to provide such a diet is disturbing and incomprehensible, especially when BOP's own Patient Care Program Statement specifically authorizes medical staff to offer such diets if clinically indicated. Further, BOP's *Food Service Technical Reference Manual* clearly states that "[a] diabetic meal plan is indicated for any person with diabetes or documented glucose intolerance and for weight management."[28] Indeed, the *Manual* dedicates over 30 pages to the preparation of diabetic diets.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

In less secure settings, nutritional counseling and education may help prisoners select a proper diabetic diet from the choices available in the institution's cafeteria. But this approach is unworkable in secure units in which prisoners have few, if any, opportunities to select menu items.[29] Because SCU prisoners do not eat from the mainline, they are unable to self-select healthy options. Given this circumstance, the *Manual* requires the Bureau to provide a medically appropriate diet.[30] The repercussions of failing to do so may be life-threatening, as outlined below.

## 2. Poor Management of Prisoners with Diabetes – Glycemic Control

Prisoner 1 and Prisoner 2 are type-1 and type-2 diabetics, respectively. During their incarceration in the SCU, both have had "severely uncontrolled diabetes" as defined by BOP criteria.[31] Prior to mid-2007, health staff provided dangerously infrequent blood glucose monitoring. Prisoner 2's medical records indicate that, between February 2005 and May 2007, staff checked his blood glucose fewer than 50 times. The checks that did occur were hardly regular; rather, they occurred at seemingly random intervals, suggesting the lack of a treatment plan. In mid-2007, Bureau officials increased the frequency of blood glucose checks for SCU prisoners. This was a welcome and necessary step, and all parties involved are grateful.

---

[27] American Diabetes Association, *Standards of Medical Care in Diabetes, supra*, at S20-22.

[28] Food Service Technical Reference Manual TRM 4701.02 at 62.

[29] American Diabetes Association, *Diabetes Management in Correctional Institutions, supra*, at S89.

[30] Food Service Technical Reference Manual at 45.

[31] BOP Clinical Practice Guideline: Management of Diabetes (2008) at 10.

15

But increasing the frequency of checks, while a positive development, appears to have gone only so far in helping Prisoner 1, a type-1 diabetic, control his condition. Prisoner 1's blood sugar continues to reach levels in the 400s. During the course of his incarceration in the SCU, Prisoner 1 has had multiple life-threatening diabetic emergencies. Typical of such emergencies is the incident documented in his BOP medical file on December 17, 2006: "Inmate was found to be lying in his bed. Inmate is a known diabetic. Extremely diaphoretic. Was not alert or oriented but was moving about bed and moaning. Noted to have saliva pouring out of mouth. Blood sugar noted to be 34." Three weeks *before* this incident, the warden, in a BP-9 response, informed Prisoner 1 that he was "receiving proper medical treatment for the aforementioned [diabetic] issues."[32] And four weeks *after* the emergency, the Regional Director assured Prisoner 1 that health staff were "aware of your concerns and have been responsive to your requests."[33] Similarly, on October 26, 2007, Prisoner 1 was "found in his bed non-responsive with clonic/tonic movements systemically. the prisoner was extremely diaphoretic." Prisoner 1 was taken to an exam room and given intravenous fluids. Six minutes elapsed before he regained consciousness. Despite the graveness of this emergency,[34] the nurse felt that no follow-up medical care needed to be scheduled. Rather, health staff would follow-up only as needed. Prisoner 1 did not see a physician until November 7th.

Prisoners 1 and 2 report that their life-saving medications are delivered at inconsistent times. For proper control of diabetes, insulin delivery should be coordinated with meal service. The BOP's Clinical Practice Guideline unequivocally echoes this principle: "The consequences of insulin/food mismatch are, at best, suboptimal control of hyperglycemia; at worst, the result is frequent and potentially severe hypoglycemic episodes." The American Diabetes Association concurs: "[t]iming of meals and snacks must be coordinated with medication administration as needed to minimize the risk of hypoglycemia..." The Bureau has consistently flouted these bedrock principles of diabetic care. When prisoners seek redress, they are brushed off with bureaucratic indifference. Typical of the boilerplate responses received by prisoners is this example:

> FCC Terre Haute medical staff acknowledge that you may not have received your insulin injection at exactly the same time as normal on May 27, 28, 29, 30, and 31, 2007, however, you did receive the injection,

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[32] Response to Request for Administrative Remedy No. 430701-F1, dated November 27, 2006.

[33] Response to Regional Administrative Remedy Appeal No. 430701-R1, dated January 17, 2007.

[34] Altered mental status, diaphoresis, and seizures are symptoms of "severe hypoglycemia" which is a "medical emergency." American Diabetes Association, *Diabetes Management in Correctional Institutions, supra*, at S89.

Exhibit 3, Pg. 16

—

without suffering from any medical complications.[35]

Not only are the responses to the prisoners' BP-11s grossly inadequate, it should be noted that the responses were generally written six months or more after the underlying events occurred. A patient asking for the care to which he is entitled should not have to wait six months to receive a conclusive reply. Further, on multiple occasions, health services fails to provide even a boilerplate response to properlfdy submitted Informal Resolution requests (BP-8s). When unit staff admirably attempt to follow up on the prisoners' BP-8 requests, they are often met with the same response that the prisoners receive: silence.[36]

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

### 3. Improper Management of Diabetic Complications

It appears that Prisoner 2's diabetic complications are being neglected. Prisoner 2's attempts to be vigilant about his insulin have been met by apathy. In response to a BP-11 dated September 25, 2007, a BOP official acknowledged that Prisoner 2's laboratory results "remain at high levels."[37] However, a few sentences later, the official concludes that "[t]he record reflects you are receiving appropriate medical care and treatment for your diabetes condition." When Prisoner 2 raised similar concerns about his disease control a few months later, the same BOP official replied that these concerns had previously been addressed and that the Bureau would provide no further response.

Patients with diabetes are at increased risk of cardiovascular disease. Accordingly, the BOP Clinical Guideline asserts that "[l]ipid disorders should be managed aggressively in diabetic patients to reduce the risk of serious cardiovascular events." Although Prisoner 1's cholesterol levels have improved, his triglycerides remain unacceptably high. Prisoner 2 is in a similar situation. In a BP-10 dated June 19, 2007, Prisoner 2 cited the BOP Clinical Guideline and attached copies of laboratory results indicating triglyceride levels of 450 and 511 mg/dL (the BOP treatment goal for diabetics is 150 mg/dL or less) and HDL levels of 29 and 28 mg/dL (the BOP treatment goal for diabetics is 40 mg/dL or

---

[35] Request for Administrative Remedy (BP-9) No. 456291-A1. For nearly identical responses, see Nos. 455064-A1, 455068-A1, 455061-F1, 455070-A1, 456287-A1, 456290-A1, 456721-A1, and 456471-A2.

[36] For example, in a memorandum dated July 2, 2007 from the SCU Unit Counselor to Prisoner 1, the Counselor writes "This memorandum is in reference to the informal resolution that you filed in reference to the Health Services Department concerning your diabetes. The Health Services Department was contacted in reference to this issue and asked to assist me with providing you with a response in an effort to informally resolve this matter. They failed to reply to my requests timely."

[37] Response to Central Office Administrative Remedy Appeal No. 453503-A1, dated September 25, 2007.

17

greater).[38] Notwithstanding that Prisoner 2's lipid levels were dangerously out of line with BOP's Clinical Practice Guideline, the Regional Director replied that "[w]e have reviewed the documentation related to your appeal. We have determined the HSD staff members are aware of your medical status. They are providing ongoing assessment and treatment per the BOP's Patient Care Policy, Program Statement 6031.01, and the BOP's Clinical Practice Guidelines for Diabetes."[39] Within a few months of that response, Prisoner 2 suffered a serious cardiovascular event that could have cost him his life.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Prisoner 2 also suffers from a diabetic-related retinopathy, an eye condition that, according to the Clinical Guideline, "can lead to retinal detachment and irreversible vision loss." It is unclear whether Prisoner 2's vision has already suffered irreparable damage. Regardless of the harm already done, he requires medical intervention by specialists to treat this serious and potentially disabling condition.

Further, it is well-established that diabetic patients are prone to kidney disease. Prisoner 1's lab results, dated January 29, 2008, show a significantly elevated blood creatinine level. These results appear to be initialed and acknowledged by the FCC-TH Clinical Director. Prisoner 1 must be monitored for possible chronic kidney disease.

BOP has been on notice of the grave deficiencies in its care of diabetic SCU prisoners for some time. My office expressed serious concerns to you directly last year, as have other counsel. I urge you to take immediate steps to improve care before a diabetic emergency or complication proves fatal.

### E.    Medications

SCU prisoners seeking effective, clinically appropriate medications face an uphill battle. Indeed, clinical staff seem to expend more effort denying medications than they do prescribing and dispensing them. The medications sought by SCU prisoners are not "lifestyle" drugs or medically optional. Rather, they are important treatments for serious medical conditions.

1. Prisoner 7

Prisoner 7 has a documented history of stomach ulcers and related

---

[38] Regional Administrative Remedy Appeal (BP-10) No. 452452-R1. BOP's lipid goals for diabetics are set forth in the BOP Clinical Practice Guideline: Management of Diabetes (2008) at 36.

[39] Response to Regional Administrative Remedy Appeal No. 452452-R1 dated July 23, 2007.

18

problems dating back at least eight years. His BOP medical records indicate a
diagnosis of gastroesophageal reflux disease (GERD) as early as October 18,-
2006. When untreated, he vomits up his food, experiences acid reflux, and passes
bloody stools. Although BOP's Clinical Practice Guideline emphasizes the value
of upper endoscopy and other diagnostic tests, Prisoner 7 has never received these
procedures. Instead, medical staff has subjected him to extended medication
outages and the arbitrary discontinuation of treatment with omeprazole, a
medication that provides relief of Prisoner 7's symptoms. At times, they have
refused to prescribe omeprazole and, instead, prescribed ranitidine – a medication
that has been ineffective for Prisoner 7's condition. At other times, staff has
instructed him that he must purchase his omeprazole from the commissary (at a
cost of over $17.00 per box).

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

        As an initial matter, knowingly continuing to treat Prisoner 7 with an
ineffective medication states an Eighth Amendment claim for deliberate
indifference to a serious medical need. On two occasions, the Seventh Circuit has
addressed this very issue. In *Greeno v. Daley*, 414 F.3d 645 (7th Cir. 2005), the
court reversed the dismissal of claims against a defendant who had failed to
prescribe omeprazole and, instead, continued the prisoner-patient on an
ineffective course of treatment. In *McCarty v. Pitzer*, No. 96-2301, 1997 WL
2225869 (7th Cir. April 20, 1997), the court allowed claims to proceed when a
prison doctor insisted on prescribing ranitidine instead of omeprazole when the
former had proven ineffective and no justification for the substitution had been
offered.

        Second, Program Statement P6541.02 (Over-the-Counter Medications)
authorizes medical staff to refer prisoners to the commissary to purchase over-the-
counter medications "in response to complaints related to cosmetic and general
hygiene issues or symptoms of minor medical ailments." Prisoner 7's
documented history of gastrointestinal disease is hardly a matter of cosmetics,
general hygiene, or a minor medical ailment. And, while it is true that the
Bureau's National Formulary (2007) and the Clinical Guideline for the treatment
of GERD place certain conditions on the prescription of omeprazole, it appears
that Prisoner 7 satisfies the conditions and should be eligible to receive this vital
medication by prescription.

        2. Prisoner 2

        Prisoner 2, discussed above, was discharged from a local hospital in
February 2008 after suffering a cardiac emergency. He reports that he waited five
days before receiving the first dose of a critical medication prescribed by the
hospital cardiologist. My office will be looking at Prisoner 2's records to
determine the risk at which he was placed by this inexplicable delay. It should

19

also be noted that he received little if any physician follow up upon returning to the SCU, and that he was denied a diabetic diet.

### 3. Prisoner 8

Prisoner 8 saw an orthopedic specialist for chronic, excruciating knee pain. Prisoner 8 has a history of not tolerating several standard pain medications, which cause him gastrointestinal bleeding, vomiting, diarrhea, and abdominal cramps. Given this history, the specialist prescribed the pain medication Celebrex. After a substantial delay, medical staff refused to grant non-formulary approval for this medication. While it is true that Celebrex is a non-formulary drug,[40] this fact does not absolve BOP from its obligation to provide proper pain relief to Prisoner 8. Whether with Celebrex or a suitable substitute, Prisoner 8 has the constitutional right to receive safe and effective treatment for his serious knee pain. He continues to suffer as a result of BOP's conduct.

### F.    Infectious Disease, Preventive Health Care, and Documentation

The failure to identify, treat, and prevent infectious diseases creates needless suffering for individual prisoner-patients and substantial dangers for staff and the entire prison population.

#### 1. Management of a MRSA Case

Prisoner 7's medical records indicate a diagnosis of methicillin-resistant *staphylococcus aureus* (MRSA) based on laboratory tests performed on January 3, 2008 and reported five days later. However, nobody informed him of the results – and treatment was not started – until early February. Aside from any prejudice to Prisoner 7's health, a four-week delay in treating an infectious disease puts other prisoners at risk.

#### 2. Preventive Health Care

This disregard for basic principles of public health extends to the institution's gross failure to implement the vaccination protocols mandated by the Bureau's own policies.[41] In a recent Department of Justice Inspector General's report, auditors reviewed compliance with various health care-related performance measures by institutions. USP-TH performed poorly in several

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[40] BOP Health Services National Formulary (2007) at 21.

[41] Vaccination protocols are set forth in the BOP Preventive Health Care Clinical Practice Guidelines (April 2007).

20

areas, but the most serious deficiencies were found to be in the institution's vaccination program. Only *one percent* of eligible prisoners had received a measles/mumps/rubella vaccine, only *forty percent* had received a tetanus vaccine within the past ten years, and only *forty-eight percent* of eligible prisoners had received vaccination against hepatitis A. Nine percent of prisoners had not received hepatitis B testing or vaccination and fourteen percent had not received an annual influenza vaccine.[42]

Compliance with several other measures of preventive health care performance was equally poor. Only *eighteen percent* of prisoners had received a cardiovascular risk calculation in the last five years. Given the significant number of SCU prisoners with risk factors for cardiovascular disease, it is likely that prisoners will suffer death or injury before health staff assess their risk and take prophylactic measures. Similarly, only *thirty-six percent* of prisoners had received a current body mass index calculation. A full twenty percent had not received a fecal occult blood test, which is used to screen for colorectal cancer and other serious diseases. And twenty-two percent had not received a hearing screening test – an unfortunate statistic given the level of noise to which SCU prisoners are subject (see Section IV, below).

When asked why vaccination rates were so low, USP-TH health staff responded that "they did not provide routine tests and vaccines because of staffing inadequacies and scheduling constraints."[43] This response is no more acceptable than the underlying gross failure to provide vaccines and other preventative health care.

### 3. Non-Compliance with BOP Documentation Protocols

Finally, it appears that USP-TH health services staff fail to document key health care data as specifically required by BOP policy. The Bureau requires that the institutional Health Services Administrator (HSA) prepare quarterly reports "to help monitor the health care services provided."[44] Among other things, in her quarterly report, the HSA must document (1) the use of health care services by category; (2) referrals to specialists; (3) the number of medication, laboratory, and radiology orders filled; (4) hospital admissions; and (5) serious injuries, illnesses, deaths, or offsite transports. On May 19, 2008, my office submitted a Freedom of Information Act request asking for copies of these quarterly reports. On August 25, 2008, BOP Regional Counsel informed me that "[i]nstitution staff conducted a

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[42] U.S. Department of Justice Office of the Inspector General, Audit Division, *The Federal Bureau of Prison's Efforts to Manage Inmate Health Care,* Audit Report 08-08 (February 2008) at 93-94.

[43] *Id.* at 31.

[44] Program Statement P6010.02 (Health Services Administration) § 7(b).

thorough search for the records responsive to your request." However, institution staff were unable to locate any of the quarterly reports required by BOP policy. Similarly, BOP requires the HSA to "maintain a Consultant Log Book reflecting times and dates of all consultant visits."[45] No such log book could be found in response to my FOIA request. Given the seriousness of the deficiencies found in medical care at USP-TH, the absence of these documents is alarming.

## II.    Failure to Provide Mental Health Care

Prisoners uniformly report that they lack meaningful access to even the most basic level of mental health care. Evaluations are cursory, programming is unavailable, and the Complex lacks an on-site psychiatrist. Treatment of mentally ill prisoners is minimal.

### 1. Lack of Meaningful Evaluation

A mental health care provider tours the unit periodically, accompanied by security staff. The provider stops at each cell and, through the cell door, asks the prisoner if he is doing okay. Quite literally, prisoners are asked if they are "all right" and the "clinical" encounter ends just seconds after it began. Frequently, these conversations occur within listening distance of security staff and other prisoners, making confidential communication impossible. Prisoners express serious concerns about whether these conversations could be used as evidence in their post-conviction proceedings and, understandably, are extremely hesitant to participate. Even if they chose to participate, the value of a "drive-by" mental health consult would be limited. Minute-long cell-front consultations do not satisfy the Bureau's legal duty to provide mental health care to prisoners. Further, the notes written by clinical staff are often boilerplate, even when the subject is a prisoner with serious, documented mental illness. In one instance, it appears that a prisoner's periodic mental health evaluation was based on observations made while the prisoner was having his teeth cleaned. Based on this observation, the Ph.D. psychologist concluded that the prisoner "does not appear to be a danger to self or others at this time."

### 2. Insufficient Staffing and Treatment

Prisoners who receive care beyond these cursory screenings are seen by a provider in Springfield, Missouri via a tele-psychiatry consult. It is my understanding that these consultations are solely for the purpose of prescribing psychotropic medications. Putting aside the question of whether a condemned prisoner's mental health needs can be adequately met by an unfamiliar provider

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

---

[45] Program Statement P6010.02 (Health Services Administration) § 7(j).

22

located hundreds of miles away, the therapeutic value of these interactions is questionable. It appears that prisoners do not receive psychotherapy or counseling of any sort, and it is unclear whether prisoners receive the kind of medication monitoring that should accompany all courses of psychotropic medications. Further, prisoners report that there is no on-site psychiatrist at FCC-TH, despite a population of approximately 3,500 prisoners. The Seventh Circuit has characterized the lack of an on-site psychiatrist as a "serious system deficiency" contributing to a finding of deliberate indifference to a serious medical need. *Wellman v. Faulkner,* 715 F.2d 269, 272-73 (7th Cir. 1983). Indeed, so little mental health care is provided that a systemic evaluation is difficult. The Bureau's own policy speaks of "an overall effective, integrated mental health program for the institution."[46] Nothing of the sort exists for prisoners confined in the SCU, many of whom require both acute and chronic psychiatric care.

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

### 3. Prisoner 9

Prisoner 9 suffers from severe, debilitating mental illness. Both his counsel and fellow prisoners paint a sad portrait of his symptoms. He rarely leaves his cell and, when he does, he frequently dresses in just his underwear. He showers only when forced to do so by staff. His cell is filthy; he urinates in the corners and ejaculates on the walls, often without regard as to who may be watching. His pathology is evident to even the most casual observer; he screams at the television and will stare at a blank screen, listening to the static. He has attacked a microwave oven with a broom and complains of implanted devices controlling his thoughts and actions. In July 2006, for several days in a row, Prisoner 9 jettisoned urine and feces from his cell, believing that BOP had rendered his toilet inoperable. Recently, he flooded his cell for no apparent reason. But more shocking than his behavior is the Bureau's response. Counsel for Prisoner 9 informs me that, in her client's nearly nine years at USP-TH, he has received no meaningful mental health treatment.

### 4. Prisoner 10

Equally disturbing as the BOP's failures to treat mental illness are the lengths to which the Bureau has gone to affirmatively prevent prisoners from receiving adequate mental health care. Multiple SCU prisoners report that BOP staff discontinued their psychotropic medications upon arrival at USP-TH. This is a dangerous practice.

---

[46] Program Statement 5310.12 (Psychology Services Manual) § 3.2(A). It should be noted that this document is dated August 30, 1993 and references American Correctional Association Standards that have since been superseded.

Prisoner 10 has a long history of symptoms of mental illness. In the past, a regimen of psychotropic medications helped Prisoner 10 keep his symptoms under control. However, it appears that BOP abruptly discontinued these medications after he arrived at USP-TH. On February 14, 2007, Prisoner 10 filed papers dropping his *habeas* proceedings and volunteering for execution. Among his reasons for doing so, Prisoner 10 cited BOP's denial of mental health treatment. Prisoner 10's volunteering for execution should have, at a minimum, alerted Bureau staff that he needed psychiatric assessment and treatment. Instead, the Bureau focused its resources on opposing a motion by his counsel seeking treatment for their client. Prisoner 10 withdrew his motion to be executed but the court denied the motion for psychiatric treatment, and he continues to suffer needlessly.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

5. Increased Attention Is Needed to the Mental Health Needs of Condemned Prisoners

As the former warden at USP-TH, I am sure that you have a keen appreciation for the special mental health issues confronted by prisoners awaiting execution. These men are locked down in supermax-style cells for most of the day. Hundreds or thousands of miles separate them from their families and attorneys. Many may have organic brain disorders, histories of substance abuse and trauma, and suffer from serious (and often poorly treated) medical conditions. Some of these men arrived with diagnosed mental disorders and had their treatment plans abruptly interrupted and discontinued. Others may have developed disorders while incarcerated. And all must cope with the nagging, chronic stress of awaiting their trip to the death chamber.[47]

In 1972, the California Supreme Court noted that "Penologists and medical experts agree that the process of carrying out a verdict of death is often so degrading and brutalizing to the human spirit as to constitute psychological torture."[48] And psychologists have recognized that "...the incidence of

___

[47] *See* American Bar Association, *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (rev. ed. 2003), 31 Hofstra L. Rev. 913, 1082 (2003) ("Even if their executions have been safely stayed, however, the mental condition of many capital clients will deteriorate the longer they remain on death row. This may result in suicidal tendencies and/or impairments in realistic perception and rational decisionmaking."). *See also* Mark E. Olive & Russell Stetler, *Using the Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases to Change the Picture in Post-Conviction*, 36 Hofstra L. Rev. 1067, 1086 (2008) ("conditions of confinement on death row often exacerbate preexisting disorders or give rise to new ones.")

[48] *People v. Anderson*, 493 P.2d 880, 894 (Cal. 1972) *recognized as superseded by state constitutional amendment*, *People v. Hill*, 3 Cal.4th 959, 1017 (1992).

Exhibit 3, Pg. 24

psychological symptoms and mental health problems among death row inmates calls for comprehensive mental health services. Effective treatment of psychological symptoms and disorders among death row inmates is not only humane, but likely to facilitate institutional management and reduce disciplinary misconduct."[49]

As the Bureau's Clinical Guideline points out, simple screening methods have a high sensitivity for detecting depressive disorders.[50] And there are myriad cost-effective treatment options available to clinicians for depression and other mental disorders suffered by SCU prisoners. There is no defensible reason why any prisoner in need of mental health care should go untreated.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

## III.   Dental Care

Dental care for SCU prisoners is grossly and dangerously deficient. SCU prisoners wait and wait in considerable pain while their requests for care are routinely ignored. Care is so poor that some prisoners have chosen to have all of their teeth extracted rather than suffer any further.[51]

### 1. An Ongoing Lack of Staffing and Resources

In an Inmate Request to Staff dated February 12, 2008, a SCU prisoner inquired about the waiting time to receive routine dental care. He was told that *there were 281 prisoners ahead of him on the routine care waiting list.* He was further told that he could expect to wait *a minimum of 13 months* before being seen and that only *3 hours of dentist time* per week were set aside for SCU prisoners. And, most shockingly, only *one dentist provided routine care to the approximately 4,000 inmates at the FCC at the time.* The same prisoner asked the same questions of the warden. A month later, he was told that nothing had changed since the original response.[52] The same prisoner brought these numbers to the attention of the Regional Office. In a stunning example of bureaucratic indifference, he received this response: "Although we respect your concerns, we have determined the FCC Terre Haute Dental Department operates in accordance with the BOP's Program Statement 6400.02, Dental Services. Sick call is the

---

[49] Mark D. Cunningham & Mark P. Vigen, *Death Row Inmate Characteristics, Adjustment, & Confinement: A Critical Review of the Literature*, 20 Behav. Sci. & L. 191, 207 (2002).

[50] BOP Clinical Practice Guidelines: Management of Major Depressive Disorder (2001) at 9.

[51] However, even this "solution" fails to guarantee a dentally adequate outcome. After waiting over a year to have his remaining teeth pulled, Prisoner 2 received a pair of dentures that do not fit his mouth. He now is unable to eat with his dentures.

[52] Response by Warden Marberry to Inmate Request to Staff Member dated March 11, 2008.

25

appropriate avenue to advise staff of symptomatic concerns with your teeth and gums. The subsequent assessment will guide your course of dental care."[53]

These statistics are startling and suggest that problems with dental care are endemic to the entire FCC. They should have triggered an urgent response by the Bureau. Instead, nothing was done. As openly acknowledged by BOP administrators, the dental department at USP-TH remains understaffed.[54]

## 2. Long Delays and Limited Care

The lack of access to routine care is particularly troublesome given the institution's emergency dental care policy. Prisoners report that, should they require a filling before their turn on the routine care list, they receive only a temporary filling, which is subject to crumbling.[55] Further, during emergency care visits, prisoners report that the dentist will treat only one tooth at a time, even if multiple teeth require attention.

Prisoners further report that generally, when they finally do get to see the dentist, extraction is the only treatment offered. This restriction, even if exceptions are occasionally made, is at odds with BOP policy, which authorizes a wider array of treatment options.[56]

Even simple extractions are handled poorly. After approximately six weeks of pain, Prisoner 7 finally saw the dentist, who extracted the wrong tooth. Fifteen minutes later, he was returned to the dentist and the correct tooth was pulled. Subsequently, he developed an abscess. Three weeks passed before he was seen for this serious medical condition. Such a three-week delay may constitute deliberate indifference to a serious medical need. *Fields v. Gander*, 734 F.2d 1313, 1314 (8th Cir. 1984) (three-week delay before treating painful dental condition). His abscess returned in January 2008 and, once again, his pleas for care were ignored even though the pain kept him awake at night. Prisoner 7 continues to have significant dental problems and inadequate treatment. His "cop-outs" continue to elicit silence from dental staff.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[53] Response to Regional Administrative Remedy Appeal No. 487816-R1, dated May 27, 2008.

[54] Response to Central Office Administrative Remedy Appeal No. 487816-A, dated July 17, 2008.

[55] This policy is confirmed in the former warden's July 28, 2006 response to Prisoner 7's Request for Administrative Remedy (BP-9) No. 418950-F1.

[56] Program Statement P6400.02 (Dental Services) § 8(d).

### 3. Dental Care for Patients with Special Needs

Dental care for prisoners with diabetes is poor. The Bureau's Clinical Guideline aptly recognizes the special dental needs of diabetic patients. Diabetics are subject to "an increase in the incidence and severity of dental caries, gingival inflammation, periodontal abscesses, and chronic periodontal disease."[57] Yet diabetic Prisoners 1 and 2 continue to receive substandard care that not only causes them pain and impairment, but also increases their risk of serious health consequences. Prisoner 2 has had all of his teeth pulled. However, his dentures do not fit properly and he cannot eat with them in place. Failure to provide Prisoner 2 with a soft diet or other relief until new dentures are fitted may constitute an Eighth Amendment violation. *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989).

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Until a few weeks ago, Prisoner 1 had only six teeth left in his mouth, making it difficult to eat the few foods he receives that are appropriate for a diabetic patient. His remaining teeth were loose and painful and he had requested that the remaining teeth be extracted and that he be fitted with dentures. His multiple requests and efforts at informal remedies were routinely met with boilerplate and often contradictory responses. For example, on August 21, 2007, Prisoner 1 wrote to Dr. Cooper, a dentist, complaining of dental pain. In response, he was told "[f]or dental pain sign up for dental sick call with the nurse."[58] Despite the inappropriateness of this response, Prisoner 1 complied and submitted a dental sick call request. Sixteen days later, he submitted a second request. Seventeen days later, he submitted a third request, emphasizing that "I have severe pain from my teeth when I eat and when I brush..." Finally, fifteen days after his third request, Prisoner 1 was seen by a hygienist who did nothing to address Prisoner 1's pain other than to tell him that "if he has any pain or problems to fill out [a] sick call slip."

Prisoner 1 made every effort to follow the instructions of BOP staff. In a letter to Prisoner 1's counsel, Warden Marberry advised that he must submit a sick call request if he has additional pain issues.[59] Prisoner 1 complied. But, once again, his efforts were ignored. He submitted three sick call requests over seventeen days before being seen by the dentist.

It is my understanding that Prisoner 1 has finally had his remaining teeth pulled in June or July of this year. Accordingly, it is imperative that he receive

---

[57] BOP Clinical Practice Guideline: Management of Diabetes (2008) at 24.

[58] Inmate Request to Staff dated August 31, 2007.

[59] Letter to David C. Hemingway, Esq. from Warden H.J. Marberry, May 15, 2008.

Exhibit 3, Pg. 27

dentures as soon as possible as he has no teeth with which to chew his food. Prisoner 1 has already filed a BP-9 on this issue. The warden's boilerplate response glaringly failed to address Prisoner 1's urgent needs: "You are currently on the list to be evaluated for dentures. If you are in pain caused by your teeth, submit a sick call request for dental during sick call rounds."[60]  However, as Prisoner 1 aptly points out, "[j]ust because my name may be on some list for dentures [] does not address the emergency situation created because of my immediate need…"[61]  Failure to provide dentures to a prisoner having difficulty eating may constitute deliberate indifference to a serious medical need. *Wynn v. Southward*, 251 F.3d 588, 593-94 (7th Cir. 2001).

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Dental care at USP-TH is in crisis. The Bureau has allowed months to pass with no effort to remedy the lack of staff, intolerable waits, and the excruciating pain endured by many prisoners. Immediate action is necessary.

## IV.    Noise

Prisoners continue to report extreme, unbearable noise at all hours of day and night. Prisoner 10 cited "constant bombardment" with "incessant noise and pounding" as a reason for dropping his *habeas* petition and volunteering for execution.[62]  Noise emanates from two sources. First, since the SCU sits atop the SHU, the constant screaming, banging, and pounding of prisoners in the SHU is easily audible in the SCU.  Second, prisoners report frequent fire alarms. While some number of fire alarms is to be expected, prisoners report several deafening fire alarms each week that last between 10 and 90 minutes with the strobe light lasting even longer. The alarm is deafening and the flashing strobe light causes significant psychological distress. The alarms are so loud that correctional officers wear over-the-ear hearing protection, suggesting that the frequency and volume of the alarms may place prisoners at risk of irreversible hearing loss. One prisoner reports that he was given yellow ear plugs, but these were insufficient. As a result of the constant alarms, screaming, and banging, prisoners are sleep deprived, unable to get a healthy night's sleep, and suffer daytime fatigue.

The American Correctional Association has issued a standard concerning daytime and nighttime noise levels in housing units.[63]  At a very minimum, BOP

---

[60] Response to Request for Administrative Remedy No. 498862-F1, dated August 11, 2008.

[61] Regional Administrative Remedy Appeal No. 498862, dated August 14, 2008.

[62] This motion was subsequently withdrawn.

[63] "Noise levels in inmate housing units do not exceed 70 dBA (A Scale) in daytime and 45 dBA (A Scale) at night."  American Correctional Association, *Standards for Adult Correctional Institutions* § 4-4150 (4th ed. 2003).

28

should ensure compliance with this standard. Seventh Circuit case law holds that complaints of excessive noise state a claim under the Eighth Amendment. *Antonelli v. Sheahan*, 81 F.3d 1422, 1433 (7th Cir. 1996) (nightly noise interrupted and prevented prisoner from sleeping); *Lucien v. Peters*, No. 95-2778, 1997 WL 58812, at *1-2 (7th Cir. Dec. 17, 1996). Sadly, given the paucity of medical and mental health care available to prisoners, it is likely that any physical or psychological harm resulting from the noise will go undiagnosed and/or untreated. However, as the Seventh Circuit noted, incessant noise "may cause agony" and "the state is not free to inflict such pains without cause just so long as it is careful to leave no marks." *Williams v. Boles*, 841 F.2d 181, 183 (7th Cir. 1988).

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

\* \* \*

The above examples are not isolated incidents. Rather, they represent a pattern of deliberate indifference to serious medical needs, including dental and mental health needs. The Seventh Circuit holds that plaintiffs may demonstrate deliberate indifference by *either* showing "'repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff'" *or* by "'proving there are such systemic and gross deficiencies in staffing, facilities, equipment or procedures that the inmate population is effectively denied access to adequate medical care.'" *Wellman*, 715 F.2d at 272 (quoting *Ramos v. Lamm,* 639 F.2d 559, 575 (10th Cir. 1980)). The Bureau's failure to provide adequate medical care to SCU prisoners satisfies both tests. BOP has been on notice of this pattern for some time. Rather than working to resolve these concerns, the Bureau seems to have chosen a course of willful blindness. The problems with medical, mental health, and dental care at USP-TH are patent. Yet despite the obviousness of these deficiencies, BOP continues to ignore "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

While all prisoners are entitled to the rights guaranteed by the United States Constitution, death row prisoners have unique needs, many of which are outlined in this letter. Proper correctional leadership demands sensitivity to these special needs and circumstances. Based on my investigation, such leadership is currently lacking. Indeed, one of the men in the SCU recently related that some USP-TH and SCU staff members, including high-ranking officials, were completely unaware of the government's pending efforts to proceed with the executions of six prisoners. However, it is not the responsibility of SCU staff to monitor the court dockets of the prisoners in their charge. Rather, ultimate responsibility for the health and well-being of SCU prisoners lies with those BOP

29

officials empowered with the statutory duty,[64] oversight authority, technical expertise, and leadership ability to effect real, meaningful change. Responsibility for addressing the concerns raised in this letter should not rest with unit staff or even the warden; your direct involvement is both requested and required.

I suspect that the serious deficiencies in medical, mental health, and dental care may extend beyond the SCU to other components of the FCC. But the express purpose of this letter is to yet again alert you to the plight of the federally death-sentenced prisoners in the SCU. These men will continue to suffer needlessly until you make substantial, immediate changes to the quantity and quality of health services provided to SCU prisoners. The concerns raised in this letter are neither minor nor abstract; rather, they speak to fundamental issues of human dignity.

My office – and all other concerned parties – sincerely hope that we can work together to ensure that the condemned prisoners in your charge receive the care constitutionally guaranteed to them. We look forward to your response.

<div style="margin-left:40%">
Very truly yours,

Gabriel B. Eber
</div>

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Enclosures

---

[64] 18 U.S.C. § 4042(a).

30